IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES F. MACKEY, JR.,<br><br>        Plaintiff,<br><br>v.<br><br>Town of Tewksbury, Town of Tewksbury Police Department, Chief of Police Timothy Sheehan, Officer Michael McLaughlin, Officer Markus McMahon, Sergeant Brian Warren, Detective Patrick Connor, Officer David Duffy, Officer James Ryser, Officer Daniel Kerber, Officer Eric Hanley, Detective Peter Regan, Sergeant Timothy Kelly, Sergeant Chris Coviello, Detective Andrew Richardson, Officer Albert Piccolo, Officer Kimberly O'Keefe, Lieutenant Scott Gaynor, Detective Michael Donovan, Lieutenant Robert Stephens, Officer James Griffin, Officer Paul Nicosia, Officer David Miano, Sergeant Walther Jop, III, Officer James Hollis, Officer Jason McNamara, Officer Robert Bjorkgren, Officer Robert Field and Officer Alysia Russo,<br><br>        Defendants. | Civil Action No. 15-CV-12173<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff James F. Mackey, Jr. ("Mr. Mackey" or "Plaintiff") complains against the named Defendants as follows:

## INTRODUCTION

1.      This is an action brought against the Town of Tewksbury ("the Town"), the

Tewksbury Police Department ("TPD") and a group of individual Tewksbury police officers

based on their continued violation of Mr. Mackey's Constitutional and common law rights over

the course of several years.  Specifically, Tewksbury Police Chief Timothy Sheehan and at least

26 police officers in their respective individual capacities, conspired to subject Mr. Mackey to

years of harassment in the form of the issuance of repeated, baseless criminal complaints,

summonses, and search and arrest warrants against Mr. Mackey, one of which resulted in Mr.

Mackey's unlawful arrest and detention.  This harassment resulted in at least 19 different

criminal applications and/or charges being filed against Mr. Mackey, *all of which were*

*ultimately dismissed by the Lowell District Court*.  The shocking conduct of the TPD was,

without limitation, in retaliation for Mr. Mackey having filed a written complaint with the

Massachusetts Attorney General's Office which was critical of the TPD.

2.      The various forms of criminal process that the TPD initiated against Mr. Mackey

were based on alleged violations of a restraining order made by Mr. Mackey's now ex-wife, Lisa

Mackey ("Ms. Mackey").  The TPD repeatedly initiated criminal process against Mr. Mackey

without performing any investigation into or corroboration of Ms. Mackey's allegations and with

full knowledge that Ms. Mackey had repeatedly provided false police reports to the TPD

concerning Mr. Mackey.

3.      The TPD's actions were not made in good faith and were motivated solely by a

desire to persecute Mr. Mackey and punish him for exercising his Constitutional right to express

his dissatisfaction with the TPD.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343(3), this action being an action seeking redress for violation or Mr. Mackey's constitutional and civil rights. Plaintiff invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case and controversy. Plaintiff demands a trial by jury on each and every one of his claims.

5.     Venue in the District of Massachusetts is appropriate pursuant to 28 U.S.C. § 1391(b), as Massachusetts is the judicial district in which all of the events giving rise to this claim occurred and in which, upon information and belief, all of the defendants either reside or conduct business.

## PARTIES

6.     Plaintiff James F. Mackey, Jr. ("Mr. Mackey") is an individual who resides in Tewksbury, Middlesex County, Massachusetts.

7.     Defendant Town of Tewksbury ("the Town") is a municipal entity duly organized and chartered under the laws of the Commonwealth of Massachusetts, with its principle place of business at 1009 Main Street, Tewksbury, Middlesex County, Massachusetts.

8.     Defendant Town of Tewksbury Police Department ("TPD") is a municipal government entity duly created and organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 918 Main Street, Tewksbury, Middlesex County, Massachusetts.

9.     Defendant Timothy Sheehan is the Chief ("Chief Sheehan") of the TPD and is sued in his individual and official capacity.  Chief Sheehan is a resident of the Commonwealth of

3

Massachusetts and was at all pertinent times a duly sworn police officer and the Tewksbury Chief of Police.

10. Defendant Officer Michael McLaughlin ("Officer McLaughlin"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

11. Defendant Officer Markus McMahon ("Officer McMahon"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

12. Defendant Sergeant Brian Warren ("Sergeant Warren"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

13. Defendant Detective Patrick Connor ("Detective Connor"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

14. Defendant Officer David Duffy ("Officer Duffy"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

15. Defendant Officer James Ryser ("Officer Ryser"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

16. Defendant Officer Daniel Kerber ("Officer Kerber"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

4

17.    Defendant Officer Eric Hanley ("Officer Hanley"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

18.    Defendant Detective Peter Regan ("Detective Regan"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

19.    Defendant Sergeant Timothy Kelly ("Sergeant Kelly"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

20.    Defendant Sergeant Chris Coviello ("Sergeant Coviello"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

21.    Defendant Detective Andrew Richardson ("Detective Richardson"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

22.    Defendant Officer Albert Piccolo ("Officer Piccolo"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

23.    Defendant Officer Kimberly O'Keefe ("Officer O'Keefe"), who is sued in her individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

24. Defendant Lieutenant Scott Gaynor ("Lieutenant Gaynor"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

25. Defendant Detective Michael Donovan ("Detective Donovan"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

26. Defendant Lieutenant Robert Stephens ("Lieutenant Stephens"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

27. Defendant Officer James Griffin ("Officer Griffin"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

28. Defendant Officer Paul Nicosia ("Officer Nicosia"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

29. Defendant Officer David Miano ("Officer Miano"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

30. Defendant Sergeant Walther Jop, III ("Sergeant Jop"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

31. Defendant Officer James Hollis ("Officer Hollis"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

32. Defendant Officer Jason McNamara ("Officer McNamara"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

33. Defendant Officer Robert Bjorkgren ("Officer Bjorkgren"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

34. Defendant Officer Robert Field ("Officer Field"), who is sued in his individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

35. Defendant Officer Alysia Russo ("Officer Russo"), who is sued in her individual and official capacity, is a resident of the Commonwealth of Massachusetts and was at all pertinent times a duly sworn police officer of the TPD.

**FACTS APPLICABLE TO ALL COUNTS**

36. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

37. At all relevant times, the Town was the employer of each individual defendant.

38. At all relevant times hereto, Defendant Timothy Sheehan, as Chief of Police, exercised authority over the TPD and its officers and was a maker of policy as to standards of conduct and discipline within the TPD. Chief Sheehan had the power to discipline, including the power to effectively recommend dismissal of officers, and the power, authority and duty to hold

officers accountable for any use of excessive, abusive or unjustified police power and for misstatements of fact in official reports.

39.     At all pertinent times hereto, each individual defendant acted under color of law in his or her capacity as a police officer and/or policy maker of the Town and pursuant to the statutes, ordinances, regulations, polices, customs, practices, and usage of the Commonwealth of Massachusetts and/or the Town.

40.     Each of the above named Defendants are specifically identified and/or mentioned in police reports and/or police records as active participants in the incidents described herein.

### I.     Mr. Mackey is Violently Beaten While Lawfully Bow Hunting in Tewksbury.

41.     On or about November 6, 2010, Mr. Mackey was lawfully bow hunting on public property in Tewksbury in the woods behind Tewksbury State Hospital.

42.     On that date, two anti-hunters, James D. O'Brien ("O'Brien") and John W. Buckley ("Buckley"), tracked down and confronted Mr. Mackey by questioning his right to bow hunt in the area.

43.     O'Brien told Mr. Mackey that he was an off duty Malden Police Officer and demanded that Mr. Mackey produce his hunting license.  Mr. Mackey refused to produce his hunting license, and O'Brien and Buckley began to verbally threaten Mr. Mackey.

44.     Feeling threatened, Mr. Mackey called 911.  Suddenly and without provocation, O'Brien and Buckley attacked Mr. Mackey, violently punching and kicking him.

45.     Tewksbury Police Sergeant Thomas M. Cooke ("Sergeant Cooke"), along with Officer George Lozado, were the first officers to respond to Mr. Mackey's 911 call.

46.     Despite the obvious one sided attack and brutal beating of Mr. Mackey, Sergeant Cooke failed to arrest either O'Brien or Buckley and let them walk away from the scene after

finding out O'Brien was an off duty police officer. Meanwhile, Mr. Mackey was taken away in an ambulance in order to receive treatment for his injuries.

47. After returning to the station, Sergeant Cooke's investigation confirmed that bow hunting was legal in the area of the incident and that Mr. Mackey did have a valid hunting license.

48. The entire incident, including the violent beating of Mr. Mackey, was recorded on Mr. Mackey's 911 call and clearly supported charges against O'Brien and Buckley for beating Mr. Mackey.

49. On November 8, 2010, despite all of the evidence, and relying solely on the self-serving statements of O'Brien and Buckley, Sergeant Cooke shockingly charged the victim of the beating, Mr. Mackey, with two (2) counts of Assault and Battery with a Dangerous Weapon in addition to charging the true offenders O'Brien and Buckley with criminal charges.

50. On or about November 4, 2011, Mr. Mackey filed a written complaint with the Massachusetts Attorney General's Office, alleging, without limitation, that Sergeant Cooke was unprofessional and condescending at the scene and criticizing the TPD's failure to arrest O'Brien and Buckley and its decision to, instead, charge Mr. Mackey with a crime.

51. On or about November 15, 2011, the Attorney General's Office notified Mr. Mackey that it was not going to pursue an investigation as a result of limited resources.

52. Upon information and belief, Chief Sheehan and the officers from the TPD took offense to Mr. Mackey's complaint to the Attorney General's Office and set out to use all of their police powers to unlawfully retaliate against Mr. Mackey.

## II.    Mr. Mackey Files for Divorce from Ms. Mackey.

53.    In or about February of 2012, Mr. Mackey filed for divorce from his wife, Lisa Mackey ("Ms. Mackey"), in the Middlesex Probate and Family Court ("Probate Court"), Docket Number MI12DO0570DR (the "Divorce Action").

54.    On or about March 19, 2012, Ms. Mackey filed a Motion for Temporary Orders in the Divorce Action, which specifically requested that Mr. Mackey vacate the marital home and "continue to pay for all maintenance, utilities, mortgages and property taxes of the marital properties."

55.    The Probate Court in the Divorce Action **denied** Ms. Mackey's Motion for Temporary Orders including, without limitation, the request that Mr. Mackey pay utilities at Ms. Mackey's residence, 68 Mitchell G Drive in Tewksbury, Massachusetts.

## III.    Ms. Mackey Obtains a Restraining Order Against Mr. Mackey.

56.    On May 2, 2012, Mr. Mackey reported Ms. Mackey to the North Andover Police Department for stealing money out of his truck.

57.    The very next day, on May 3, 2012, Ms. Mackey, irate at Mr. Mackey for reporting her to the North Andover Police Department and unhappy with the Probate Court's denial of her request that Mr. Mackey pay the household utilities, filed for a restraining order against Mr. Mackey in the Lowell District Court, Docket No. 1211RO0622 (the "RO"). Ms. Mackey's filing of the RO was a clear attempt to gain leverage in the Divorce Action.

58.    Ms. Mackey's RO Application included a request that the court order Mr. Mackey to "pay emergency alimony to put food on my table for children and myself." The Lowell District Court denied Ms. Mackey's request for emergency alimony and issued a temporary RO (a copy of the RO is attached hereto as Exhibit A), with a return date of May 17, 2012, with the

10

following three (3) conditions: (1) Mr. Mackey must not abuse Ms. Mackey; (2) Mr. Mackey must have no contact with Ms. Mackey; and (3) Mr. Mackey must vacate and stay away from 68 Mitchell G Drive.

59.     On the May 17, 2012 return date for the RO, Ms. Mackey moved the court to issue the restraining order and specifically requested that the Lowell District Court order Mr. Mackey to pay for all of the utilities at 68 Mitchell G Drive.

60.     The Court **denied** Ms. Mackey's request that Mr. Mackey pay for utilities, and instead modified the temporary RO to include a provision (¶ 9) that Mr. Mackey pay Ms. Mackey $150 per week in support.  The Lowell District Court records are absolutely clear that Mr. Mackey's *only financial obligation was to pay Lisa Mackey $150 per week*, and the RO has **never** included a provision that Mr. Mackey pay the utilities at 68 Mitchell G Drive.

61.     On May 22, 2012, Ms. Mackey appeared at the Lowell District Court and filed a motion to modify the RO on the grounds that Mr. Mackey had violated the RO because he had not yet paid Ms. Mackey the $150 in support.  This was the first of a litany of false accusations that Ms. Mackey would allege against Mr. Mackey for violation the RO.

62.     The Lowell District Court scheduled the motion for a hearing on June 4, 2012, at which time the Court records confirm that the court took "No action" on Ms. Mackey's frivolous motion because the payment was not late.

## IV.    The TPD's Initial Unlawful Conduct and False Arrest of Mr. Mackey.

63.     Having had no luck with reporting a false RO violation to the Lowell District Court, Ms. Mackey changed strategies and turned her attention to the TPD, where the officers were all too happy to retaliate against Mr. Mackey after his complaint to the Attorney General's Office.

11

A.    **June 7, 2012: Mr. Mackey is Falsely Arrested**

64.    On June 7, 2012, Ms. Mackey called the TPD and falsely reported that Mr. Mackey had violated Paragraph 3 of the RO by failing to pay the Comcast bill for cable, phone and internet at 68 Mitchell G Drive. Officer McMahon and Officer McLaughlin responded to 68 Mitchell G Drive and spoke directly with Ms. Mackey.

65.    Paragraph 3(c) of the RO states in relevant part that "The Court Orders you . . . (c) not to shut off or cause to be shut off any utilities or mail delivery to the Plaintiff." See RO, ¶ 3(c), attached hereto as Exhibit A.

66.    The only logical reading of Paragraph 3(c) is that Mr. Mackey must not take any affirmative action to cancel the utilities and/or mail service (e.g., calling the phone company or post office to terminate the service). Paragraph 3(c) does **not** mean that Mr. Mackey has an obligation to pay for utilities and/or mail service at 68 Mitchell G Drive. Instead, the terms of the RO are very clear that Mr. Mackey's only payment obligation as of June 7, 2012 was to pay $150 per week. The RO contained absolutely no obligation to also pay for the utilities at 68 Mitchell G Drive.

67.    The TPD had a copy of RO and had actual knowledge that Mr. Mackey was not obligated to pay for the utilities at 68 Mitchell G Drive.

68.    Officers McLaughlin and McMahon did a minimal investigation to confirm through a Comcast representative that payment of the Comcast bill was past due. Officer McLaughlin and Officer McMahon intentionally misinterpreted the terms of the RO to manufacture an unlawful determination of probable cause to arrest Mr. Mackey.

69.    According to the police report, Officer McMahon called Lieutenant Stephens, and Lieutenant Stephens approved the unlawful finding of probable cause.

12

70.    Furthering the unlawful scheme, Officers McLaughlin and McMahon went directly to 20 South Oliver Street, where they located Mr. Mackey and falsely arrested him on a bogus charge of violation of the RO.

71.    Mr. Mackey was falsely imprisoned overnight at the TPD, and was brought into the Lowell District Court on June 8, 2012 in handcuffs, where he was arraigned on a baseless charge of violation of an RO, Docket Number 1211CR3435.

72.    Mr. Mackey was required to appear in court on at least 9 different occasions to defend against this false and malicious arrest and charge.  On December 13, 2013, the Lowell District Court granted Mr. Mackey's motion to dismiss on the grounds that *the RO does not require Mr. Mackey to pay utilities at 68 Mitchell G Drive.*

**B.    June 8, 2012: False Criminal Charge #2 Against Mr. Mackey**

73.    One day later, on June 8, 2012, Ms. Mackey, apparently encouraged by the TPD's willingness to arrest Mr. Mackey on false allegations of a violation of the RO, went into the TPD and reported to Detective Connor that Mr. Mackey had "turned her and her daughters' cell phone off this morning."

74.    As the June 8, 2012 TPD Report indicates, Ms. Mackey failed to provide proof that her cell phone was shut off and the TPD failed to investigate whether her allegations were true.

75.    Moreover, Ms. Mackey filled out a Voluntary Statement Form that contained the following false allegations: "On June 7 my husband had our phone, cable + internet shut off at our residence.  On June 8 at Lowell Court he was ordered to put them back on, which he has not."

13

76.    There is absolutely *no record* of any Court, including Lowell District or Probate Court, ever ordering Mr. Mackey to pay for the utilities at 68 Mitchell G Drive.  To the contrary, both the Lowell District Court and Probate Court denied Ms. Mackey's multiple requests for payment of utilities.  The only support that Mr. Mackey was obligated to pay Ms. Mackey pursuant to the RO was the $150 per week.

77.    Despite the indisputable evidence that the RO did not order Mr. Mackey to pay Ms. Mackey's cell phone bill (which is not even a utility), Detective Connor and Sergeant Warren initiated an application for criminal complaint, which resulted in criminal charges being filed against Mr. Mackey in the Lowell District Court, Docket number 1211CR6424.

78.    On October 8, 2013, the Court dismissed that case for Failure to Prosecute because there was no evidence to substantiate this false charge.

C.    **June 11, 2012:  False Criminal Charge #3 Against Mr. Mackey**

79.    On June 11, 2012, for the third time in four days, Ms. Mackey called the TPD to report that Mr. Mackey had violated the RO.

80.    Officer Duffy and Officer Russo responded to 68 Mitchell G Drive and spoke to Ms. Mackey.  Ms. Mackey alleged that Mr. Mackey had violated the RO on two occasions by driving the couple's children to the house.

81.    Ms. Mackey alleged that the first violation occurred on Friday, June 8, 2012, when Mr. Mackey dropped their daughter, Melissa, off at the house at approximately 10:50 P.M.

82.    Ms. Mackey failed to tell Officers Duffy and Russo that Melissa had called Ms. Mackey for a ride home and, when Ms. Mackey refused to pick Melissa up, Melissa called Mr. Mackey, who came to get her and drove her home.

83.    As noted in Officer Duffy's report, the RO requires Mr. Mackey to stay 100 yards away from Ms. Mackey. Officer Duffy's report confirms that the "driveway leading up to the residence is approximately 150 yards long."

84.    Officer Duffy did not speak with Melissa.

85.    Ms. Mackey also reported that, on June 11, 2012, Mr. Mackey drove their son, James Mackey, III, to 68 Mitchell G Drive and that he pulled his truck into the beginning of the driveway (according to Ms. Mackey, "he stayed approximately 120 yards back.").

86.    Officers Duffy and Russo interviewed James Mackey, III, who disputed Ms. Mackey's statement and said that his father, Mr. Mackey, never entered the driveway and stayed in the street at all times.

87.    Officers Duffy and Russo, despite the disputed claims and despite having never interviewed Melissa, unlawfully determined that there was probable cause to arrest Mr. Mackey and began searching the Town of Tewksbury to effectuate an arrest.

88.    Officers Duffy and Russo were unable to locate Mr. Mackey, so they requested that a warrant issue for his arrest. Officer Duffy initiated an Application for Criminal Complaint, which resulted in Lowell District Court criminal complaint Docket number 2111CR4999.

89.    That baseless complaint was dismissed for Failure to Prosecute on November 6, 2014.

## V.    Probate Court Denies Ms. Mackey's Request that Mr. Mackey Pay Utilities

90.    On June 13, 2012, the Probate Court issued a Temporary Order in the Divorce Action, once again **denying** Ms. Mackey's request that Mr. Mackey pay the utilities at 68 Mitchell G Drive, and, instead, adopting the Lowell District Court's order that Mr. Mackey pay Ms. Mackey $150 per week in support.

## VI.    Lowell District Court Modifies RO and Reduces Support Payment from $150 to $75

91.    On June 15, 2012, the Lowell District Court modified Paragraph 9 of the RO to reduce the weekly payment from **$150 to $75** per week.

## VII.    June 21, 2012: Ms. Mackey Falsifies a Court Document

92.    On June 21, 2012, just six days after the Lowell District Court amended the RO to reduce the weekly payment from $150 to $75, Officer Edward Jackman took a report from Ms. Mackey which states in relevant part as follows:

> At approximately 3:30 P.M. Sergeant Steven Torres and I responded to the lobby of the Tewksbury Police Department to assist a citizen. Upon arrival we were met by Lisa Mackey, who stated that her estranged husband James Mackey was denying her cable television from her service provider Comcast. Mrs. Mackey stated that her husband was responsible for providing $150.00 per week in plaintiff support. Mrs. Mackey provided a printed copy of a 209-A order Docket #1211RO0622, on which the sum of $150 was handwritten. Sergeant Brian Warren provided a current copy of the same order that been issued today. On this copy of the order the sum of the plaintiff support had been changed to $75.00. Sergeant Torres asked Mrs. Mackey if there had been any amendments and at this time she stated that the sum had been changed to $75.00. Sergeant Torres also asked Mrs. Mackey who had written the sum of $150.00 on the old copy of the order and Mrs. Mackey stated that she had. **Mrs. Mackey was advised that she had falsified a court document** and advised that she needed to be completely truthful when completing her voluntary statement form.

93.    Having caught Ms. Mackey in a lie and undoubtedly skeptical of the status of the cable services, Officer Jackman and Sergeant Torres went to 68 Mitchell G Drive to check on the cable.

94.    When Ms. Mackey turned the cable on, the Officers observed that access had been locked and then watched as Ms. Mackey "presumably entered the correct code," which resulted in an error message.

95.    Officer Jackman's report acknowledges that "in the interest of being impartial all parties involved would need to be contacted to determine what was the problem."

16

96.    Despite admitting to falsifying a court document and blatantly lying about the amount of support due under the RO, the TPD did not charge Ms. Mackey with making a false police report.  Moreover, this report *is proof positive* that the officers from the TPD were aware that Ms. Mackey had lied and were on notice that her future reports should not be taken at face value and must be corroborated before such reports may serve as the basis for a probable cause determination.

97.    The TPD was also on notice that the RO only required Mr. Mackey to pay $75 per week, and that any payment by Mr. Mackey above $75 per week should have been considered a credit or prepayment of future weekly payments.

## VIII.    The TPD Continues Its Campaign of Harassment Against Mr. Mackey.

### A.    June 22, 2012: False Criminal Charge #4 Against Mr. Mackey

98.    On Friday, June 22, 2012, just one day after being caught making a false report to the TPD relating to the amount of the weekly payment in the RO, Ms. Mackey returned to the Tewksbury Police Station and made **the same exact** false statement that she had been warned about the day before -- that Mr. Mackey had violated the RO by failing to pay the Court ordered $150.

99.    Officer Ryser's report acknowledges that the restraining order in effect only requires the payment of $75; however, he completely ignores Ms. Mackey's **second** false report in two days and requested that an Application for Criminal Complaint issue for a clerk's hearing.

100.    Officer Ryser's report states that Ms. Mackey called him at some point later that day to report that she had received the money from Mr. Mackey.

101.    As further evidence of the unlawful conspiracy to harass Mr. Mackey, Officer Ryser's report determined that, even if Ms. Mackey received the payment, "this payment would still be late and could be a possible violation based on that and the amount paid."

102.    Officer Ryser ignored Ms. Mackey's false report and deceitfully determined that there was a potential violation for late payment on Friday, when the RO clearly stated that Mr. Mackey had until the end of the week or Sunday to make the $75 payment.

103.    Moreover, Officer Ryser made absolutely no effort to determine whether Mr. Mackey, who had been making $150 payments in accordance with the probate court order, had a surplus balance on the payments for the RO.

104.    Based on Officer Ryser's request, Sergeant Warren initiated an Application for Criminal Complaint which resulted in false charges being entered against Mr. Mackey at the Lowell District Court on August 15, 2012, Docket number 1211CR4998.

105.    Mr. Mackey was once against forced to appear in court on at least 9 occasions to defend a malicious and false criminal complaint, which was eventually dismissed on June 19, 2014.

**B.    June 26, 2012:  False Criminal Charge #5 Against Mr. Mackey**

106.    On June 26, 2012, Ms. Mackey returned to the Tewksbury Police Station to report another false restraining order violation.  Officer Kerber's report indicates that Ms. Mackey claimed that Mr. Mackey texted their daughter allegedly asking questions about Ms. Mackey.

107.    There is no evidence that the TPD ever reviewed any of the alleged text messages or even made an attempt to investigate whether the allegations were true.

108.    Moreover, the allegations in Officer Kerber's report do not allege that Mr. Mackey tried to contact Ms. Mackey, so there was no possible violation of the RO.

109. Despite the fact that (1) there was no evidence to substantiate a violation of the RO, and (2) Ms. Mackey had made at least two knowingly false reports to the TPD a week prior to this report, Officer Kerber unlawfully determined the Mr. Mackey had violated the RO and that there was probable cause to arrest him.

110. Officer Kerber was unable to locate Mr. Mackey to arrest him, so he sought a warrant for Mr. Mackey's arrest.

111. The TPD initiated an Application for Criminal Complaint, which resulted in false criminal charges against Mr. Mackey in the Lowell District Court, Docket number 12CR4997.

112. On November 6, 2014, the Lowell District Court dismissed this complaint for Failure to Prosecute because there was absolutely no evidence to substantiate this false charge.

C. **July 6, 2012: TPD Is Aware of Another False Report By Ms. Mackey**

113. On Friday, July 6, 2012, at approximately 3:00 P.M., Officer Russo responded to 68 Mitchell G Drive as a result of a call from Ms. Mackey reporting a possible violation of the RO.

114. Ms. Mackey told Officer Russo that the RO required Mr. Mackey to pay her $150 per week on Wednesday of each week. This is the **third** time that Ms. Mackey lied to the TPD about the amount of support due and the second time that she provided them with a falsified copy of the RO.

115. Officer Russo's report indicates that she told Ms. Mackey that the RO does not require payment by a certain date, and, therefore, that there was no violation of the RO because it was only Friday. Officer Russo' report states that no further action was taken at that time. This is yet another instance of the TPD being put on notice of Ms. Mackey's lack of credibility.

**D.    July 12, 2012: False Criminal Charge #6 Against Mr. Mackey**

116.    On Thursday, July 12, 2012, Ms. Mackey reported another alleged violation of the RO by Mr. Mackey to the TPD based on Mr. Mackey's alleged failure to pay $150 for the prior two weeks.

117.    Ms. Mackey filled out a Voluntary Statement Form which contained the following false statements: (1) Ms. Mackey dishonestly stated, for the **fourth** time, that the RO required payment of $150; (2) Ms. Mackey dishonestly stated that she did not receive payment for the week of July 2, 2012; and (3) Ms. Mackey dishonestly stated that the RO required payment to be made by Wednesday of each week.

118.    Officer Hanley failed to investigate Ms. Mackey's false statements, despite the TPD's knowledge of her lack of credibility.

119.    Officer Hanley unlawfully determined that there was probable cause to believe that Mr. Mackey violated the RO for failing to make the payments as ordered and requested that a summons issue charging Mr. Mackey with a violation of the RO.

120.    Officer Hanley's determination of probable cause was in bad faith because Ms. Mackey's statements were absolutely false. A cursory investigation would have uncovered that Ms. Mackey had filed *three other* false statements with the TPD in less than a month, that she was lying about the amount of payment due, lying about the date the payments were supposed to be made, and lying when she claimed she had not received payments in accordance with the RO.

121.    In furtherance of the conspiracy to harass Mr. Mackey, Officer Hanley filled out an Application for Criminal Complaint based on Ms. Mackey's fabricated report, which resulted in false charges being entered against Mr. Mackey in the Lowell District Court on August 15, 2012, Docket number 1211CR4996.

122.    These false charges were dismissed on September 19, 2014.

**E.    July 17, 2012: Unwarranted Criminal Charge #7 and Excessive Use of Police Resources**

123.    On July 17, 2012, Ms. Mackey again appeared at the TPD to report another alleged violation of the RO.

124.    For the **fifth** time in less than a month, Ms. Mackey made an intentionally false report to the TPD.  Despite being specifically warned not to do so on June 21, 2012, Ms. Mackey once again reported that Mr. Mackey was obligated to pay her $150 per week in accordance with the RO.

125.    In addition to the false report, Ms. Mackey complained of a technical violation of the RO because Mr. Mackey allegedly made a payment on July 13, 2012 through their daughter Melissa instead of through the mail.

126.    Approximately thirty (30) minutes after Ms. Mackey made an allegation of an alleged technical violation of the RO, "Sgt. Coviello informed all Officers that the 8-4 P.M. shift investigated a 209A violation involving Mr. James Mackey Jr. and that Mr. Mackey was arrestable on probable cause.  Sgt. Coviello requested that the sector cars check multiple locations where Mr. Mackey may be located, one of which being #20 South Oliver Street."

127.    In an outrageous and bad faith waste of police resources, the TPD, under the direction of Chief Sheehan and Sergeant Coviello, initiated an all-out man hunt for Mr. Mackey based on purported charges, which even if true, were, at best, a technical violation of the RO based on method of payment made.

128.    At approximately 4:51 P.M., two uniformed Tewksbury Police Officers in separate cruisers arrived at 20 Oliver Street, which is owned by Mr. Mackey's father, James Mackey, Sr., in order to apprehend Mr. Mackey.

129. The Officers approached the open garage at the house, where they were met by James Mackey, Sr., who consented to a perimeter search of his property but denied access to the interior of his house.

130. The Officers returned to their cruisers and Chief Sheehan personally told Detective Richardson to "stay in close proximity to the residence."

131. Shortly thereafter, Sergeant Coviello arrived on the scene to personally oversee the man hunt for Mr. Mackey.

132. While following Chief Sheehan's instructions to stake out the house, Detective Richardson observed James Mackey, Sr. leave the property in his pickup truck, which had an enclosed bed. At least 4 TPD cruisers were left at James Mackey, Sr.'s house for several hours.

133. As if harassing Mr. Mackey were not enough, Detective Richardson followed James Mackey, Sr. and pulled him over on a trumped up claim that he was driving "at a speed that was greater than reasonable for this area" and purportedly failed to use a left turn signal.

134. After a less than cheerful conversation, James Mackey, Sr. allowed Detective Richardson to search the bed of his truck for Mr. Mackey, who was not there. Because no real moving violation occurred, Detective Richardson could only give James Mackey, Sr. a verbal warning.

135. Detective Richardson returned to the stake out of 20 South Oliver Street and, at approximately 5:35 P.M., his report indicates that he observed Mr. Mackey arrive at the property on a motorcycle and enter his father's house.

136. Detective Richardson waited for Officer Jackman to get back on the scene, and then they approached the house and knocked on the door. James Mackey, Sr. opened the door and refused to let them in without a search warrant.

22

137. After being denied access to James Mackey, Sr.'s house, Sergeant Timothy Kelly directed Detective Regan to apply for a baseless arrest warrant for Mr. Mackey and a baseless search warrant for 20 Oliver Street. As evidence that the TPD's actions were not only unwarranted, but were also unlawful, the Arrest and Search Warrants were both **denied.**

138. After wasting valuable police resources on the man hunt for Mr. Mackey over an alleged technical violation of a restraining order and getting rejected on his applications for an arrest warrant and a search warrant, Detective Regan continued the harassment by filling out an Application for Criminal Complaint against Mr. Mackey, which issued on August 15, 2012, Docket number 1211CR004991.

139. That case was dismissed on September 19, 2014.

F. **July 24-26, 2012: False Criminal Charge #8 Against Mr. Mackey**

140. On July 24, 2012, at approximately 6:00 P.M., Ms. Mackey went to the TPD to report another false RO violation, this time stating that "her husband turned off the phone at the family home at 68 Mitchell G Dr."

141. Officer Piccolo took Ms. Mackey's report, and the only investigation he did was to call the home phone number, which was temporarily disconnected.

142. Officer Piccolo failed to call the phone provider to investigate why the phone was disconnected and, instead, requested that a baseless warrant be issued for Mr. Mackey for violation of a 209A Order.

143. On July 25, 2012, at approximately 3:00 P.M, Ms. Mackey went to the TPD to meet with Chief Sheehan to discuss "her current domestic situation and a restraining order violation committed by her estranged husband, James Mackey, which consisted of him shutting off the phone service (land line) to her residence."

23

144.    After waiting for several minutes, Ms. Mackey left the station without seeing Chief Sheehan.

145.    At approximately 3:30 P.M., Chief Sheehan sent Sergeant Cooke to Ms. Mackey's residence so he could talk with her on Sergeant Cooke's cell phone.  Ms. Mackey apparently informed Chief Sheehan that Officer Piccolo was applying for a warrant for Mr. Mackey as a result of her July 24, 2012 false report of a restraining order violation.

146.    Chief Sheehan told Ms. Mackey that he would see what he could do about getting her phone turned back on.

147.    Chief Sheehan personally called Verizon (Copper) Repair and spoke with a representative named Shelley who informed Chief Sheehan that: (1) the phone line was in Ms. Mackey's name; and (2) the phone line was disconnected because **Ms. Mackey personally scheduled a disconnect order (#D5UH9881) on June 10, 2012** (just three days after she alleged that her Comcast Cable was shut off) so that she could transfer the line to Verizon Fios. Shelley connected Chief Sheehan to Eric from Verizon Fios, who stated that, on June 10, 2012, Ms. Mackey scheduled Fios (ticket #NZ287270169) for a set up on June 19, 2012.  Ms. Mackey rescheduled the connection to July 19, 2012, but that was never completed because Verizon was unable to reach Ms. Mackey to confirm installation.

148.    Later that day, Ms. Mackey called Chief Sheehan, and he informed her that the phone line was disconnected because Ms. Mackey had scheduled it for termination after signing up to switch over to Verizon Fios.  Ms. Mackey was forced to admit that she did schedule the phone line for termination and never called to cancel it when she decided not to switch to Verizon Fios.

24

149. This investigation proved that Ms. Mackey made a false police report on July 24 and 25 when she alleged that Mr. Mackey shut her phone off.

150. On July 26, 2012, Ms. Mackey returned to the TPD where she met with Sergeant Warren and Chief Sheehan to report that Verizon would not turn her phone (which was in her name) back on because she had an outstanding balance of $392.00.

151. Sergeant Warren spoke with Verizon several times on July 26, 2012, and it was confirmed that the phone was shut off because Ms. Mackey ordered the termination and not because of nonpayment. However, Verizon was not willing to turn the phone back on because there was an outstanding balance owed on Ms. Mackey's account.

152. Ultimately, Sergeant Warren brokered a payment plan for Ms. Mackey to pay the outstanding Verizon bill, and Verizon agreed to turn the phone back on.

153. Despite the fact that the phone line was in Ms. Mackey's name, that Ms. Mackey lied to the TPD about the cause of the phone disconnect, that Ms. Mackey was the person that ordered a phone disconnect (which she never cancelled), and that Mr. Mackey had absolutely no obligation to pay for the Verizon bill in the RO or otherwise, Sergeant Warren falsely and maliciously determined that there was probable cause to issue a warrant for Mr. Mackey for "not paying the phone bill, thus being shut off for an outstanding bill."

154. In furtherance of the conspiracy, Sergeant Warren filed an Application for Criminal Complaint against Mr. Mackey which resulted in criminal charges in Lowell District Court, Docket Number 12-4992.

155. These malicious, false charges were eventually dismissed on October 8, 2013 for Failure to Prosecute.

## IX.    July 25, 2012:  Probate Court Denies Request that Mr. Mackey Pay Utilities

156.    On July 17, 2012, Ms. Mackey, through her attorney, filed a motion for further temporary orders with the Probate Court in the Divorce Action to order Mr. Mackey to pay the living expenses and utilities at 68 Mitchell G Drive.

157.    On July 25, 2012, the Probate Court once again denied Ms. Mackey's motion and acknowledged that, although the $150 payment order in the Divorce Action may not have been enough to cover all of Ms. Mackey's expenses and utilities, there was no evidence that Mr. Mackey had the income "available to pay an increased amount."

## X.    July 30, 2012: Criminal Charge #9 Against Mr. Mackey

158.    On July 30, 2012, at approximately 2:00 P.M., Ms. Mackey went into the TPD to report that Mr. Mackey had technically violated the RO by having his daughter, Melissa Mackey, deliver the support payment to Ms. Mackey instead of mailing it.

159.    Ms. Mackey once again lied to the TPD by telling them for the **sixth** time that the RO required a $150 weekly payment, and she seemingly provided the falsified RO to Officer McMahon.

160.    Once again, the TPD made absolutely no effort to interview Melissa Mackey in order to confirm Ms. Mackey's allegations, despite knowing of Ms. Mackey's history of false allegations and lack of credibility.

161.    Officer McMahon filled out an Application for Criminal Complaint, which was issued on August 15, 2012, Docket number 1211CR4994.

162.    This complaint was dismissed on September 19, 2014.

## XI.    July 31, 2012: Ms. Mackey Goes to Mr. Mackey's House

163.    On July 31, 2012, at approximately 2:30 P.M., Mr. Mackey called the TPD to report that Ms. Mackey was at his house at 51 Riverdale Road.

164.    Officer Russo observed Ms. Mackey drive away from Riverdale Avenue as Officer Russo was approaching and pulled her over.

165.    Ms. Mackey told Officer Russo that she went to 47 Riverdale Avenue to check on her daughter.

166.    Approximately forty-five minutes later, at 3:15 P.M., Ms. Mackey called the TPD with another false report that she had "just read her daughter's journal entry and there was an entry made that claims that her father hurts her (did not specify how)."

167.    On August 4, 2012, Melissa Mackey provided the TPD with a statement that Ms. Mackey's report is an "absolute lie." Melissa Mackey's statement further claims that Ms. Mackey is "crazy," a "pathological liar," and a "drug addict" and that Mr. Mackey never touched Melissa.

168.    Despite Ms. Mackey's repeated false police reports and falsification of court documents, there is no record of the TPD ever charging her for these crimes. Instead, the pattern of conduct by Ms. Mackey and the TPD support a bad faith conspiracy to persecute Mr. Mackey.

## XII.    August 4, 2012: TPD Is On Notice of Another False Report By Ms. Mackey

169.    On August 4, 2012, Officer Hanley responded to 68 Mitchell G Drive to take another false report from Ms. Mackey of a RO violation.

170.    Ms. Mackey again lied to the TPD when she told them for the **seventh** time that the RO required Mr. Mackey to pay $150 per week and she once again dishonestly provided Officer Hanley with an old RO which showed $150 was due each week.

171. In this particular report to the TPD, Ms. Mackey added another false statement to the list when she told Officer Hanley that the court had ordered Mr. Mackey to make the RO support payment by Saturday of each week.

172. Putting aside the fact that the Saturday payment requirement was an outright lie, Officer Hanley's decision to request a summons charging Mr. Mackey with violating the RO, when it was only 11:24 A.M. and the mail had not even been delivered yet, further proves the bad faith of the TPD.

173. On August 4, 2012, at approximately 3:40 P.M., Lieutenant Stephens received a call from Mr. Mackey informing him that a check was mailed and that it should be in the mailbox at 68 Mitchell G Drive.

174. Lieutenant Stephens drove to 68 Mitchell G Drive and opened the mailbox and confirmed that an envelope from Mr. Mackey was inside with other mail. Ms. Mackey came outside and opened the letter and confirmed that there was a $150 check in the envelope.

175. As a result, there was no violation of the RO and the TPD was forced to recall Officer Hanley's request for a summons.

## XIII. August 23, 2012: TPD Is On Notice of Another False Report By Ms. Mackey

176. On August 23, 2012, Officer Kimberly Riccardi ("Officer Riccardi") and Sergeant Torres were dispatched to 68 Mitchell G Drive to take yet another false allegation of an RO violation from Ms. Mackey.

177. Ms. Mackey told Officer Riccardi and Sergeant Torres that her daughter Melissa gave her $150 in cash and asked her to sign a receipt, allegedly in violation of the RO requirement that Mr. Mackey's support payments must be made by mail.

178.    In a rare investigation into Ms. Mackey's reports of RO violations by Mr. Mackey, Sergeant Torres took the time to call Melissa, and Melissa informed him that the $150 came from the mail in an envelope with a return address. Melissa stated that she retrieved the envelope from the mailbox and gave it to her mother. Melissa further stated that Ms. Mackey was well aware that the money came from the mail in an envelope.

179.    Despite another obvious lie by Ms. Mackey, the TPD failed to charge her with filing a false police report. No charges were initiated against Mr. Mackey.

## XIV.    September 9, 2012: Ms. Mackey Again Goes to Mr. Mackey's Property

180.    On September 9, 2012, Mr. Mackey called the TPD to report that Ms. Mackey was once again near his property and had parked her car on the property next door to his residence (47 Riverdale Road - which they own together).

181.    Officer Jackman's report states that he "advised Mr. Mackey that his recourse would be to petition for the R.O. to be vacated, because Mrs. Mackey is obviously not in fear of Mr. Mackey if she is driving up to his residence."

## XVI.    September 28, 2012: TPD Is Aware of Another False Report By Ms. Mackey

182.    On September 28, 2012, Officer Hanley responded to 68 Mitchell G Drive to respond to a report by Ms. Mackey that Mr. Mackey had not paid the gas bill, allegedly in violation of the RO. Ms. Mackey once again lied and made a false police report when she "stated that part of the probate court agreement, and the restraining order against James, is that James shall pay the mortgage and all of the utilities."

183.    The TPD was well aware that neither the RO nor the Probate Court order required Mr. Mackey to pay the mortgage and/or utilities. Instead, the TPD knew that Mr. Mackey's only financial obligation pursuant to the RO, as of September 28, 2012, was to pay $75.00 per week.

184.    Ms. Mackey showed Officer Hanley a letter from National Grid stating that the gas would be shut off if payment in the amount of $400.55 was not made by October 1, 2012. Officer Hanley informed Ms. Mackey that there would be no violation of the RO until the utility was shut off for failure to pay.

185.    Once again, the TPD and the officers named herein took no action against Ms. Mackey for her false report and instead continued to maliciously harass Mr. Mackey.

## XVII.  Additional Unlawful Police Action Against Mr. Mackey

### A.    September 29, 2012: False Criminal Charge #10 Against Mr. Mackey

186.    One day later, on September 29, 2012, Ms. Mackey misrepresented, for at least the **eighth** time, that Mr. Mackey was obligated to pay her $150 in support pursuant to the RO.

187.    As early as June 15, 2012, the TPD was aware that the support order in the RO was amended from $150 to $75 weekly.

188.    Despite that reduction, Mr. Mackey paid $150 in support to Ms. Mackey on a weekly basis, which meant that he was carrying a balance of at least $1,000 as of September 29, 2012.

189.    Despite no corroboration of Ms. Mackey's allegations and, indeed, despite knowledge of facts contrary to Ms. Mackey's allegations, Sergeant Warren applied for a Criminal Complaint against Mr. Mackey, which issued on November 5, 2013, Docket Number 1311CR7040.

190.    That case was dismissed September 19, 2014.

30

**B.     October 15, 2012: False Criminal Charge #11 Against Mr. Mackey**

191.    On October 15, 2012, Ms. Mackey again went to the TPD and filled out a Voluntary Statement Form falsely alleging that Mr. Mackey violated the RO by: (1) shutting off her home phone; (2) failing to pay the National Grid bill for heat and electricity; and (3) failing to pay the mortgage.

192.    Once again, the TPD were well aware that the only financial support that Mr. Mackey was obligated to pay pursuant to the RO was $75 per week.

193.    Moreover, the TPD knew that both the Lowell District Court and Probate and Family Court had repeatedly denied Ms. Mackey's requests that Mr. Mackey pay for the utilities at 68 Mitchell G Drive.

194.    Instead of charging Ms. Mackey with filing a false police report, Lieutenant Gaynor unlawfully took out a criminal complaint against Mr. Mackey for violation of the RO in Lowell District Court, Docket Number 1311CR7044.

195.    That case was dismissed on January 31, 2014.

196.    Lieutenant Gaynor had knowledge that Ms. Mackey had made several false police reports and still, in bad faith, made inaccurate statements in support of his request for a criminal complaint.

**C.     October 17, 2012: Unlawful Arrest Warrant Issued for Mr. Mackey**

197.    On October 17, 2012, Ms. Mackey went to the TPD and falsely reported to Officer Hanley that Mr. Mackey violated the RO because (1) her Verizon land line telephone was disconnected on 10/14/12 for failure to pay the bill; and (2) National Grid was scheduled to shut off the gas for failure to pay a past bill.

198. TPD were well aware that the land line was in Ms. Mackey's name and that the RO did not obligate Mr. Mackey to pay for the utilities (phone or gas). Moreover, there was no evidence that National Grid was going to shut off the gas.

199. Based on Ms. Mackey's false statements, Officer Hanley and multiple other TPD Officers searched all over town to arrest Mr. Mackey but did not find him.

200. Officer Hanley then requested that a warrant issue for Mr. Mackey for an alleged violation of a RO.

**D.**     **November 2, 2012: False Criminal Charge #12 Against Mr. Mackey**

201. On November 2, 2012, Ms. Mackey filed another false report with the TPD when she alleged that Mr. Mackey failed to pay $150 in support in accordance with the RO.

202. This was at least the **ninth** time that Ms. Mackey had made a false report to the TPD about the $150 support payment.

203. As early as June 15, 2012, the TPD was aware that the support order in the RO was amended from $150 to $75 weekly; however, the TPD and officers named herein refused to take any action against Ms. Mackey for the false reports.

204. Despite that reduction, Mr. Mackey paid $150 in support to Ms. Mackey on a weekly basis, which meant that he was carrying a balance of $1,300 as of November 2, 2012.

205. Putting aside Ms. Mackey's false report relating to the amount of support owed under the RO, the restraining order in effect on November 2, 2012 merely required a weekly payment, by mail, of $75. November 2, 2012 was a Friday. Mr. Mackey was obligated to pay $75 by the end of the week, which was Sunday, November 4, 2012. As such, there was no violation of the RO based on nonpayment as of November 2, 2012.

206.    Moreover, Mr. Mackey *did* send $150 to Ms. Mackey by certified mail on November 2, 2012.

207.    Despite no supporting facts and a failure to conduct even a basic investigation to corroborate the claims of a known liar, Sergeant Warren applied for yet another Criminal Complaint against Mr. Mackey, which issued on November 5, 2013, Docket Number 1311CR7034.

208.    That case was dismissed on September 19, 2014.

**E.    November 8-16, 2012: False Criminal Charge #13 Against Mr. Mackey**

209.    On Thursday, November 8, 2012, Mr. Mackey went into the TPD to report a fraudulent transaction on a closed Enterprise Bank Account of Mackey Construction, Inc. Lieutenant Stephens took the report.

210.    Mr. Mackey explained that, on February 12, 2012, Enterprise Bank called Mr. Mackey to inform him that a $3,000 check made out to John Gamble (Ms. Mackey's father) was cashed at an Eastern Bank in Lynn, Massachusetts.

211.    Mr. Mackey confirmed that he did not write or sign the check and reported that Ms. Mackey was the only other person that had knowledge of this account, which had been closed in March of 2010.

212.    Mr. Mackey provided the TPD with a copy of the check and bank receipt.

213.    On or around November 16, 2012, Detective Donovan was assigned to investigate Mr. Mackey's report.

214.    Detective Donovan confirmed that the license number that Eastern Bank accepted to cash the check belonged to Ms. Mackey.

215. Detective Donovan called Ms. Mackey, and she agreed to an interview at the station the same day.

216. During the interview, Ms. Mackey claimed that Mr. Mackey voluntarily provided the check to her to assist her father with repairing his roof.

217. Ms. Mackey also informed Detective Donovan that Mr. Mackey filed for a criminal hearing against her in Lynn District Court on charges of uttering and forgery and that those charges were dismissed. Ms. Mackey provided Detective Donovan with paperwork relating to the Lynn District Court clerk's hearing, which indicated that Mr. Mackey applied for the hearing on July 30, 2012 and that the hearing took place on August 15, 2012. Mr. Mackey made the following statement in his court filings:

> Estranged wife stole a check from a closed account from my incorporated construction company. She forged my signature on the check. She forged her father's signature on the back of check and cashed it thru her parents account @ Eastern Bank.

218. Detective Donovan's report indicates that he spoke with Mr. Mackey on the phone at approximately 1:15 P.M. Officer Donovan informed Mr. Mackey that

> any potential crime involved with her receiving the money or cashing the check would have to be handled with Lynn Police or in Lynn District Court. James stated that he had not contacted either, and that he would just like to go forward with the crime that occurred at their residence (68 Mitchell G Drive) in Tewksbury; which would allege Larceny of the check.

219. Detective Donovan failed to investigate whether Ms. Mackey committed any crimes in the TPD's jurisdiction (such as by stealing the check and forging it).

220. Instead, Detective Donovan continued the TPD's unlawful persecution of Mr. Mackey by issuing a warrant *for Mr. Mackey* for Misleading a Police Officer and False Crime Report.

34

221.    The basis for Detective Donovan's request for a warrant was that Mr. Mackey lied to him when he asked if he had contacted the Lynn Police Department or Lynn District Court. Mr. Mackey claims that Detective Donovan only asked him if he had contacted the Lynn Police Department, to which he replied that he had not. Regardless, Mr. Mackey reported a crime to Detective Donovan that clearly took place in Tewksbury (theft of the check and possible forgery) and Detective Donovan intentionally decided to turn the report into an opportunity to further harass Mr. Mackey.

222.    Detective Donovan's request for a warrant resulted in criminal felony charges against Mr. Mackey for: (1) Misleading a Police Officer; and (2) False Crime Report, Docket Number 1211CR7847.

223.    The Application for Criminal Complaint indicates that Detective Donovan requested that the warrant issue without the benefit of a magistrate's hearing on the basis that: (1) there was an imminent threat of flight and (2) a felony was being charged. In reality, a warrant was requested without a hearing because Detective Donovan knew that there was absolutely no evidence to support the trumped up felony charges he initiated against Mr. Mackey.

224.    Mr. Mackey was arraigned on December 12, 2012.

225.    On or about March 28, 2013, Mr. Mackey went to the TPD and spoke with Officer Russo. Mr. Mackey provided Officer Russo with the following documents:

   a. A signed, notarized statement from Tina Mello (Ms. Mackey's sister);
   b. A signed, notarized statement from Mary Feeley (Ms. Mackey's sister);
   c. Gambler Irrevocable Trust Notice of Removal of Trustee and Appointment of Successor Trustee dated 3/29/2012 – removing Ms. Mackey as Trustee;
   d. A business card of Daniel Kelley, Asst. Branch Manager at Eastern Bank;
   e. A copy of Criminal Complaint filed against Mr. Mackey;
   f. A copy of cancelled check showing Ms. Mackey's license number and forged signature; and
   g. A copy of Ms. Mackey's voluntary statement form dated November 28, 2012.

35

226. The signed, notarized statement of Tina Mello stated: "Lisa explained to my parents that she needed the money to give to her attorney and that she took the check from her husband without him knowing and that she was unaware the account had been closed."

227. The signed, notarized statement of Mary Feeley stated:

> "Because of this [Lisa's forging of his name] my father became upset and all he could say was 'Lisa stole from me' 'Why would she do that.'" "When I got my father home and told my mother she was hysterical. Until that day my parents had no knowledge of a $3,000 check being written to my father by Jim Mackey. At that point my mother called Lisa and asked her why she stole $3,000 from them. Lisa told my mother she needed the money for an attorney for her divorce. I was there for this whole conversation."

228. Officer Russo's report indicates that she reviewed all of the documents that Mr. Mackey provided, but that none of them "prove that Lisa stole the check from him."

229. The portions of the statements referenced above provided evidence that Ms. Mackey lied to the TPD during both her November 16, 2012 interview and November 28, 2012 signed Voluntary Statement.

230. At the very least, it was incumbent upon the TPD to investigate Mr. Mackey's claims and the veracity of Ms. Mackey's statements.

231. Instead, the TPD continued to accept known lies and untruthful statements from Ms. Mackey for the purpose of advancing its vendetta against Mr. Mackey.

232. These false charges against Mr. Mackey were dismissed for failure to prosecute on November 6, 2014.

**XIX.    November 13, 2012: TPD Is Aware of Another False Allegation By Ms. Mackey**

233.    On November 13, 2012, Ms. Mackey went to the TPD to falsely report another alleged RO violation by Mr. Mackey.

234.    Ms. Mackey told Officer Jackman that Mr. Mackey's lawyer, Julien LaBeck, had contacted her lawyer, Michael McDonald, because Mr. Mackey wanted to send a plumber to winterize the house.  Ms. Mackey said she received the name and contact information of a plumber, Rick Caan ("Mr. Caan"), who allegedly informed Ms. Mackey that he was asked to winterize the house.

235.    Officer Jackman called Mr. Caan, and Mr. Caan stated that *Ms. Mackey* contacted him and that Mr. Mackey never contacted him.  Officer Jackman's report indicates that he told Ms. Mackey that "no crime had been committed" . . . "because Mrs. Mackey contacted Mr. Caan."

**XX.    Lowell District Court Once Again Refuses to Order Mr. Mackey to Pay Utilities**

236.    On November 16, 2012, the Lowell District Court refused to take any action on Ms. Mackey's motion to modify the RO to order Mr. Mackey to increase the support payments to cover the utilities at the former marital home.  The Lowell District Court refused to address Ms. Mackey's request and referred the issue to the Probate Court and Divorce Action.

**XXI.    TPD Continues Its Unlawful Harassment of Mr. Mackey**

**A.    November 16, 2012: False Criminal Charge #14 Against Mr. Mackey**

237.    On Friday, November 16, 2012, Ms. Mackey filed another report with the TPD alleging that Mr. Mackey failed to pay $150 in support in accordance with the active RO.

238.    This was at least the **tenth** time that Ms. Mackey made a false report to the TPD regarding the $150 support payment.

37

239. As early as June 15, 2012, the TPD was aware that the support order in the RO was amended from $150 to $75 weekly; however, the TPD and officers named herein refused to take any action against Ms. Mackey for the false reports.

240. Officer O'Keefe took the report on November 16, 2012 and requested a summons based solely upon Ms. Mackey's false statement. Absolutely no investigation was done to determine whether Ms. Mackey was telling the truth, despite TPD's awareness of Ms. Mackey's history of false statements and reports.

241. Moreover, November 16, 2012 was a Friday, and the RO did not require payment by Friday. Instead, the RO only required that payment be made on a weekly basis – there was no provision in the RO which required a date by which payment must have been made or received. Accordingly, there was no violation as of Friday, November 16, 2012.

242. In fact, Mr. Mackey did send $150 to Ms. Mackey by certified mail on November 17, 2012.

243. Despite no facts corroborating Ms. Mackey's claims and despite knowledge of facts contrary to Ms. Mackey's claims, Sergeant Warren again applied for a Criminal Complaint against Mr. Mackey, which issued on November 5, 2013, Docket Number 1311CR7037.

244. That case was dismissed on September 19, 2014.

**B.     November 25, 2012: Request for a False Summons Against Mr. Mackey**

245. On November 25, 2012, Ms. Mackey filed a report with the TPD, again alleging that Mr. Mackey failed to pay $150 in support in accordance with the active RO.

246. This was at least the **eleventh** time that Ms. Mackey made a false report to the TPD regarding the $150 support payment.

247. As early as June 15, 2012, the TPD was aware that the support order in the RO was amended from $150 to $75 weekly; however, the TPD and officers named herein refused to take any action against Ms. Mackey for the false reports.

248. Based on Ms. Mackey's report, Officer James Hollis and Officer Griffin went to Mr. Mackey's residence to arrest him for an alleged restraining order violation.

249. Mr. Mackey opened the door after Officer Griffin knocked, and Officer Griffin unlawfully attempted to force his way into the house by pushing the door.

250. Mr. Mackey's daughter was with him and was very upset by this unwarranted and illegal use of force.

251. Officer Hollis stopped Officer Griffin from pushing on the door, and Mr. Mackey was able to produce proof that he mailed $150 to Ms. Mackey via certified mail on November 24, 2012. Accordingly, there was no violation on November 25, 2012.

252. Upset that they were unable to arrest Mr. Mackey, Officer Hollis requested that an unlawful summons issue for Mr. Mackey for a violation of the RO because payment was not received by Ms. Mackey during the calendar week.

253. The RO states that payment must be made each week, and payment was made on November 24, 2012. The RO does not state that payment must be *received by* Ms. Mackey during the week. Once again, this is yet another example of the TPD's flagrant abuse of its police power to harass Mr. Mackey.

## XXI. December 13, 2012: Lowell District Court Increases Mr. Mackey's Payment to $150

254. On December 13, 2013, the Lowell District Court modified the RO to increase Mr. Mackey's weekly support payment from $75 to $150.

255. The Lowell District Court also modified the RO to require the weekly $150 payment to be post marked by Wednesday of each week.

256. The Lowell District Court once again denied Ms. Mackey's request that the RO include a provision that Mr. Mackey be ordered to pay the utilities at 68 Mitchell G Drive.

## XXII. December 18, 2012: TPD Officers Harass Mr. Mackey on an Inactive Default Warrant

257. Mr. Mackey, who routinely showed up at the Lowell District Court to defend against the bogus criminal charges referenced herein, missed a *single court date* on December 17, 2012, and default warrants were issued by the Lowell District Court.

258. The very next morning, December 18, 2012, Mr. Mackey appeared at the Lowell District Court at 9:00 A.M. and the default warrants were recalled. Mr. Mackey was told to go home and return to court at 2:00 P.M.

259. According to TPD records, at approximately 1:20 P.M., the TPD and its officers attempted to arrest Mr. Mackey on the default warrant (which had been recalled) and surrounded Mr. Mackey's house in a preposterous and unwarranted show of force.

260. Specifically, the TPD brought seven different officers, four police cruisers and a K-9 in order to try to take Mr. Mackey into custody. Among the Officers involved in this incident of harassment were Officer McNamara, Officer Bjorkgren, Officer Field, Officer Griffin, Officer O'Keefe, Officer Russo, and Officer Piccolo.

261. Mr. Mackey calmly allowed the police to enter his house and showed them the warrant recall slip that he was given at the court earlier that day.

262. This type of abuse of police powers is exactly the type of abusive conduct that the TPD subjected Mr. Mackey to on a regular basis since he filed a complaint against the TPD with the Attorney General.

## XXIII. February 6, 2013: TPD Is Aware of Another False Report By Ms. Mackey

263.    On Wednesday, February 6, 2013, Ms. Mackey went to the TPD and reported to Officer Griffin that Mr. Mackey had violated the RO by failing to pay support in the amount of $75, which had to be post marked by Wednesday of each week.

264.    According to his report, Officer Griffin informed Ms. Mackey that there was no violation because Mr. Mackey had until the end of the day to send the payment.

265.    Officer Griffin then misinformed Ms. Mackey by telling her that if she did not receive the payment by the next day (Thursday), then Mr. Mackey would be in violation of the RO.

266.    The RO does not require *receipt* of the payment by Thursday of each week; it only requires that the payment be postmarked by Wednesday of each week.

267.    Mr. Mackey did make a postmarked payment on February 6, 2013, so there was no RO violation.

## XXIV. February 21, 2013: Criminal Charge #15 and Excessive Use of Police Resources

268.    On Thursday, February 21, 2013, Ms. Mackey went to the TPD to report that she received a money order from Mr. Mackey in the amount of $150, but that the payment was not postmarked by Wednesday of that week.  Ms. Mackey provided a copy of the Postal Money Order in the amount of $150, dated Thursday, February 21, 2012.

269.    Officer Griffin's report indicates that he believed that probable cause existed to arrest Mr. Mackey for a violation of the RO because the money order was dated February 21st instead of February 20th.  Officer Griffin's determination of probable cause was baseless because Mr. Mackey was carrying a balance of at least $1,000 due to paying $150 per week between June 15, 2012 and December 13, 2012 instead of the $75 ordered by the RO.

41

270. Based on Ms. Mackey's allegations of a minor technical RO violation, the TPD and its officers once again undertook a malicious manhunt for Mr. Mackey.

271. On February 21, 2013, the TPD sent at least three cruisers and multiple police officers to arrest Mr. Mackey at 64 Lorum Street, which is a private property.

272. Officer Nicosia and several other officers opened the door to 64 Lorum Street without permission and Officer Nicosia entered the building without a search warrant.

273. Sergeant Coviello and Officer Nicosia told the occupants of 64 Lorum Street that they had to bring Mr. Mackey out of the building so they could arrest him.

274. After the officers' unlawful requests were refused, The TPD officers surrounded the building in an attempt to enter or cover all of the doorways.

275. Sergeant Coviello, Officer Nicosia and the officers waited outside the property and harassed the individuals as they were leaving, including, without limitation, stopping a vehicle driven by Ed Clement so they could search the truck bed for Mr. Mackey.

276. Sergeant Coviello demanded that Mr. Clement let him search the bed of his pickup truck for Mr. Mackey. Mr. Mackey was not in the truck, so Sergeant Coviello tried to justify the unwarranted stop by writing Mr. Clement a sham citation for Improper Equipment (bald tire) and seatbelt violation. In general, the Tewksbury Police officers were rude and aggressive during the interaction with Mr. Clement.

277. The TPD was unable to apprehend Mr. Mackey on the unlawful warrant at 64 Lorum Street; however, Officer Griffin's February 25, 2013 TPD report intentionally misstates that "the Tewksbury Police Department has been unsuccessful in locating Mr. Mackey."

278. Sergeant Warren initiated a criminal complaint in Lowell District Court, Docket Number 1311CR7045 based on the alleged questionable violation of the RO.

42

279.    That case was dismissed on September 19, 2014.

## XXV. March 21, 2013: TPD Is Aware of Another False Allegation By Ms. Mackey

280.    On Thursday, March 21, 2013, Officer Russo was dispatched to 68 Mitchell G Drive for a report of a restraining order violation.

281.    Ms. Mackey reported that the RO required Mr. Mackey to postmark his payment by Wednesday of each week and that she had not received her payment yet.

282.    Officer Russo returned to the station to confirm the terms of the RO.

283.    Officer Russo concluded that there was no violation because the RO required that the payment is postmarked by Wednesday; however, it does not state how it must be sent or that it must be received by a certain day.

284.    Officer Russo called Mr. Mackey and went to his residence to interview him; however, he was not home.

285.    Mr. Mackey called Officer Russo back at approximately 10:00 P.M. and confirmed that he did in fact send a payment on Wednesday, and also faxed her a receipt from the Salem, New Hampshire post office dated March 20, 2012 for $150.00.

286.    Officer Russo concluded that there was no violation of the RO.

## XXVI. May 13, 2013:  False Criminal Charge #16 Against Mr. Mackey

287.    On May 13, 2013, Ms. Mackey went to the TPD and falsely reported to Officer Miano that Mr. Mackey had violated the RO because National Grid shut off the gas at her home for failure to pay the bill.

288.    Officer Miano was unable to confirm with National Grid that the gas was shut off because it was after 5:00 P.M.

289.    Officer Miano and the TPD were well aware that Mr. Mackey's only financial obligation under the RO was to pay Ms. Mackey $150 in support per week.  They also knew that the Lowell District Court had repeatedly denied Ms. Mackey's request to modify the RO include a provision that Mr. Mackey pay the utilities at 68 Mitchell G Drive.

290.    In furtherance of a conspiracy to persecute Mr. Mackey, Officer Miano and Sergeant Warren initiated a bad faith criminal complaint which resulted in criminal charges against Mr. Mackey in the Lowell District Court, Docket Number 1311CR6210.

291.    On December 13, 2013, the Lowell District Court dismissed this charge for failure to establish probable cause.

## XXVII. May 17, 2013: Lowell District Court Denies Request that Mr. Mackey Be Ordered to Pay Utilities

292.    On May 17, 2013, Mr. Mackey and Ms. Mackey appeared at the Lowell District Court on the Return Date on the RO.  Ms. Mackey requested that the court extend the RO and modify the terms to order Mr. Mackey to pay the utilities at 68 Mitchell G Drive.

293.    After a hearing, the Lowell District Court extended the RO for another year and once again rejected Ms. Mackey's request that Mr. Mackey be ordered to pay the utilities.

## XXVIII. May 30, 2013: False Criminal Charge # 17 Against Mr. Mackey

294.    On May 30, 2013, Ms. Mackey went to the TPD and once again reported a false violation of the RO by Mr. Mackey.

295.    Ms. Mackey informed Lieutenant Gaynor that National Grid had shut off her electricity for failure to pay the outstanding bill.

296.    At the time of this report, Lieutenant Gaynor was very familiar with the terms of the RO and the fact that the Lowell District Court had repeatedly denied Ms. Mackey's request to modify the RO to include a provision that Mr. Mackey pay the utilities at 68 Mitchell G Drive.

297. In furtherance of the unlawful conspiracy to persecute Mr. Mackey, Lieutenant Gaynor and Sergeant Warren initiated an unlawful criminal complaint against Mr. Mackey for violation of the RO, Docket Number 13-6961.

298. That case was dismissed on January 31, 2014.

## XXIX. June 1, 2013: False Criminal Charge #18 Against Mr. Mackey

299. On Saturday, June 1, 2013, Ms. Mackey went to the TPD to report a false RO violation that allegedly took place on May 29, 2013.

300. Ms. Mackey spoke with Sergeant Jop and claimed that, on May 29, 2013, she was in her car, waiting at a stop sign, when Mr. Mackey approached her car on his motorcycle from the opposite direction, looked her in the eye and made a gun gesture with his hand, as if he were shooting a real gun.

301. Ms. Mackey claimed that she attempted to follow Mr. Mackey to get a picture of him but was unable to do so.

302. Sergeant Jop's report correctly calls into question the reliability of Ms. Mackey's allegations when he stated that "It should be noted that Lisa Mackey came into the police station on Thursday, May 30th and Friday, May 31st to report several possible restraining order violations but failed to mention the incident that transpired on May 29th."

303. Despite acknowledging the dubious nature of Ms. Mackey's report, Sergeant Jop *still concluded* that Mr. Mackey committed the alleged criminal acts as described by Ms. Mackey.

304. Sergeant Jop failed to conduct even a basic investigation to corroborate Ms. Mackey's allegations and made no effort to interview Mr. Mackey.

305.    Instead, Sergeant Jop initiated a criminal application for complaint, Docket Number 1311AC0899, in the Lowell District Court, alleging that Mr. Mackey had intimidated a witness and violated the RO.

306.    On Sunday, June 2, 2013, Mr. Mackey's son, James Mackey III, went to the TPD and spoke with Sergeant Jop to dispute Ms. Mackey's false claims.

307.    James Mackey III informed Sergeant Jop that Mr. Mackey could not have committed the alleged acts because he was with Mr. Mackey for the entire day on May 29, 2013. James Mackey III provided Sergeant Jop with gas receipts, a contract for the sale of a truck and dealership salesman information which confirmed that Mr. Mackey was not in Tewksbury at the time Ms. Mackey alleged.

308.    Sergeant Jop refused to take any evidence or initiate an investigation into the matter and told James Mackey III that the case was still going to court.

309.    After the evidence of Mr. Mackey's alibi was presented to the clerk magistrate, the application for criminal complaint was appropriately denied.

## XXX.    June 2, 2013: TPD Is Aware of Another False Report By Ms. Mackey

310.    On Sunday, June 2, 2013, at approximately 6:45 P.M., Ms. Mackey went to the TPD to report another false RO violation.

311.    Ms. Mackey informed Officer O'Keefe that Mr. Mackey had violated the RO because she had not yet received the $150 payment that was due that week.

312.    In a rare example of proper conduct, instead of taking the opportunity to file a spurious criminal complaint against Mr. Mackey for an RO violation, Officer O'Keefe actually took it upon herself to investigate the reported claim and called Mr. Mackey on his cell phone.

313. Mr. Mackey produced proof of a money order dated May 29, 2013, addressed to Ms. Mackey at 68 Mitchel G Drive.

314. As a result, Officer O'Keefe wisely did not pursue any further action.

315. On June 4, 2013, Ms. Mackey informed Officer O'Keefe that she still had not received the $150 payment.

316. Officer O'Keefe once again prudently investigated the matter and confirmed with the Post Master, Ken Macquire, that the payment was actually made, but was lost in the system.

317. Officer O'Keefe called Mr. Mackey to report the lost money order and Mr. Mackey agreed to issue a new money order.

318. This interaction is illustrative when compared with all of the other instances in which the TPD took Ms. Mackey's false complaints of a RO violation as an invitation to harass Mr. Mackey.

## XXXI. June 21, 2013: Lowell District Court Again Confirms Mr. Mackey Was Not Obligated to Pay for Utilities.

319. On June 11, 2013, Ms. Mackey filed a motion for civil contempt of the RO against Mr. Mackey for non-payment of utilities.

320. After a hearing on the motion on June 21, 2013, the Lowell District Court denied Ms. Mackey's motion, once again confirming that the RO did not obligate Mr. Mackey to pay for the utilities at 68 Mitchell G Drive.

## XXXII. July 26, 2013: False Criminal Charge #19 Against Mr. Mackey

321. On July 26, 2013, Ms. Mackey reported that Mr. Mackey violated the RO by failing to pay the $150 as ordered.

322. Officer Nicosia did not perform any type of investigation to confirm the veracity of Ms. Mackey's statement and, instead, requested a warrant for Mr. Mackey. Even a cursory

investigation would have revealed that Mr. Mackey did send payment by Wednesday, July 24, 2013.

323. Officer Nicosia's groundless request for a warrant resulted in a criminal complaint being issued against Mr. Mackey on February 12, 2014, Docket Number 1411CR875.

324. That case was dismissed on November 6, 2014 for Failure to Prosecute.

## XXXIII. August 23, 2013: Lowell District Court Takes No Action on Ms. Mackey's Motion to Order Payment of Utilities.

325. On August 23, 2013, the Lowell District Court heard Ms. Mackey's motion to modify the RO, which asked the court to, without limitation, enter an "Order so as to require Defendant James Mackey to resume his payment of the electricity, gas, and telephone bills for the home."

326. After a hearing, the court took "No Action" on the motion; however, it did modify the RO to include a provision that Mr. Mackey must "stay 200 yards away from Plaintiff's residence otherwise conditions remain the same."

## XXXIV. May 15, 2015: Lowell District Court Orders the RO to Expire

327. On May 15, 2015, after a hearing, the Lowell District Court refused to continue the baseless RO and Ordered that the RO expire at 4:00 P.M. See Exhibit A.

## XXXV. Damages

328. As a result of the Defendants' unconstitutional, bad faith, and intentionally tortious actions, Mr. Mackey sustained, without limitation, the following injuries: unlawful detention, loss of liberty, pain and suffering, severe mental anguish, emotional distress, infliction of physical trauma and illness, anxiety, post-traumatic stress, sleeplessness, tension headaches, neck pain, gastrointestinal problems, palpitations, humiliation, indignities and embarrassment, degradation, injury to reputation, loss of enjoyment of activities with family and others,

monetary damages, and financial implications including lost wages and earning and lost future income.

## Count I
## Violation of 42 U.S.C. § 1983
## All Defendants

329. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

330. At all relevant times, the Plaintiff alleges that each and every one of the named Defendants, acting closely together and under the color of state law, deprived the Plaintiff of his rights guaranteed by the United States Constitution and rights secured by federal law, including but not limited to: Plaintiff's clearly established constitutional right to engage in protected speech under the First Amendment, without being subject to retaliation, and Plaintiff's clearly established constitutional right to be free from unlawful and false arrest and malicious prosecution under the Fourth Amendment.

331. Plaintiff engaged in protected speech when he filed a complaint with the Attorney General's Office concerning the TPD's inadequate response to Plaintiff's beating at the hands of an off-duty Malden Police Officer.

332. Each of the named Defendants violated Plaintiff's First Amendment rights when they engaged in a long campaign of harassment against Mr. Mackey, including the filing of at least 19 meritless criminal charges, in retaliation for him engaging in protected speech.

333. Plaintiff's complaint to the Attorney General's Office was a substantial or motivating factor in Defendants' decision to take repeated unlawful criminal actions against Mr. Mackey.

49

334. There was no probable cause for any of the criminal charges brought against Mr. Mackey. As alleged herein, each of the individual named Defendants personally participated in conduct that violated Mr. Mackey's constitutional rights.

335. Defendants also violated Plaintiff's Fourth Amendment rights to be free from unlawful searches and seizures when they repeatedly, without probable cause, issued baseless arrest warrants and criminal complaints against the Plaintiff. These unlawful warrants and complaints constituted legal process.

336. The multiple baseless warrants, criminal complaints and requests for summons issued for Plaintiff's arrest caused Plaintiff to significantly restrict his travel and freedom of movement out of fear of being arrested.

337. At least one of the unlawful warrants resulted in the physical arrest and detention of Plaintiff.

338. The physical arrest of Plaintiff was without probable cause.

339. Every single one of the unlawful criminal charges, warrants, misstatements in police reports and requests for summons brought against Plaintiff terminated in Plaintiff's favor.

340. All of Defendants' unlawful conduct occurred under color of state law and while they were acting in their capacities as Tewksbury Police Officers.

341. The fact that at least 27 TPD officers participated in violating Plaintiff's rights allows for the reasonable inference that Defendants were acting pursuant to an agreement to bring unlawful criminal actions against Mr. Mackey and otherwise harass and persecute him.

342. As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## Count II
## 42 U.S.C. § 1983, Supervisory Liability
## The Town, TPD, and Chief Sheehan

343.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

344.    The Town, TPD and Chief Sheehan encouraged, condoned, and acquiesced in the unlawful conduct of the various individual TPD Officers described in this Complaint.

345.    On at least one occasion, July 25, 2012, Chief Sheehan was personally involved with and aware of Ms. Mackey's false allegations against Plaintiff. On this occasion, Chief Sheehan directed and/or allowed a criminal complaint to issue against Mr. Mackey despite his knowledge that Ms. Mackey made a false police report and that Mr. Mackey had no obligation to pay for the phone bill and/or any other utilities.

346.    Chief Sheehan also affirmatively directed and/or allowed TPD Officers to engage in all-out manhunts for the Plaintiff based on entirely false reports and/or alleged minor technical violations of a RO.

347.    The Town, TPD, and Chief Sheehan's conduct amounted to deliberate indifference to Plaintiff's constitutional rights and the wrongs that were repeatedly perpetrated against him.

348.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

51

**Count III**
**42 U.S.C. § 1983, Monell Claim**
**The Town, TPD, and Chief Sheehan**

349.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

350.    Chief Sheehan exercised authority over the TPD and its officers and was a maker of policy as to standards of conduct and discipline within the TPD. Chief Sheehan had the power to discipline, including the power to effectively recommend dismissal of officers, and the power, authority and duty to hold officers accountable for any use of excessive, abusive or unjustified police power and for misstatements of fact in official reports.

351.    The Town, TPD, and Chief Sheehan had an unconstitutional policy, custom or practice of encouraging the unlawful harassment and persecution of Plaintiff, including, but not limited to, a practice of bringing false criminal charges against Plaintiff wherever possible and without regard to the existence of probable cause.

352.    Every single criminal application and/or charge brought by the TPD referenced in this complaint was dismissed.

353.    The Town, TPD, and Chief Sheehan's policy, custom or practice amounted to deliberate indifference to Plaintiff's constitutional rights and the wrongs that were repeatedly perpetrated against him.

354.    The Town, TPD, and Chief Sheehan's policy, custom, or practice was the moving force behind the individual TPD Officers' repeated violations of Plaintiff's constitutional rights.

355.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

52

## Count IV
### False Arrest/False Imprisonment
### Officer Markus, Officer McMahon, and Lieutenant Stephens

356. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

357. On June 7, 2012, the TPD unlawfully arrested Plaintiff without probable cause.

358. Officer Markus and Officer McMahon effectuated the unlawful arrest of Plaintiff.

359. In addition, Officers Markus and McMahon manufactured a basis for a probable cause finding by intentionally and unreasonably misinterpreting the terms of the RO against Plaintiff.

360. Lieutenant Stephens approved this manufactured and unreasonable probable cause finding.

361. As a result of Defendants' false arrest, Plaintiff was falsely imprisoned overnight at the TPD, and was brought into the Lowell District Court on June 8, 2012 in handcuffs, where he was arraigned on a baseless charge of violation of an RO, Docket Number 1211CR3435.

362. The Lowell District Court dismissed that criminal complaint on October 8, 2013 for Failure to Prosecute because there was no evidence to substantiate the charge.

363. As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## Count V
## Malicious Prosecution
**Officer McLaughlin, Officer McMahon, Detective Connor, Sergeant Warren, Officer Duffy, Officer Ryser, Sergeant Kerber, Officer Hanley, Detective Regan, Sergeant Coviello, Officer Piccolo, Officer O'Keefe, Lieutenant Gaynor, Detective Donovan, Officer Hollis, Officer Griffin, Officer Miano, Officer Nicosia, Sergeant Jop, Lieutenant Stephens, and Chief Sheehan**

364.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

365.    Over the course of several years, these Defendants are specifically mentioned in false police reports and took part in instituting criminal process against the Plaintiff at least 19 times.

366.    This criminal process was instituted with malice, in retaliation for Mr. Mackey filing a complaint regarding the TPD with the Attorney General's Office.

367.    Defendants lacked probable cause for all of the warrants and criminal complaints issued against Mr. Mackey.

368.    Defendants acted unreasonably and without probable cause when they repeatedly based their decision to initiate criminal process solely on the statements of an individual who was known to be unreliable and not credible.

369.    Every single one of the criminal complaints, applications and warrants issued against Mr. Mackey terminated in Mr. Mackey's favor.

370.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## Count VI
## Abuse of Process
**Officer McLaughlin, Officer McMahon, Detective Connor, Sergeant Warren, Officer Duffy, Officer Ryser, Sergeant Kerber, Officer Hanley, Detective Regan, Sergeant Coviello, Officer Piccolo, Officer O'Keefe, Lieutenant Gaynor, Detective Donovan, Officer Hollis, Officer Griffin, Officer Miano, Officer Nicosia, Sergeant Jop, Lieutenant Stephens, and Chief Sheehan**

371.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

372.    Over the course of 2+ years, these Defendants instituted criminal process against Plaintiff at least 19 times.

373.    Defendants lacked probable cause for all of the warrants and criminal complaints issued against Mr. Mackey.

374.    Every single one of the criminal complaints, applications and warrants issued against Mr. Mackey terminated in Mr. Mackey's favor.

375.    Defendants repeatedly initiated criminal process against Mr. Mackey for the ulterior and illegitimate purpose of retaliating against him for filing a complaint with the Attorney General's Office.

376.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## Count VII
## Civil Conspiracy
## All Defendants

377.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

378.    Defendants conspired with one another to violate Plaintiff's federal and state constitutional rights and to engage in tortious conduct amounting to malicious prosecution, abuse of process, and false arrest of Plaintiff, as set forth above.

379.    The fact that at least 27 TPD officers participated in violating Plaintiff's rights allows for the reasonable inference that Defendants were acting pursuant to an agreement to bring unlawful criminal actions against Mr. Mackey and otherwise harass and persecute him.

380.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

**Count VIII**
**Intentional Infliction of Emotional Distress**
**All Defendants**

381.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

382.    Defendants' campaign to violate Plaintiff's rights and harass and persecute him inflicted severe emotional distress on Plaintiff.

383.    Defendants' repeated disregard of the facts made known to them and intentional violation of Plaintiff's rights was extreme and outrageous.

384.    Plaintiff was subjected to false arrest and imprisonment, was forced to appear in court numerous times to defend against baseless allegations, was harassed and followed by multiple TPD officers in attempts to arrest him on baseless charges, and witnessed his elderly father and friends being subjected to the TPD's harassment.

385.    The years of harassment at the hands of the TPD resulted in, without limitation, pain and suffering, severe mental anguish, emotional distress, infliction of physical trauma and illness, anxiety, post-traumatic stress, sleeplessness, tension headaches, neck pain, gastrointestinal problems, palpitations, humiliation, indignities and embarrassment, degradation, injury to reputation, and loss of enjoyment of activities with family and others.

386.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## Count IX
## Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12, §§ 11H & 11I
## All Defendants

387.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

388.    At all relevant times, the Defendants, acting closely together and under the color of state law, deprived the Plaintiff of his rights guaranteed by the Massachusetts Constitution and Declaration of Rights and rights secured by state law, including but not limited to:  Plaintiff's clearly established constitutional right to engage in protected speech under the 1st Amendment and Article 16 of the Massachusetts Declaration of Rights, without being subject to retaliation, and Plaintiff's clearly established constitutional right to be free from unlawful and false arrest and malicious prosecution under the 4th Amendment and Article 14 of the Massachusetts Declaration of Rights.

389.    Plaintiff engaged in protected speech when he filed a complaint with the Attorney General's Office concerning the TPD's inadequate response to Plaintiff's beating at the hands of an off-duty Malden Police Officer.

390.    Defendants violated Plaintiff's constitutional rights when they engaged in a long campaign of harassment against Mr. Mackey, including the filing of at least 19 meritless criminal charges, in retaliation for him engaging in protected speech.

391.    Plaintiff's complaint to the Attorney General's Office was a substantial or motivating factor in Defendants' decision to take repeated unlawful criminal actions against Mr. Mackey.

392.    There was no probable cause for any of the criminal charges and/or applications brought against Mr. Mackey.

57

393. Defendants also violated Plaintiff's constitutional rights, including without limitation those rights set forth in Article 14 of the Massachusetts Declaration of Rights, to be free from unlawful searches and seizures when they repeatedly, without probable cause, issued baseless arrest warrants and criminal complaints against the Plaintiff. These unlawful warrants and complaints constituted legal process.

394. The multiple baseless warrants issued for Plaintiff's arrest caused Plaintiff to significantly restrict his travel and freedom of movement out of fear of being arrested.

395. At least one of the unlawful warrants resulted in the physical arrest and detention of Plaintiff.

396. The physical arrest of Plaintiff was without probable cause.

397. Every single one of the unlawful criminal charges and warrants brought against Plaintiff terminated in Plaintiff's favor.

398. The violations of Plaintiff's constitutional rights were accomplished through threats, intimidation, or coercion, including, but not limited to, when Defendants repeatedly used excessive displays of force in an attempt to arrest Plaintiff pursuant to unlawful warrants.

399. The fact that at least 27 TPD officers participated in violating Plaintiff's rights allows for the reasonable inference that Defendants were acting pursuant to an agreement to bring unlawful criminal actions against Mr. Mackey and otherwise harass and persecute him.

400. All of Defendants' unlawful conduct occurred under color of state law and while they were acting in their capacities as Tewksbury Police Officers.

401. As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

WHEREFORE, Mr. Mackey requests that the Court:

1.    Enter judgment in Plaintiff's favor on all counts and award damages in an amount to be determined at trial, plus prejudgment and post-judgment interest;

2.    Award Plaintiff all compensatory damages, consequential damages, actual damages, punitive damages, statutory damages, special damages, unspecified damages, emotional distress damages, and any such other damages as the court may deem just and proper;

3.    Award Plaintiff his attorneys' fees, interest and costs; and

4.    Grant such other relief as the Court deems just and proper.


**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

JAMES F. MACKEY, JR.


By his attorneys,


    /s/ *Benjamin S. Kafka*
Sean T. Carnathan, Esq. (BBO # 636889)
scarnathan@ocmlaw.net
David B. Mack, Esq. (BBO # 631108)
dmack@ocmlaw.net
Benjamin S. Kafka, Esq. (BBO# 640993)
bkafka@ocmlaw.net
Stephanie Parker, Esq. (BBO #687610)
sparker@ocmlaw.net
O'Connor, Carnathan and Mack LLC
Landmark One
1 Van De Graaff Drive
Suite 104
Burlington, Massachusetts 01803
Tel. 781-359-9000

Dated: June 4, 2015


4814-1721-4756, v. 1