UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES F. MACKEY, JR.,
    Plaintiff,

v.                                    CIVIL ACTION NO.
                                      15-12173-MBB

TOWN OF TEWKSBURY, et al.,
    Defendants.

**MEMORANDUM AND ORDER RE:
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY # 74)**

**January 7, 2020**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment
filed by defendants Town of Tewksbury ("the Town"), the
Tewksbury Police Department ("TPD"), Tewksbury Police Chief
Timothy Sheehan ("Chief Sheehan"), Officer Michael McLaughlin
("Officer McLaughlin"), Officer Markus McMahon ("Officer
McMahon"), Sergeant Brian Warren ("Sergeant Warren"), Detective
Patrick Connor ("Detective Connor"), Officer David Duffy
("Officer Duffy"), Officer James Ryser ("Officer Ryser"),
Sergeant Daniel Kerber ("Sergeant Kerber"), Officer Eric Hanley
("Officer Hanley"), Detective Patrick Regan ("Detective Regan"),
Sergeant Timothy Kelly ("Sergeant Kelly"), Sergeant Chris
Coviello ("Sergeant Coviello"), Detective Andrew Richardson

("Detective Richardson"), Officer Albert Piccolo ("Officer Piccolo"), Officer Kimberly O'Keefe ("Officer O'Keefe"), Lieutenant Scott Gaynor ("Lieutenant Gaynor"), Detective Michael Donovan ("Detective Donovan"), Lieutenant Robert Stephens ("Lieutenant Stephens"), Officer James Griffin ("Officer Griffin"), Officer Paul Nicosia ("Officer Nicosia"), Officer David Miano ("Officer Miano"), Sergeant Walter Jop, III ("Sergeant Jop"), Officer James Hollis ("Officer Hollis"), Officer Jason McNamara ("Officer McNamara"), Officer Robert Bjokgren ("Officer Bjokgren"), Officer Robert Field ("Officer Field"), and Officer Alysia Russo ("Officer Russo") (collectively "defendants").[1] Plaintiff James F. Mackey, Jr. ("plaintiff") opposes summary judgment and submits this court should enter partial summary judgment on a civil rights claim brought under 42 U.S.C. § 1983 ("section 1983") against the arresting officers pursuant to Fed. R. Civ. P. 56(f)(1) ("Rule 56(f)(1)"). (Docket Entry ## 74, 79).

---

[1] Officer McLaughlin, Officer McMahon, Detective Connor, Sergeant Warren, Officer Duffy, Officer Ryser, Sergeant Kerber, Officer Hanley, Detective Regan, Sergeant Coviello, Officer Piccolo, Officer O'Keefe, Lieutenant Gaynor, Detective Donovan, Officer Hollis, Officer Griffin, Officer Miano, Officer Nicosia, Sergeant Jop, Lieutenant Stephens, and Chief Sheehan are collectively referred to as "sub-defendants." Officer Markus, Officer McMahon, and Lieutenant Stephens are referred to as the "arresting officers."

Defendants also move to strike an affidavit filed by plaintiff in opposition to the summary judgment motion. (Docket Entry # 82). A separate opinion addresses this motion as well as defendants' motion to strike. After conducting a hearing, this court took the motions (Docket Entry ## 74, 82) under advisement.

PROCEDURAL BACKGROUND

Plaintiff filed this civil rights action seeking damages for an arrest and multiple applications for criminal complaints filed against plaintiff. The complaint sets out the following nine counts: (1) violation of plaintiff's civil rights, specifically his First and Fourth Amendment rights, by defendants in violation of section 1983 (Count I);[2] (2) supervisory liability against the Town, TDP, and Chief Sheehan under section 1983 (Count II); (3) a _Monell_ claim[3] against the Town, TPD, and Chief Sheehan under section 1983 (Count III); (4) false arrest and false imprisonment against "Officer Markus," Officer McMahon and Lieutenant Stephens (Count IV); (5) malicious prosecution against the sub-defendants (Count V); (6)

---

[2] The Fourth Amendment claim in Count I alleges plaintiff's "right to be free from unlawful and false arrest _and_ malicious prosecution." (Docket Entry # 1, p. 49, ¶ 330) (emphasis added).

[3] _Monell v. Dep't of Soc. Servs. of the City of New York_, 436 U.S. 658 (1978).

abuse of process against the sub-defendants (Count VI); (7)

civil conspiracy against all defendants (Count VII); (8)

intentional infliction of emotional distress ("IIED") against

all defendants (Count VIII);[4] and (9) violation of the

Massachusetts Civil Rights Act ("MCRA"), Massachusetts General

Laws chapter 12, sections 11H and 11I, against all defendants

(Count IX).  (Docket Entry # 1).  Defendants filed an answer

raising inter alia a qualified immunity defense.  (Docket Entry

# 9).

## STANDARD OF REVIEW

Summary judgment is designed "to 'pierce the boilerplate of

the pleadings and assay the parties' proof in order to determine

whether trial is actually required.'"  Tobin v. Fed. Express

Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts

Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)).  It is

appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is

inappropriate "if the record is sufficiently open-ended to

permit a rational factfinder to resolve a material factual

dispute in favor of either side."  Pierce v. Cotuit Fire Dist.,

741 F.3d 295, 301 (1st Cir. 2014).

---

[4]  Counts IV to VIII are brought under Massachusetts law.

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (internal citations omitted). The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in favor of the moving party. Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). "Unsupported allegations and speculation" however, "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 39-40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded"). Where, as here, the nonmovant bears the burden of proof at trial, he "'must point to facts memorialized by materials of evidentiary quality and reasonable inferences therefrom to forestall the entry of summary judgment.'" Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014) (internal citation omitted); see Woodward v. Emulex Corp., 714 F.3d 632, 637 (1st Cir. 2013) (as to issues on which nonmovant bears burden of proof, he must "'demonstrate that a trier of fact

reasonably could find in his favor'") (internal citation
omitted).

FACTUAL BACKGROUND

1.  Hunting Incident and Massachusetts Attorney General's Report

     While plaintiff was bow hunting on public property in
Tewksbury, Massachusetts on November 6, 2010, two men confronted
him and questioned his right to hunt in the area.  (Docket Entry
# 81-1, Ex. 3).  Plaintiff testified that he called 911 after
they became threatening and the two men began to beat him when
he started dialing the phone.  (Docket Entry # 81-5, Ex. 43, pp.
254-59).  The altercation continued until a number of Tewksbury
police officers arrived.  (Docket Entry # 81-5, Ex. 43, p. 258).
The officers, Sergeant Thomas Cooke ("Sergeant Cooke") and
Officer Lozado, questioned the men but made no arrests.  (Docket
Entry # 81-1, Ex. 2).  Plaintiff was transported to a medical
center for treatment whereas the two men "just walked away."
(Docket Entry # 81-1, Exs. 2, 3).

     Afterwards, plaintiff called the TPD and complained to
Lieutenant Stephens about the officers' decision "not to arrest
the [alleged] attackers" because one of the attackers "was a
cop" and also described being choked and "kicked in the face" by
the two attackers.  (Docket Entry # 81-1, Ex. 3).  In addition,
plaintiff "called the State Police on a recorded line and told
them" what happened, including Sergeant "Cooke's favoritism."

(Docket Entry # 81-1, Ex. 3). Sergeant Cooke's narrative report reflects that an officer of the Massachusetts Environmental Police provided Sergeant Cooke with a written statement by plaintiff dated November 7, 2010. (Docket Entry # 81-2). The statement recounts his conversation with Lieutenant Stephens and with "the State Police" regarding Sergeant Cooke's favoritism and plaintiff's above-noted conversation with Lieutenant Stephens. (Docket Entry # 81-1, Ex. 3). The statement additionally informs the TPD that plaintiff would ask "the State Police and" the Massachusetts Attorney General's Office ("AGO") to investigate the incident and Sergeant Cooke's alleged favoritism. (Docket Entry # 81-1, Ex. 3). As noted, Sergeant Cooke confirms that he received a copy of this statement. (Docket Entry # 81-1, Ex. 2). Sergeant Warren filed an application for a criminal complaint against plaintiff for assault and battery with a dangerous weapon in Lowell District Court along with the narrative report by Sergeant Cooke. (Docket Entry # 81-1, Ex. 2). The prosecution entered a nolle prosequi on September 2, 2011. (Docket Entry # 81-1, Ex. 2). Plaintiff filed a complaint to the AGO on November 4, 2011, which it declined to investigate. (Docket Entry 81-1, Ex. 6).

2. Abuse Prevention Orders

In February 2012, plaintiff filed for divorce from his wife, Lisa Mackey. (Docket Entry # 1, p. 10, ¶ 53). In March

2012, the Middlesex Family and Probate Court ("Probate Court")
denied two motions, one filed by Lisa Mackey and the other filed
by plaintiff, seeking temporary orders for support and custody
of a minor child. (Docket Entry # 81-1, Ex. 7) (Docket Entry #
81, p. 2, ¶ 8). The court noted the absence of "specific,
credible grounds" to enter a vacate order and unclear financial
issues. (Docket Entry # 81-1, Ex. 7). One of Lisa Mackey's
requests was for plaintiff to continue to pay utilities.
(Docket Entry # 81-1, Ex. 7). On May 3, 2012, the Lowell
District Court issued an abuse prevention order ("the RO") under
Massachusetts General Laws chapter 209A ("chapter 209A") against
plaintiff. (Docket Entry # 81-1, Ex. 10) (Docket Entry # 76-1).
The top of the RO states, in part, that "VIOLATION OF THIS ORDER
IS A CRIMINAL OFFENSE punishable by imprisonment or fine or
both." (Docket Entry # 81-1, Ex. 10). The RO also states that
the order "was issued without advance notice because the Court
determined that there is a substantial likelihood of immediate
danger of abuse." (Docket Entry # 81-1, Ex. 10). Section A(1)
of the RO states, "YOU ARE ORDERED NOT TO ABUSE [Lisa Mackey],
by harming, threatening or attempting to harm [Lisa Mackey]
physically or by placing [Lisa Mackey] in fear of imminent
serious physical harm, or by using force, threat or duress to
make [Lisa Mackey] engage in sexual relations." (Docket Entry #
81-1, Ex. 10).

Section A(2) of the RO states, in part, that "YOU ARE
ORDERED NOT TO CONTACT [Lisa Mackey], in person, by telephone,
in writing, electronically or otherwise, either directly or
through someone else, and to stay at least 100 yards from [Lisa
Mackey] even if [Lisa Mackey] seems to allow or request it."
(Docket Entry # 81-1, Ex. 10). Section A(3) of the RO states,
in part, that "YOU ARE ORDERED TO IMMEDIATELY LEAVE AND STAY
AWAY FROM THE PLAINTIFF'S RESIDENCE." (Docket Entry # 81-1, Ex.
10). Subsection A(3)(c) of the RO states, in part, that
plaintiff was "not to shut off or cause to be shut off any
utilities or mail delivery to [Lisa Mackey]."[5] (Docket Entry #
81-1, Ex. 10).

On May 17, 2012, the Lowell District Court added paragraph
nine to the RO, requiring plaintiff to make support payments of
$150 per week "directly to [Lisa Mackey] by mailing payments to
68 Mitchell G. Dr. Tewksbury." (Docket Entry # 81-1, Ex. 10).
On June 15, 2012, it modified paragraph nine to reduce the
support payments to $75 per week.[6] (Docket Entry # 81-1, Ex.

---

[5] Plaintiff contends he "was never ordered or obligated to pay
for the utilities, maintenance, mortgage, cable, phone bill,
electric bill or heat[ing] bill at 68 Mitchell G. Drive in
Tewksbury" ("68 Mitchell Drive"). (Docket Entry # 80, p. 3, ¶
5). He also objects to any characterization by defendants that
the RO "obligated [him] to pay for the utilities, mortgage,
taxes, and/or expenses for 68 Mitchell G. Drive." (Docket Entry
# 80, p. 3, ¶ 5).
[6] Paragraph nine includes a line for financial support payments
that includes spaces to identify the amount, the frequency of

9

10).  On June 13, 2012, two days before this modification, the

Probate Court entered a temporary order stating that it was

adopting the Lowell District Court's order of $150 per week as a

temporary support order.  (Docket Entry # 76-2).  On December

13, 2012, the Lowell District Court again modified paragraph

nine, raising the support payments to $150 per week to be

consistent with the Probate Court's June 13, 2012 order.[7]

(Docket Entry # 76-1).  The Lowell District Court further

modified the RO on December 13, 2012 by requiring "[t]he weekly

---

the payment as either weekly or monthly, and the mailing address
for the payments.  The line for financial support payments has
an "x" at the beginning of the line, followed by a slash
crossing out the handwritten figure of $150, and an insertion of
$75 circled immediately above the slashed $150 figure.  The
fifth line in that paragraph instructs that payments are weekly
with the payments for plaintiff mailed to the 68 Mitchell Drive
address.  (Docket Entry # 81-1, Ex. 10).
[7]  Plaintiff asserts that the "Lowell District Court denied or
took no action on every single one of Lisa Mackey's requests
and/or motions for an order that [plaintiff] continue to pay the
maintenance, utilities, [mortgages] and property taxes of the
marital property."  (Docket Entry # 80, pp. 3-4, ¶ 7).  On June
4, 2012, the Lowell District Court took "no action" on Lisa
Mackey's May 22, 2010 motion to modify the RO.  (Docket Entry #
81-2, Ex. 11).  On July 17, 2012, the Lowell District Court
denied Lisa Mackey's motion for temporary support orders to
increase the support payments.  (Docket Entry # 81-2, Ex. 14).
On November 16, 2012, the court also took "no action" on Lisa
Mackey's November 7, 2012 motion to increase the support
payment, which noted the house telephone was shut off and she
needed more money for utilities.  (Docket Entry # 81-2, Ex. 15).
The Lowell District Court also denied Lisa Mackey's June 2013
motion to modify the RO, including her request for an order
requiring plaintiff to comply with a purported order to pay
utilities, and took "no action" on Lisa Mackey's August 2013
motion to modify the RO.  (Docket Entry # 81-2, Exs. 16-17).

payment . . . to be postmarked Wednesday of each week." (Docket Entry # 81-1, Ex. 10). On August 23, 2013, the Lowell District Court modified the RO again by ordering that plaintiff stay 200 yards away from Lisa Mackey's residence. (Docket Entry # 81-1, Ex. 10). Each modification of the RO extended its expiration date by about one year, including another modification on May 16, 2014. (Docket Entry # 81-1, Ex. 10).

3. <u>TPD Training and Departmental Material</u>

Slides from the Middlesex District Attorney's Office contain information that pertains to arrest procedures following violations of an order issued under chapter 209A.[8] (Docket Entry

---

[8] Defendants' LR. 56.1 statement of facts references a "training slide from the Office of the Middlesex District Attorney" that is "used to train police officers" indicating "utilities fall under a non-arrestable offense." (Docket Entry # 80, p. 9, ¶ 18). In response, plaintiff objects to the characterization of the slide as a "'training slide'" and maintains that defendants do not provide "any foundation to support the purpose for which" the slide is used. (Docket Entry # 80, p. 9, ¶ 18). In order "[t]o authenticate evidence 'the proponent must produce evidence sufficient to support a finding that the item is what its proponent claims it is.'" <u>United States v. Blanchard</u>, 867 F.3d 1, 5 (1st Cir. 2017) (quoting Fed. R. Evid. 901(a)), *cert. denied*, 138 S. Ct. 2691 (2018). Defendants' attorney avers that the document is "a copy of a slide from [the] Middlesex District Attorney" but provides no other foundation for the document as a training slide used to train police officers, as asserted in paragraph 18 of defendants' LR. 56.1 statement. (Docket Entry # 77, p. 2, ¶ 7) (capitalization omitted). The deposition of defendants' expert does not authenticate the document as a *training slide* used to *train* police officers. (Docket Entry # 81-4, Ex. 33, p. 223) (Docket Entry # 76-5). Officer McMahon had not seen this exhibit prior to being presented with it at his deposition. (Docket Entry # 81-4, Ex. 40, p. 676). Accordingly, defendants authenticate the document as a slide

# 76-5) (Docket Entry # 77, p. 2, ¶ 7). One slide, entitled

"Special Arrest Rule in DV Cases under G.L. c. 209A, § 6(7),"

states that when the violation is a "felony, or a misdemeanor

involving 'abuse' as defined by 209A, § 1 . . . the '<u>Preferred

Response</u>' is to make a <u>warrantless arrest</u>." (Docket Entry # 76-

5) (emphasis in original). The slide also states in pertinent

part: "<u>Mandatory Arrest</u> for Violation of a Restraining Order

under G.L. c. 209A, § 6(7): An officer <u>must</u> make an arrest if

he/she has probable cause to believe that a suspect has violated

any arrestable provision of an existing restraining order from

any jurisdiction." (Docket Entry # 76-5) (emphasis in

original).

Another slide, entitled "When a 209A Order is in Effect,"

sets out two columns ("chapter 209A slide"). (Docket Entry #

76-5). The left column on this slide reads: "Mandatory Arrest

---

from the Middlesex District Attorney's Office through their
counsel's averment, see Fed. R. Evid. 901(b)(1) (giving example
of proper authentication as testimony from witness with
knowledge "that an item is what it is claimed to be"), but, as
the proponents of the challenged exhibit, they do not point to
evidence in the record that authenticates the document as a
*training* slide used to train police officers. The substance and
content of the slide also does not authenticate the slide as a
training slide used to train police officers. See Fed. R. Evid.
901(b)(4); cf. <u>Xiao Wei Yang Catering Linkage in Inner Mongolia
Co. Ltd. v. Inner Mongolia Xiao Wei Yang USA, Inc.</u>, Civil Action
No. 15-10114-DJC, 2017 WL 507211, at *4 (D. Mass. Feb. 6, 2017).
Plaintiff's argument is therefore well-taken inasmuch as
defendants fail to argue any other basis to authenticate the
exhibit as a *training* slide.

when probable cause to believe that there has been a violation

of: No Contact[,] No Abuse[,] Vacate Household[,] Stay Away[,]

Surrender[,] Weapon/FID/LTC." (Docket Entry # 76-5). The right

column reads: "Non-Arrestable 209A Violations: Custody[,]

Visitation[,] Support[,] Utilities (Current View Note: We are

looking for a case to decide this)." (Docket Entry # 76-5).

A manual entitled "Criminal Law: Massachusetts Police

Manual 2011" authored by John Sofis Scheft, Esq. ("MCLP Manual"

or "Scheft Manual") discusses the different types of restraining

orders, the courts that issue them, and violations thereof in

chapter 13 of the manual. (Docket Entry # 81-4, Ex. 31). The

TPD kept a copy of the Scheft Manual in an office of the

"officer in charge" and used the manual in training at the

Police Academy. (Docket Entry # 81-4, pp. 307-08, 486-87). In

a section labeled "Notes," the manual explains that chapter 209A

is "different than most laws that officers utilize because it

provides *both* civil remedies (the restraining order and its

related protections) and criminal penalties (the consequences

that flow from violations of the order)." (Docket Entry # 81-4,

Ex. 31, p. 27)[9] (emphasis in original). The Scheft Manual

includes a table entitled "Violation of a Restraining Order G.L.

---

[9] All page numbers refer to the page number in the upper right-
hand corner of the docketed filing rather than the page number
on the bottom of the actual exhibit.

c. 209A § 7" that contains four items: "Elements," "Mandatory

Arrest," "Penalty," and "Contempt of Court." (Docket Entry #

81-4, Ex. 31, pp. 29-30). The first item, entitled "**Elements**,"

states in pertinent part:

> **Direct or Indirect violation of order**. The suspect, either
> directly or indirectly, violated the terms of a permanent
> or temporary restraining order, which was in effect at the
> time of the violation. By failing to do one or more of the
> following: **Refrain from abuse**; or **[h]ave no contact with
> the plaintiff or her child(ren)**; or **[s]urrender his
> firearms, weapons, ammunition and gun licenses**; or
> **[v]acate**. A vacate order means that defendant must:
> Surrender the keys immediately; [n]ot damage any household
> property; *[n]ot disrupt utility service* or mail delivery;
> [l]eave and remain away from the house, a multi-family
> dwelling, and/or the victim's workplace.

(Docket Entry # 81-4, Ex. 31, p. 29) (emphasis in original and

italics added). The following section, entitled "**Mandatory**

**Arrest**," states:

> *G.L. c. 209A, § 6 mandates warrantless arrest on probable
> cause.* This authority applied even when the abuser has
> fled the scene and is discovered later . . .

> *Arrest warrant option.* Officers may obtain an arrest
> warrant and avoid applying for a complaint. However, they
> must use this approach "in good faith." *Comm. v. Ledger*,
> 52 Mass App. Ct. 232 (2001) (arrest warrant appropriate
> because the defendant had violated the order twice within a
> short time period).

> Compare *Comm. v. Tipolone*, 44 Mass. App. Ct. 23 (1997) (the
> victim approached the police nine months after the
> defendant violated the order; police should have arranged a
> show cause hearing; at the time, there was no indication
> that the defendant posed a threat or flight risk; a warrant
> was unnecessary).

(Docket Entry # 81-4, Ex. 31, pp. 29-30) (emphasis in original).

The last section, entitled "**Contempt of Court**," states: "G.L. c.

209A, § 7 establishes that 209A criminal remedies are *not* exclusive.  A court 'may enforce by *civil contempt* . . . a violation of its own order.' *Mahoney v. Comm.*, 415 Mass. 278 (1993)."  (Docket Entry # 81-4, Ex. 31, p. 30) (emphasis and ellipses in original).  After the table, a section labeled "**Notes**" states:

> **Coverage.**  Officers must remember that only four violations result in criminal penalties under 209A.  Thus, police must arrest any offender who violates an order by failing to: (1) refrain from abuse; or (2) stay away or have no contact with the plaintiff; or (3) vacate; or (4) surrender his guns and licenses.  Other violations are *not* arrestable and must be pursued with the court by a motion for contempt - e.g., the defendant fails to pay the victim child support or medical expenses designated in the order.

(Docket Entry # 81-4, Ex. 31, p. 30) (emphasis in original).

These procedures were also explained, in part, in the TPD's own department manual ("TPD Manual").  (Docket Entry # 81-3, Exs. 28, 29).  Chapter 21 of the TPD Manual explains the department's policies and practices regarding arrest.  (Docket Entry # 81-4, Ex. 40, p. 664) (Docket Entry # 81-3, Ex. 28) (Docket Entry # 81-5, Ex. 41, pp. 12-13).  The chapter begins with: "**POLICY:** It shall be the policy of the Tewksbury Police Department to comply with all the provisions of the laws, ordinances, and court decisions consistent with arrest and accepted police procedures."  (Docket Entry # 81-3, Ex. 28) (emphasis in original).  Regarding warrantless arrests, the TPD manual states in pertinent part:

An officer in his own jurisdiction may make arrest without a warrant for a felony if the officer has probable cause to believe the person to be arrested committed or is committing a felony. An officer may also, with a warrant, arrest for a misdemeanor which constitutes a breach of the peace, or for a misdemeanor where a warrantless arrest is allowed by statute.

(Docket Entry # 81-3, Ex. 28, p. 64). The TPD Manual also sets out specific arrest guidelines related to domestic abuse and chapter 209A violations. (Docket Entry # 81-4, Ex. 40, p. 666) (Docket Entry # 81-5, Ex. 41, pp. 13-14) (Docket Entry # 81-3, Ex. 29). The TPD Manual states in pertinent part:

1. In the interest of immediacy, and the statutory mandate to arrest, officers shall make a warrantless arrest of any person the officer witnesses or has probable cause to believe has violated an emergency, temporary or permanent vacate, refrain from abuse, stay away or no-contact order or judgment, a suspension and surrender order, or protection order issued by another jurisdiction.

2. When there are no refrain from abuse, vacate, stay-away or no contact orders or judgments in effect, arrest shall be the preferred response whenever an officer witnesses or has probable cause to believe that a person:

   a. has committed a felony; or
   b. has committed an assault and battery of a family or household member in violation of M.G.L. c.265 ss: 13A; or
   c. has committed a misdemeanor involving abuse, as defined in M.G.L. c. 209A.

(Docket Entry # 81-3, Ex. 29, pp. 76-77) (emphasis in original).

The TPD Manual provides a definition for "abuse":

A. For the purpose of this policy "ABUSE" is defined by M.G.L. c. 209A as the occurrence of one or more of the following acts between family or household members:
1. attempting to cause or causing physical harm,
2. placing another in fear of imminent physical harm;

16

3. causing another to engage involuntarily in sexual
   relations by force, threat, or duress.

(Docket Entry # 81-3, Ex. 29, p. 72) (bolding in original).

Several TPD officers testified about their understanding of chapter 209A and TPD arrest policies. Chief Sheehan testified that "[i]f there's probable cause to believe that a violation of a 209A has occurred, our officer's response is supposed to be arrest . . . It's a mandatory mandate from the law." (Docket Entry # 81-4, Ex. 32, p. 158). In other words, he testified that it was the "practice" of the TPD to arrest for any chapter 209A violation. (Docket Entry # 81-4, Ex. 32, p. 158). Lieutenant Gaynor agreed that "any violation of a restraining order is an arrestable offense without a warrant in Tewksbury." (Docket Entry # 81-4, Ex. 36, p. 430). He based this opinion "on all the training we've had" and his personal interactions with prosecutors and courts. (Docket Entry # 81-4, Ex. 36, p. 430). Likewise, Sergeant Jop testified that "any violation" of a restraining order authorized a warrantless arrest. (Docket Entry # 81-4, Ex. 37, p. 491). He also agreed that "the actual language in General Law Chapter 209A differs from [TPD] policy," explaining that "our policies and procedures are just a guide . . . [t]hey're not . . . set in stone." (Docket Entry # 81-4, Ex. 37, pp. 492-493). He further agreed that "what really guides [him] or what prescribes the limitations of [his] actions

would be the language of General Law Chapter 209A or case law analyzing General Law Chapter 209A." (Docket Entry # 81-4, Ex. 37, p. 493). Sergeant Warren testified that, "Every 209A violation is arrestable" because "[i]t is written in the law that way." (Docket Entry # 81-4, Ex. 39, p. 589). He agreed that "the law says you have to arrest for an alleged 209A violation" because that is "something [he] [was] trained in." (Docket Entry # 81-4, Ex. 39, p. 596). However, he was unsure whether "it was an actual written policy [of the TPD]." (Docket Entry # 81-4, Ex. 39, p. 596). Officer McLaughlin agreed "that 209A, Section 6 provides you or the Tewksbury Police Department with the right to arrest anyone who violates a restraining order." (Docket Entry # 81-5, Ex. 41, p. 10). He stated that was his "understanding of the law as it was explained to [him]." (Docket Entry # 81-5, Ex. 41, p. 10). Officer McMahon agreed that "any violation of a restraining order is an arrestable offense." (Docket Entry # 81-4, Ex. 40, p. 665).

4. June 7, 2012

On June 7, 2012, Officers McMahon and McLaughlin responded to a radio call regarding an alleged chapter 209A violation at 68 Mitchell Drive. (Docket Entry # 76-14) (Docket Entry # 81-5, Ex. 41, p. 8). In June 2012, Officer McMahon was an 11-year veteran patrolman at the TPD with training in domestic-violence cases at the time of the arrest. (Docket Entry # 81-4, Ex. 40,

18

pp. 655, 657). Officer McLaughlin, a 2011 graduate of the

police academy, was a recently-hired patrolman undergoing field

training at the TPD.[10] (Docket Entry # 81-5, Ex. 41, p. 4).

After they arrived at 68 Mitchell Drive, they spoke with Lisa

Mackey, who stated she had a restraining order against

plaintiff, her husband at that time. (Docket Entry # 76-14).

Lisa Mackey informed the officers that plaintiff had not paid

for her cable, telephone, or internet services "and that this

violated her restraining order."[11] (Docket Entry # 76-14). She

---

[10] Specific to chapter 209A, Officer McLaughlin "went over
cases[,] . . . the law, [and] the statute" while at the police
academy. (Docket Entry # 81-5, Ex. 41, p. 7).
[11] The above statement by Lisa Mackey is set out in Officer
McLaughlin's narrative report. Assuming that the statement
constitutes a "statement" within the meaning of Fed. R. Evid.
801(a), plaintiff's failure to object to the statement on the
basis that it is hearsay allows this court to consider it. See
Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 420
n.2 (1st Cir. 2014) (rejecting argument that summary judgment
affidavit included hearsay and explaining that, "because Bellone
did not raise any objection to the affidavit below, the district
court was free to consider it") (citing Desrosiers v. Hartford
Life and Accident Ins. Co., 515 F.3d 87, 91 (1st Cir. 2008)).
Plaintiff's and defendants' failure to challenge other
statements in other police narrative reports likewise waives the
issue for purposes of the summary judgment motion and this court
is free to consider the statements. See Bellone v. Southwick-
Tolland Reg'l Sch. Dist., 748 F.3d at 421 n.2; Desrosiers, 515
F.3d at 91 (explaining at length that party must take "some
affirmative action" to, inter alia, "spell out the nature of the
ostensible defects" in a summary judgment affidavit "clearly and
distinctly" to district court) (internal citation omitted).
That said, this court considers the above statement by Lisa
Mackey solely for purposes of what the officers involved
objectively knew for purposes of qualified immunity. Thus, here

did not provide paperwork or documents to corroborate her allegations, but the officers "observed the television and phone not functioning."[12] (Docket Entry # 76-14). Lisa Mackey then contacted a Comcast representative, who, after also speaking with Officer McMahon, would confirm only that the payment for an account in plaintiff's name was past due. (Docket Entry # 76-14). Although Officer McLaughlin's narrative report notes that under the RO plaintiff "cannot shut off any utilities of Lisa's" (Docket Entry # 76-14), Officer McMahon testified at his deposition that neither he nor Officer McLaughlin had a copy of the RO at the scene.[13] (Docket Entry # 81-4, Ex. 40, p. 661). (Docket Entry # 81-5, Ex. 41, p. 8). Rather, Officer McLaughlin

---

and elsewhere (unless noted otherwise), this court considered any "statements" in police narrative reports only to show knowledge and notice of the officers involved and/or the presence of probable cause. See generally United States v. Barbosa, 896 F.3d 60, 72 n.5 (1st Cir. 2018) ("'Hearsay statements, like those of . . . the informant, often are the stuff of . . . warrant affidavits.'") (quoting United States v. Jordan, 999 F.2d 11, 13-14 (1st Cir. 1993)), cert. denied, 139 S. Ct. 579 (2018). Two motions to strike other matters (Docket Entry ## 82, 91) are addressed in a separate opinion.

[12] Plaintiff asserts there is no indication of the reason the services were not working or whether there was any investigation into how long the services had not been working. (Docket Entry # 80, p. 20, ¶ 50). Plaintiff also maintains that the RO never required him to pay for Lisa Mackey's cable, internet, or other utilities. (Docket Entry # 79) (Docket Entry # 76-14).

[13] "[L]ater on" after the arrest, Officer McMahon personally reviewed the RO, including section three, which includes the provision prohibiting plaintiff from shutting off or causing to be shut off any utilities. (Docket Entry # 81-4, Ex. 40, p. 662) (Docket Entry # 81-1, Ex. 10).

testified that Lisa Mackey stated that the RO had a provision that plaintiff could not "shut off the utility."[14] (Docket Entry # 81-5, Ex. 41, p. 10).

Officer McMahon contacted Lieutenant Stephens and explained the situation. (Docket Entry # 76-14, p. 4) (Docket Entry # 81-4, Ex. 40, p. 661). Lieutenant Stephens informed him that he could arrest plaintiff for violating the RO.[15] (Docket Entry # 81-4, Ex. 40, pp. 661-662) (Docket Entry # 81-5, Ex. 41, p. 10). In his narrative report, Officer McLaughlin stated that "[a]fter observing the phone and television not functioning and listening to Lisa's explanation of the events, there is probable cause that [plaintiff] had violated [the RO]." (Docket Entry # 76-14). The officers traveled to plaintiff's current residence at 20 South Oliver Street, spoke to plaintiff, and placed him under arrest. (Docket Entry # 76-14). They handcuffed plaintiff

---

[14] Here again, this statement is not considered for the truth of the matter asserted but, rather, to show what facts the arresting officers had at the time of the arrest. Although the narrative report also states that "'Officer McMahon contacted Lt. Stephens,'" which can give rise to a reasonable inference that Lieutenant Stephens reviewed the RO at the TPD and communicated to Officer McMahon its requirement that plaintiff not shut off any utilities (Docket Entry # 76-1) (Docket Entry # 81-4, Ex. 40, p. 661), this court is viewing the record in plaintiff's favor. The narrative report could also give rise to a reasonable inference that the others relied only on Lisa Mackey's recitation of the RO's requirement regarding utilities.
[15] Although Lieutenant Stephens' statement, which Officer McMahon recites in his deposition, is not considered for the truth of the matter asserted, plaintiff did not object to the recitation based on hearsay.

before placing him in the back of a police cruiser. (Docket
Entry # 81-4, ¶ 3, sent. 2). On the way to the TPD station,
plaintiff told Officers McMahon and McLaughlin that "he did not
think non payment of a cable bill constituted violation of non
payment [sic] of utilities." (Docket Entry # 76-14) (emphasis
omitted); (Docket Entry # 81-1, Ex. 1, ¶ 3, sent. 3). Sergeant
Warren applied for a criminal complaint in Lowell District
Court. The court found probable cause and arraigned plaintiff
for violating chapter 209A the next day after he spent the night
in the TPD jail.[16] (Docket Entry # 81-1, Ex. 1, ¶ 3). The
complaint was dismissed upon his motion on December 13, 2013.
(Docket Entry # 81-2, Ex. 18).

After Officer McLaughlin was read excerpts of the TPD
Manual and chapter 209A at deposition, he agreed that neither
authorized him to arrest plaintiff for the chapter 209A

---

[16] Sergeant Warren filed the application for the criminal
complaint based on a chapter 209A violation together with an
attached TPD arrest report dated June 7, 2012 that lists Officer
McLaughlin as the reporting officer and Lieutenant Stephens as
the approving officer. (Docket Entry # 81-2, Ex. 18). Sergeant
Warren testified that his responsibilities required him to "be
the liaison between the [TPD] and Lowell District Court," which
included "process[ing] requests for warrants." (Docket Entry #
81-4, Ex. 39, p. 592). He testified that he reviewed "police
reports that supported a request for a warrant" to "make sure
that they actually contained probable cause" to request a
warrant. (Docket Entry # 81-4, Ex. 39, p. 592). According to
Sergeant Warren, it was "[n]ot that often" that he found a
report not to contain probable cause to request an arrest
warrant. (Docket Entry # 81-4, Ex. 39, p. 592).

violation that Lisa Mackey alleged.[17]  (Docket Entry # 81-5, Ex.
41, pp. 17-18).  He also agreed that police officers have the
authority to arrest for an alleged violation of a chapter 209A
restraining order only in cases of abuse, a violation of an
order to vacate the premises, and a violation of an order of no
contact.  (Docket Entry # 81-5, Ex. 41, p. 18).  "[A]n alleged
violation of an order to pay utilities would have to be charged
as criminal contempt and not a violation of a restraining
order," according to Officer McLaughlin.  (Docket Entry # 81-5,
Ex. 41, p. 18).  Additionally, Officer McMahon agreed that this
was the first time he had charged or arrested an individual for
shutting off utilities in violation of a restraining order.
(Docket Entry # 81-4, Ex. 40, p. 661).  After reviewing Officer
McLaughlin's narrative report, Sergeant Warren testified that
the information was not satisfactory to provide probable cause
to arrest plaintiff for violating the RO.  (Docket Entry # 81-4,
Ex. 39, p. 612).  Sergeant Warren would have sought

_____

[17]  That said, the determinative issue for qualified immunity
under the second subpart of the second prong is not whether
Officer McLaughlin personally believed there was probable cause.
Rather, the inquiry is "whether an objectively reasonable
officer would have believed he had probable cause" to arrest
plaintiff for a criminal offense, such as a violation of the RO
under chapter 209A.  See Alfano v. Lynch, 847 F.3d 71, 79 (1st
Cir. 2017) (because probable cause "is clearly established,"
matter reduces to "whether an objectively reasonable officer
would have believed he had probable cause to take Alfano into
protective custody within the meaning of the relevant protective
custody statute").

clarification from a judge to determine what a "utility" is and whether the RO requires plaintiff "to pay for Lisa Mackey's cable, internet, and phone." (Docket Entry # 81-4, Ex. 39, pp. 611-612).

5. June 8, 2012

On June 8, 2012, Detective Connor spoke with Lisa Mackey at the TPD station. (Docket Entry # 76-16). She told him that plaintiff had shut off her cell phone service as well as her daughter's that morning to make her "feel unsafe at her house, by having no means of communication to the public."[18] (Docket Entry # 76-16). She did not present documentary or physical evidence that "the cell phone" was deactivated; instead, she stated that she had contacted "her service provider and spoke with them and the[y] told her it was canceled." (Docket Entry # 76-16). Detective Connor noted in his narrative report that plaintiff had been arrested for violating the RO the previous day. (Docket Entry # 76-16). He also noted that "[s]ection #3(c) of the Abuse Prevention Order states [plaintiff] is not to shut off any utilities or mail delivery to Ms. Mackey." (Docket Entry # 76-16). On June 11, 2012, Sergeant Warren, as the

---

[18] Lisa Mackey's statements are not considered for the truth of the matter asserted. They are considered to show notice and knowledge on the part of the relevant officers as a basis for the actions they took. In any event, as stated previously, the parties do not object to statements made in the various police reports as hearsay. See fn. 11.

complainant, filed an application for a criminal complaint against plaintiff in Lowell District Court based on a chapter 209A violation that took place on June 8, 2012. (Docket Entry # 81-5, Ex. 48). The court eventually dismissed the complaint due to a failure to prosecute on October 8, 2013. (Docket Entry # 81-5, Ex. 48).

6. June 11, 2012

On June 11, 2012, Officers Duffy and Russo were dispatched to 68 Mitchell Drive in response to a reported restraining order violation. (Docket Entry # 76-17). When they arrived, Lisa Mackey presented a copy of the RO and explained that plaintiff had visited the residence twice in the last three days. (Docket Entry # 76-17). She said that he had pulled into her driveway and "parked [his truck] directly in front of the house" while dropping off their daughter, Melissa Mackey, on June 8, 2012. (Docket Entry # 76-17). He idled the truck for about 15 minutes while speaking with Melissa Mackey and then drove away. (Docket Entry # 76-17). The officers attempted to call Melissa Mackey on a number that Lisa Mackey provided, but the call failed because the phone had been disconnected. (Docket Entry # 76-17). At her deposition, Melissa Mackey testified that plaintiff dropped her off at the end of the driveway, which was "pretty far back" from the house. (Docket Entry # 81-5, Ex. 45, p. 549). In the narrative report, Officer Duffy noted that "the

driveway leading up to the residence is approximately 150 yards long." (Docket Entry # 76-17).

Lisa Mackey also told the officers that earlier on June 11, 2012, plaintiff had "pulled his truck into the beginning of the driveway" and stopped approximately 120 yards from the house. (Docket Entry # 76-17). James Mackey III, the son of plaintiff and Lisa Mackey, exited the truck and entered the garage to look for a part for a grill that plaintiff thought might be there. (Docket Entry # 76-17). Lisa Mackey informed James Mackey III that plaintiff was not allowed to remove anything from the property, whereupon James Mackey III returned to the truck. (Docket Entry # 76-17). They then left the property. (Docket Entry # 76-17).

The officers informed Lisa Mackey that the foregoing incidents violated the RO and asked where they could find plaintiff so they could speak with him. (Docket Entry # 76-17). Lisa Mackey stated that her son lived at 47 Riverdale Street, that he was remodeling a house at 51 Riverdale Street, and that he has been staying with his parents at 20 South Oliver Street. (Docket Entry # 76-17).

Sergeant Perry,[19] Officer Russo, and Officer Duffy failed to locate plaintiff on Riverdale Street. (Docket Entry # 76-17).

---

[19] Sergeant Perry's first name is not included in the above-cited reference.

They spoke to James Mackey III at his residence, who stated that plaintiff did drive him to 68 Mitchell Drive but that plaintiff had parked on the street, stayed in the truck, and never entered the driveway. (Docket Entry # 76-17). Sergeant Cooke drove to 20 South Oliver Street to check if plaintiff was at his parents' residence. (Docket Entry # 76-17). Meanwhile, Officers Russo and Duffy checked Simply Self Storage at 470 Main Street, where plaintiff "is known to spend some time." (Docket Entry # 76-17). A number of officers failed to locate plaintiff at any of these locations. (Docket Entry # 76-17). A number of officers returned to the residences a few hours later, but were again unsuccessful. (Docket Entry # 76-17).

Officer Duffy stated in his narrative report that there was "probable cause to arrest [plaintiff] for these multiple violations" of the RO. (Docket Entry # 76-17). Officer Duffy cited section A(2) of the RO, i.e., that plaintiff "was ordered not to contact" Lisa Mackey "in person, and to stay at least 100 yards from [Lisa Mackey]." (Docket Entry # 76-17). Officer Duffy also wrote that, "According to section A3, plaintiff was ordered to immediately leave and stay away from [Lisa Mackey's] residence located at 68 Mitchell" Drive and that the officers "have probable cause to believe that [plaintiff] violated both of these two sections when he entered the driveway of the residence to drop his children off." (Docket Entry # 76-17).

On June 12, 2012, Sergeant Warren filed an application for a criminal complaint against plaintiff in Lowell District Court based on a chapter 209A violation and Officer Duffy requested a warrant for his arrest. (Docket Entry # 81-5, Ex. 49). The court issued the complaint.[20] On November 6, 2014, the court dismissed the complaint in light of a failure to prosecute. (Docket Entry # 81-5, Ex. 49).

7. June 21, 2012

On June 15, 2012, the Lowell District Court amended the RO to reduce plaintiff's weekly payment to Lisa Mackey from $150 to $75. (Docket Entry # 81-1, Ex. 10). Six days later, on June 21, 2012, Sergeant Steven Torres ("Sergeant Torres") and Officer Edward D. Jackman ("Officer Jackman") met with Lisa Mackey at the TPD station. (Docket Entry # 81-5, Ex. 50). She told them that plaintiff was denying her cable television from Comcast and that plaintiff was responsible for paying her $150 weekly. (Docket Entry # 81-5, Ex. 50). She provided a copy of the RO, on which the figure of $150 had been handwritten. Sergeant Warren then provided a copy of the RO that had been issued, which showed that the figure had been reduced to $75. (Docket

---

[20] The record does not establish as a matter of law that the Lowell District Court issued an arrest warrant. The application for the criminal complaint includes a checked box for a "summons to issue" and a non-checked box for a "warrant." (Docket Entry # 81-5, Ex. 49).

Entry # 81-5, Ex. 50). Sergeant Torres asked Lisa Mackey whether the RO had been amended, to which she responded that the payment had been reduced to $75. (Docket Entry # 81-5, Ex. 50). Sergeant Torres also asked her who had written the figure of $150 on the copy of the RO that she had provided, to which she responded that she had. (Docket Entry # 81-5, Ex. 50). At this point, Lisa Mackey "was advised that she had falsified a court document and advised that she needed to be completely truthful when completing her voluntary statement form." (Docket Entry # 81-5, Ex. 50).

Sergeant Torres and Officer Jackman informed Lisa Mackey that they would visit her house to verify the problem. (Docket Entry # 81-5, Ex. 50). Upon arriving, Lisa Mackey turned on the television, which displayed a prompt requesting that a lock code be entered. Lisa Mackey "presumably entered the correct code," which caused an error message to be displayed. (Docket Entry # 81-5, Ex. 50). The officers informed her they would follow up on the issue. (Docket Entry # 81-5, Ex. 50).

After reviewing Officer Jackman's narrative report at his deposition, Sergeant Warren testified that Lisa Mackey had admitted to falsifying a court document. (Docket Entry # 81-4, Ex. 39, p. 615). Sergeant Warren also testified that it was "strange" that Sergeant Torres and Officer Jackman did not charge Lisa Mackey with a crime for the falsification. (Docket

Entry # 81-4, Ex. 39, p. 616).  Finally, Sergeant Warren agreed
that the TPD "[was] now on notice, by its own written documents,
that [Lisa] Mackey has lied to the Tewksbury Police Department
and has falsified a document, and admitted both those things."
(Docket Entry # 81-4, Ex. 39, p. 616).

8.  <u>June 22, 2012</u>

On Friday, June 22, 2012, Officer Ryser met with Lisa
Mackey at the TPD station.  (Docket Entry # 76-18).  Lisa Mackey
told him that plaintiff had violated the RO by failing to pay
her $150, which had been due on June 15, 2012.  (Docket Entry #
76-18).  Officer Ryser reviewed the RO and determined there was
"a Probate Court order" requiring that plaintiff pay $150 weekly
to Lisa Mackey and an order from the Lowell District Court
requiring that plaintiff pay $75 to Lisa Mackey weekly.  (Docket
Entry # 76-18).  Officer Ryser noted that the Lowell District
Court had amended the RO on June 17, 2012, reducing the weekly
payment to $75.  Officer Ryser determined that this was "more
current that [sic] the order stating $150."  (Docket Entry # 76-
18).  Officer Ryser stated in his narrative report that he would
request a [clerk's] hearing "to determine any possible
violations of the orders in place."  (Docket Entry # 76-18)
(Docket Entry # 81-6, Ex. 51).  Officer Ryser later added that
Lisa Mackey had called to state that plaintiff had paid "what he
owed her."  (Docket Entry # 81-6, Ex. 51).  The report, however,

notes that "this payment would still be late and could be a possible violation based on that and the amount paid." (Docket Entry # 81-6, Ex. 51). Sergeant Warren filed an application for a criminal complaint in Lowell District Court based on a chapter 209A violation and requested a hearing. (Docket Entry # 81-6, Ex. 51). The court issued a criminal complaint on August 15, 2012 for a chapter 209A violation. (Docket Entry # 81-6, Ex. 51). The court eventually dismissed the charge on a recommendation of the court's Probation Department on September 19, 2014. (Docket Entry # 81-6, Ex. 51).

At his deposition, Sergeant Warren stated that Lisa Mackey had lied to Officer Ryser about the amount of money that plaintiff owed her during this incident. (Docket Entry # 81-4, Ex. 39, p. 616). However, Officer Ryser did not charge Lisa Mackey for this conduct. (Docket Entry # 81-4, Ex. 39, p. 616). Sergeant Warren also noted that the RO did not specify a payment deadline that would have required plaintiff to make the payment by Friday on any given week. (Docket Entry # 81-4, Ex. 39, p. 616). Therefore, Sergeant Warren testified that there had been no probable cause for Officer Ryser to request a clerk's hearing. (Docket Entry # 81-4, Ex. 39, p. 616-617).

9. June 26, 2012

On June 26, 2012, Lisa Mackey returned to the TPD station to complete a voluntary statement for Sergeant Kerber alleging a

31

violation of the RO.  (Docket Entry # 76-19).  The voluntary

statement claimed that plaintiff "text[ed] [their] daughter

Kelly several times both last night and today about her."

(Docket Entry # 76-19).  Plaintiff had asked Kelly Mackey "why

[Lisa Mackey] had called the police on him today."  (Docket

Entry # 76-19).  No threats were made.  (Docket Entry # 76-19).

Rather, the questions plaintiff asked Kelly Mackey were about

"Lisa [Mackey's] going ons."  (Docket Entry # 76-19).

　　　Sergeant Kerber's narrative report noted that plaintiff may

have violated the RO, which contained a "no 3rd party clause."

(Docket Entry # 76-19).  Sergeant Kerber explained to Lisa

Mackey that Lieutenant Gaynor, an officer on duty for the next

shift, "would be advised of the 209[A] Violation and

[plaintiff's] last known address," and that "if they were able

to locate him[,] he would be arrestable.  However[,] if [the

officers] [were not] able to locate him[,] [Sergeant Kerber]

would seek a warrant on the violation of the 209A."  (Docket

Entry # 76-19).  Sergeant Warren requested a warrant and filed

an application for a criminal complaint against plaintiff in

Lowell District Court based on a chapter 209A violation.

(Docket Entry # 81-6, Ex. 52).  A judicial officer issued a

criminal complaint on August 15, 2012 based on Sergeant Kerber's

narrative report and Lisa Mackey's statement.  (Docket Entry #

81-6, Ex. 52).  The court eventually dismissed the complaint due

to a failure to prosecute on November 6, 2014.  (Docket Entry #
81-6, Ex. 52).

After reviewing the narrative report at his deposition,
Chief Sheehan testified that Sergeant Kerber should have
requested to see the texts.  (Docket Entry # 81-4, Ex. 32, pp.
108-09).  Chief Sheehan also testified that, in his opinion, the
report contained insufficient evidence to support a finding of
probable cause.  (Docket Entry # 81-4, Ex. 32, p. 109).
Sergeant Warren testified similarly.  (Docket Entry # 81-4, Ex.
39, p. 617-618).  Lieutenant Gaynor also agreed that, if it was
him, he "would have wanted to see those text messages as part of
[his] investigation" into "an alleged violation of the
restraining order."  (Docket Entry # 81-4, Ex. 36, p. 435).

10.  July 6, 2012

On Friday, July 6, 2012, Officer Russo "was dispatched to
68 Mitchell G[.] Drive."  (Docket Entry # 76-20).  There, Lisa
Mackey stated that the RO against plaintiff required him to pay
her $150 weekly and that he "usually gives the money to their
daughter" to deliver it to Lisa Mackey.  (Docket Entry # 76-20).
Lisa Mackey explained that plaintiff "is supposed to pay every
Wednesday," but that she had received the payment on Friday the
two previous weeks.  (Docket Entry # 76-20).  She then stated
that it was Friday, her daughter was "away this week," and "she
has not received" the payment.  (Docket Entry # 76-20).

Officer Russo reviewed the RO and noted that although it required plaintiff to pay Lisa Mackey $150 weekly, "it does not specify a particular day, date, or time when the payments are due." (Docket Entry # 76-20). Officer Russo told Lisa Mackey that there was no violation because "we [were] still technically in the week and [plaintiff] still has time to make the payment to her." (Docket Entry # 79-20). She then told Lisa Mackey that she (Officer Russo) "would attempt to call [plaintiff] to determine when and how he intended to make the payment this week," and Lisa Mackey stated that she understood. (Docket Entry # 76-20). Officer Russo called plaintiff and left a voicemail requesting that he contact her, and called Lisa Mackey to inform her that she "was unable to make contact with [plaintiff]." (Docket Entry # 76-20). The report concludes "[n]o further action at this time." (Docket Entry # 76-20).

11. <u>July 12, 2012</u>

On Thursday, July 12, 2012, Officer Hanley met with Lisa Mackey at the TPD station. (Docket Entry # 76-21). She explained that the RO required plaintiff to make weekly payments of $150. (Docket Entry # 76-21). In his narrative report, Officer Hanley stated that the "ninth stipulation on the restraining order states that [plaintiff] shall pay Lisa [Mackey] $150.00 plaintiff support, weekly." (Docket Entry # 76-21). Lisa Mackey explained that plaintiff usually gives the

34

money to their daughter to deliver it on Wednesdays, that Lisa Mackey then "signs a receipt, saying she received the payment, and [that] their daughter returns the signed receipt to [plaintiff] as evidence that she received the payment." (Docket Entry # 76-21). Lisa Mackey explained that because she had not received any money from plaintiff the previous week or the current week, he owed her "a total of $300.00." (Docket Entry # 76-21). Officer Hanley concluded the narrative report that:

> After listening to Lisa [Mackey's] summary of events and reviewing her statement for [sic] there is probable cause to believe that [plaintiff] did not pay Lisa [Mackey] the . . . support that is owed to her and is in violation of the restraining order . . . I am requesting a summons be filed, charging [plaintiff] with . . . [v]iolation of abuse prevention order [under chapter 209A].

(Docket Entry # 76-21). Sergeant Warren filed an application for a criminal complaint in Lowell District Court based on a chapter 209A violation. (Docket Entry # 81-6, Ex. 54). The court dismissed the complaint on a recommendation of the Probation Department on September 19, 2014. (Docket Entry # 81-6, Ex. 54).

At his deposition, Sergeant Warren agreed that Lisa Mackey had lied about the amount that the RO required plaintiff to pay and about the date on which payments were due. (Docket Entry # 81-4, Ex. 39, pp. 618-19). Sergeant Warren also testified that, in his opinion, there had been no probable cause to issue a complaint against plaintiff. (Docket Entry # 81-4, Ex. 39, p.

619).

## 12. <u>July 17, 2012</u>

On July 17, 2012, Officer Hanley responded to 68 Mitchell Drive concerning an alleged chapter 209A violation. (Docket Entry # 76-22). While at the property, he spoke with Lisa Mackey, who informed him about the RO against plaintiff. (Docket Entry # 76-22). Officer Hanley noted that the "ninth stipulation" of the RO states "that [plaintiff] shall pay Lisa [Mackey] $150.00 support, weekly. The payment is supposed to be mailed to 68 Mitchell Drive. This is the only way the payment is supposed to be payed [sic] to Lisa [Mackey], as detailed in the [RO]." (Docket Entry # 76-22). Lisa Mackey stated plaintiff usually gave the money to Melissa Mackey, their daughter, to deliver on his behalf every Wednesday. (Docket Entry # 76-22). Lisa Mackey also recounted that she would then sign a receipt verifying that she had received the payment. (Docket Entry # 76-22). Lisa Mackey stated that on Friday, July 13, 2012, plaintiff gave Melissa Mackey "the support payment" and "Melissa then brought the payment to Lisa [Mackey]." (Docket Entry # 76-22). Lisa Mackey then "sign[ed] a receipt, which was returned to [plaintiff]." (Docket Entry # 76-22). In his narrative report, Officer Hanley stated that, "After listening to Lisa [Mackey's] summary of the events and reviewing her statement there is probable cause to believe that

[plaintiff] did violate the above restraining order by involving a third party and by not sending Lisa her payment as detailed in the restraining order." (Docket Entry # 76-22). Due to these facts as summarized in Detective Regan's narrative report, "it was determined that [plaintiff] had violated the restraining order and was subject to arrest," and "Tewksbury police officers were sent to locations known to be frequented by [plaintiff]." (Docket Entry # 76-2).

A number of police officers then searched for plaintiff in various locations. (Docket Entry # 76-22). One such location was the residence of plaintiff's father on 20 South Oliver Street in Tewksbury. (Docket Entry # 76-22). Detective Regan's narrative states that Officer Richardson "observed [plaintiff] get off a motorcycle and run into his father's residence." (Docket Entry # 76-22). When officers approached the residence, plaintiff's father told them that they could not enter without a search warrant. (Docket Entry # 76-22). Officers remained on scene to "secure the residence in anticipation of obtaining" one. (Docket Entry # 76-22).

Detective Richardson's narrative states, "Chief Sheehan advised [Detective Richardson] to stay in close proximity to the residence" to keep watch on it. (Docket Entry # 81-6, Ex. 55). Eventually, Detective Richardson saw plaintiff's father enter a pickup truck and drive away. (Docket Entry # 81-6, Ex. 55).

Detective Richardson had previously observed the bed of the pickup truck, which was covered, close to the open garage door of the residence and "that there was access to the home from the garage." (Docket Entry # 81-6, Ex. 55). Under the direction of Sergeant Coviello, Detective Richardson followed the truck and observed it going "at a speed that was greater than reasonable for this area" and turning without using a turn signal. (Docket Entry # 81-6, Ex. 55). Detective Richardson then stopped the truck to check if plaintiff was inside the back of the truck. (Docket Entry # 81-6, Ex. 55). When he did not find plaintiff, Detective Richardson let plaintiff's father go with a verbal warning. (Docket Entry # 81-6, Ex. 55). Detective Richardson returned to the residence and soon saw plaintiff arrive on a motorcycle and run inside. (Docket Entry # 81-6, Ex. 55). When another officer arrived, he and Detective Richardson again approached the house and knocked on the door. (Docket Entry # 81-6, Ex. 55). Plaintiff's father repeated that they could not enter without a warrant. (Docket Entry # 81-6, Ex. 55).

Detective Regan stated in an narrative report that Melissa Mackey visited the TPD station during these events and provided a written statement, which reads:

> I, Melissa Mackey have received one hundred and fifty dollars every week, (since its [sic] been ordered by the court) to give to my mother, Lisa Mackey. My father, James Mackey [plaintiff] gives me this money every Friday. Friday is the day my mother told me she receives this

support payment.  She has never had a problem with it in the past, and my father always pays on time.  He has paid her every week since the court order.

(Docket Entry # 76-22) (emphasis omitted).  Sergeant Warren included Melissa Mackey's statement in an ensuing application for a criminal complaint.  (Docket Entry # 81-6, Ex. 55).  On July 17, 2012, Detective Regan requested an arrest warrant for plaintiff for violating the RO and applied for a search warrant for the address at 20 South Oliver Street "to effect[uate] that arrest," both of which were denied.  (Docket Entry # 76-22) (Docket Entry # 81-6, Ex. 55).  The officers at the residence "were instructed to disperse."  (Docket Entry # 76-22).

Detective Regan concluded his narrative report by stating there was probable cause to believe that plaintiff violated the RO.  (Docket Entry # 76-22).  First, he stated that plaintiff violated item number two, which required plaintiff to have no contact with Lisa Mackey either directly or through a third party, when he had "his daughter convey money and receipts between he and Lisa Mackey."  (Docket Entry # 76-22) (emphasis omitted).  Second, Detective Regan stated that plaintiff violated item number nine, which required plaintiff to mail the support payments to Lisa Mackey, by "giving the payments to his daughter to give to Lisa Mackey."  (Docket Entry # 76-22) (emphasis omitted).

As noted, Sergeant Warren filed an application for a

criminal complaint in Lowell District Court based on a chapter
209A violation.  (Docket Entry # 81-6, Ex. 55).  A criminal
complaint issued on August 15, 2012 charging a chapter 209A
violation.  (Docket Entry # 81-6, Ex. 55).  The court eventually
dismissed the complaint on a recommendation of the court's
Probation Department on September 19, 2014.  (Docket Entry # 81-
6, Ex. 55).

13.  July 24 to 26, 2012

    On July 24, 2012, Officer Piccolo spoke with Lisa Mackey at
the TPD station, who claimed that plaintiff had cancelled the
phone service at 68 Mitchell Drive in violation of the RO.
(Docket Entry # 76-24).  When Officer Piccolo attempted to call
the house phone number, he received a recorded message stating
that the number was temporarily disconnected.[21]  (Docket Entry #
76-24).  Officer Piccolo noted in his report that "[b]ased on
section 3 subsection C of the [RO] which states Defendant shall
not to [sic] shut off or cause to be shut off any utilities or
mail delivery to [Lisa Mackey]" (emphasis omitted), he believed
"there has been a violation of this order."  (Docket Entry # 76-
24).

    Sergeant Warren and Chief Sheehan filed narrative reports

---

[21]  Officer Piccolo did not report any efforts to verify Lisa
Mackey's allegations that it was plaintiff who caused the
service to be disconnected.  (Docket Entry # 76-24).

concerning events that followed. (Docket Entry # 76-25) (Docket Entry # 81-6, Ex. 58). Sergeant Warren wrote that on July 25, 2012, Lisa Mackey visited the TPD station to speak with Chief Sheehan. (Docket Entry # 76-25). She stated that she had no "means of communication with the hospital where her gravely sick parents are and [she was] the health care proxy." (Docket Entry # 76-25). Both Chief Sheehan and Sergeant Warren "made inquiries with a number of other departments and domestic violence groups to try and get a phone for [Lisa Mackey]." (Docket Entry # 76-25).

Chief Sheehan also contacted Verizon, Lisa Mackey's carrier for the home phone, to ask whether it could reconnect her phone. (Docket Entry # 81-6, Ex. 58). Verizon employees informed him that the phone was in Lisa Mackey's name, that she had contacted Verizon to change her service to Verizon Fios, and that she had set up a date and time to transfer the service. (Docket Entry # 81-6, Ex. 58). Verizon had not completed the transfer installation because it could not reach Lisa Mackey for confirmation. (Docket Entry # 81-6, Ex. 58). Chief Sheehan also learned that the phone had been disconnected because of nonpayment. (Docket Entry # 81-6, Ex. 58). When he relayed this information to Lisa Mackey, she admitted that she had scheduled the migration to Fios but she then decided against it. (Docket Entry # 81-6, Ex. 58). She also stated that she had

never cancelled the disconnection of her phone. (Docket Entry # 81-6, Ex. 58). Ultimately, Sergeant Warren helped Lisa Mackey set up a payment plan to reconnect her phone. (Docket Entry # 76-25).

Sergeant Warren concluded his narrative report by stating that he "believe[s] that we have probable cause to have a warrant issued for [plaintiff]" for violating, section A(3)(C) of the RO, which requires that he "not shut off or cause to be shut off any of the utilities or mail delivery to [Lisa Mackey's] residence." (Docket Entry # 76-25). Sergeant Warren reported that plaintiff violated this by "not paying the phone bill, thus the phone being shut off for [an] outstanding bill." (Docket Entry # 76-25). Sergeant Warren filed an application for a criminal complaint and requested a warrant in Lowell District Court based on a chapter 209A violation. (Docket Entry # 81-6, Ex. 58). A criminal complaint issued on August 3, 2012.[22] The court eventually dismissed the charge upon failure to prosecute on October 8, 2013. (Docket Entry # 81-6, Ex. 58).

At his deposition, Sergeant Warren agreed that "everyone seemed confused that Lisa Mackey reported [plaintiff] shut the

---

[22] The record does not establish as a matter of law that the Lowell District Court issued the requested arrest warrant. The application for the criminal complaint checks a box next to "summons to issue" and does not check a box next to "warrant." (Docket Entry # 81-5, Ex. 49).

service off when, in fact, Lisa Mackey shut the service off."
(Docket Entry 81-4, Ex. 39, p. 621).  He explained that his
finding of probable cause "[h]ad to be a mistake."  (Docket
Entry 81-4, Ex. 39, pp. 622-623).  In other words, Sergeant
Warren testified that there had been no probable cause to arrest
plaintiff and that he "screwed up when [he] was writing the
report."  (Docket Entry 81-4, Ex. 39, p. 623).  Chief Sheehan
testified that he did not "know how [Sergeant Warren] could have
taken out a criminal complaint based upon [Chief Sheehan's
narrative] report."  (Docket Entry # 81-4, Ex. 32, p. 119).  In
addition, he acknowledged that he was recorded as saying the
following during one of his phone calls:

> I still would like to know if this is a continuation of a
> restraining order violation, is it ongoing every day that
> the phone is off?  Should we still be locking this fucking
> guy up and dragging his ass in because obviously they don't
> even think we have the right to arrest because they're not
> putting it on for a warrant and they're not setting it up
> for a hearing and not moving it on to a summons.

(Docket Entry # 81-4, Ex. 32, p. 172).  Chief Sheehan agreed
that he appeared to be acknowledging that the Lowell District
Court did not believe that the TPD had the authority to arrest
plaintiff, but he could not recall with whom he had this
conversation.  (Docket Entry # 81-4, Ex. 32, p. 172).  Finally,
Chief Sheehan agreed there was no probable cause to charge
plaintiff with violating the RO based upon Sergeant Warren's
report.  (Docket Entry # 81-4, Ex. 32, pp. 175-76).

14. July 30, 2012

     On July 30, 2012, Officer McMahon was dispatched to 68
Mitchell Drive.  (Docket Entry # 76-27).  While there, Lisa
Mackey explained that plaintiff had paid $100 to her at midnight
on Friday, July 27, 2012.  (Docket Entry # 76-27).  Lisa Mackey
explained that plaintiff had given the payment to Melissa Mackey
to give to her thereby violating the RO provision that required
plaintiff to make payments through the mail and not through
third parties.  (Docket Entry # 76-27).  Lisa Mackey told
Officer McMahon that plaintiff "has already been charged for the
same violation in the past."  (Docket Entry # 76-27).

     Officer McMahon reported that he reviewed the RO, which
"clearly states that payment must be made to the plaintiff in
the sum of $150 a week by mail."  (Docket Entry # 76-27).
Officer McMahon explained to Lisa Mackey that he would file a
report and attempt to locate plaintiff.  (Docket Entry # 76-27).
Lisa Mackey told Officer McMahon that plaintiff was residing at
20 South Oliver Street with his father but could also be staying
at 51 Riverdale Avenue.  (Docket Entry # 76-27).

     Officer McMahon proceeded to 20 South Oliver Street with
Officer Russo.  (Docket Entry # 76-27).  After arriving at the
property, Officer McMahon spoke with plaintiff's father, who
said that plaintiff no longer resided there.  (Docket Entry #
76-27).  The officers proceeded to 51 Riverdale Avenue.  (Docket

Entry # 76-27). Officer McMahon observed a pickup truck in the driveway that was registered in plaintiff's name. (Docket Entry # 76-27). The vehicle hood was warm, "indicating the vehicle was recently driven." (Docket Entry # 76-27). The officers knocked on the door of the residence and called the residence by phone but received no answer. (Docket Entry # 76-27). They noted that all the window shades were drawn. (Docket Entry # 76-27). Officer McMahon ended his narrative report by stating that he "believe[s] that [plaintiff] was inside the house and refused to talk with us." (Docket Entry # 76-27). On July 31, 2012, Sergeant Warren filed an application for a criminal complaint in Lowell District Court for a chapter 209A violation. (Docket Entry # 81-6, Ex. 59). The court found probable cause and issued a criminal complaint on August 15, 2012 based on a chapter 209A violation. (Docket Entry # 81-6, Ex. 59). On September 19, 2014, the court dismissed the complaint on a recommendation of the court's Probation Department. (Docket Entry # 81-6, Ex. 59).

15. July 31, 2012

On July 31, 2012, Officer Russo was dispatched to 51 Riverdale Road after plaintiff reported to the TPD that Lisa Mackey was at his house. (Docket Entry # 81-6, Ex. 60). Plaintiff said that she "just showed up" and that he was remaining inside the house to avoid a confrontation. (Docket

Entry # 81-6, Ex. 60). Upon arrival, Officer Russo saw Lisa Mackey driving away. (Docket Entry # 81-6, Ex. 60). Officer Russo stopped her while Sergeant Perry and Officer Ryser went to 51 Riverdale Road to speak with plaintiff. (Docket Entry # 81-6, Ex. 60).

Lisa Mackey told Officer Russo that she is part owner of 47 Riverdale Road (which is directly next door to plaintiff's residence). Officer Russo stated in her narrative report that Lisa Mackey told her 47 Riverdale Road "is her son's house but he is currently overseas in the military." (Docket Entry # 81-6, Ex. 60). She explained that she had gone to plaintiff's house to check on her daughter, Melissa Mackey. (Docket Entry # 81-6, Ex. 60). Officer Russo told Lisa Mackey that she should stay away from plaintiff's house, as the RO had been issued because Lisa Mackey had alleged that she felt unsafe around plaintiff. (Docket Entry # 81-6, Ex. 60). Lisa Mackey stated that she would stay away from him. (Docket Entry # 81-6, Ex. 60). Meanwhile, plaintiff refused to leave the house to speak with Sergeant Perry. (Docket Entry # 81-6, Ex. 60).

Lieutenant Stephens filed a supplemental narrative report. (Docket Entry # 81-6, Ex. 60). After Lisa Mackey finished speaking with Officer Russo, Lisa Mackey called the TPD to claim that she had just read an entry in her daughter's journal wherein her daughter wrote that plaintiff hurts her. (Docket

Entry # 81-6, Ex. 60).  On August 4, 2012, Melissa Mackey

provided a written statement to the TPD.  (Docket Entry # 81-6,

Ex. 60).  She stated that Lisa Mackey's story was "an absolute

lie," that she does not have a journal, that plaintiff had never

abused her, and that Lisa Mackey is a "pathological liar" and a

"drug addict."  (Docket Entry # 81-6, Ex. 60).

16.  <u>August 4, 2012</u>

On August 4, 2012, Officer Hanley responded to 68 Mitchell

Drive.  (Docket Entry # 76-28).  After he arrived, he spoke to

Lisa Mackey.  (Docket Entry # 76-28).  Officer Hanley's

narrative report notes that the RO against plaintiff required

him to pay Lisa Mackey $150 "weekly, by the end of the week."

(Docket Entry # 76-28).  The report also recites that payment is

supposed to be mailed to 68 Mitchell Drive and, "[r]eferencing a

Sunday-Saturday calendar week," should arrive "no later than

Saturday of every week."  (Docket Entry # 76-28).  It also

states, "This is the only way the payment is supposed to be paid

to Lisa [Mackey], as detailed in the [RO]."  (Docket Entry # 76-

28).

While at the property, Lisa Mackey explained to Officer

Hanley that plaintiff usually gave the payment to Melissa Mackey

to deliver on his behalf every Wednesday, and that Lisa Mackey

then signs a receipt to return to plaintiff.  (Docket Entry #

76-28).  Officer Hanley's narrative report further states that

plaintiff "attended a court hearing on Friday, August 3, 2012 and was specifically told that he is to mail Lisa [Mackey] her support payment and that the check need[ed] to arrive no later than Saturday of every week." (Docket Entry # 76-28).

The narrative report also reflects Lisa Mackey's statement "that the check never came in the mail." (Docket Entry # 76-28). Officer Hanley's narrative report then states there was probable cause to believe that plaintiff violated the RO. (Docket Entry # 76-28). Later that day, Melissa Mackey arrived at the TPD station to speak with Officer Hanley, according to the narrative report. (Docket Entry # 76-28). She stated that plaintiff had given her money to deliver the prior evening, but that she was not talking to her mother and so had not given it to her. (Docket Entry # 76-28). Officer Hanley told her that this still violated the RO and that the TPD would not get involved with the delivery of the support payments. (Docket Entry # 76-28).

Afterwards, Lieutenant Stevens received a call from plaintiff, who said that he mailed a check to Lisa Mackey and that it should be in her mailbox. (Docket Entry # 76-28). Officer Hanley checked the mailbox with Lisa Mackey and found an envelope containing a check written to Lisa Mackey for $150. (Docket Entry # 76-28). There was also other mail in the mailbox. (Docket Entry # 76-28). Officer Hanley concluded the

narrative report with a determination that there was no
violation of the RO at this time.  (Docket Entry # 76-28).

17.  August 23, 2012

On August 23, 2012, Sergeant Torres and Officer Kimberly A.
Riccardi were dispatched to 68 Mitchell Drive.  (Docket Entry #
76-29).  Lisa Mackey explained that Melissa Mackey had given her
$150 on behalf of plaintiff and asked her to sign a receipt.
(Docket Entry # 76-29).  Lisa Mackey stated that this violated
the provision of the RO that required no third-party contact
from plaintiff.  Lisa Mackey stated that she wanted plaintiff to
mail the check so their daughter could "stay out" of the matter.
(Docket Entry # 76-29).  Sergeant Torres called Melissa Mackey,
who said that she had retrieved the money from the mail and that
a return address was printed on the envelope.  (Docket Entry #
76-29).  She also stated that Lisa Mackey was aware that the
money had come with the mail.  (Docket Entry # 76-29).  The
officers made attempts to speak with plaintiff but he "refused"
to answer the door.  (Docket Entry # 76-29).  They did not file
charges.  (Docket Entry # 76-29).

18.  September 28, 2012

On September 28, 2012, Officer Hanley responded to 68
Mitchell Drive.  (Docket Entry # 81-7, Ex. 63).  After arriving
at the property, Lisa Mackey explained that the RO against
plaintiff required him to pay the mortgage and all utilities.

(Docket Entry # 81-7, Ex. 63). However, she had received a letter from National Grid, which stated that her gas would be shut off unless an outstanding bill of $400.55 was paid by October 1, 2012. (Docket Entry # 81-7, Ex. 63). Officer Hanley told her that plaintiff had not violated the RO because the utility had not yet been shut off. (Docket Entry # 81-7, Ex. 63). He advised her that a report would be filed on this incident. (Docket Entry # 81-7, Ex. 63).

Lisa Mackey then told Officer Hanley that Melissa Mackey had visited the house to gather belongings on Tuesday, September 25, 2012. (Docket Entry # 81-7, Ex. 63). She heard something fall upstairs and investigated after Melissa Mackey left. (Docket Entry # 81-7, Ex. 63). Lisa Mackey found a box of ammunition on the floor. (Docket Entry # 81-7, Ex. 63). She stated that she assumed it had fallen out of Melissa Mackey's pocket and that the ammunition had come from a safe that Melissa Mackey had collected, which may have once contained a firearm. (Docket Entry # 81-7, Ex. 63). Officers confiscated the ammunition. (Docket Entry # 81-7, Ex. 63).

Officer Hanley and Sergeant Cooke spoke to Melissa Mackey at 51 Riverdale Avenue. (Docket Entry # 81-7, Ex. 63). She showed the officers the safe that she had collected, which did not contain any firearm or ammunition. (Docket Entry # 81-7, Ex. 63). She explained that she believed that the TPD had

confiscated all of plaintiff's guns, that she had not noticed any ammunition in the house, and that her pockets could not have fit a box of it. (Docket Entry # 81-7, Ex. 63). As reflected in Officer Hanley's narrative report, Lisa Mackey later stated to Officer Hanley that she first "observed the box of ammunition on the floor on Tuesday," September 25, 2012, but did not report it until that Friday "because she did not know how exactly to report it." (Docket Entry # 81-7, Ex. 63).

19. <u>September 29, 2012</u>

On September 29, 2012, Officer O'Keefe was dispatched to 68 Mitchell Drive. (Docket Entry # 76-30). After her arrival, Lisa Mackey stated that plaintiff was released the previous day from Cambridge Jail, where he had been held for "numerous probate order violations." (Docket Entry # 76-30). She also reported that she had not received a court-ordered payment from plaintiff of $150. (Docket Entry # 76-30). When Officer O'Keefe asked if it was late because plaintiff had been in jail, Lisa Mackey stated he was released as of 11:00 a.m. the previous day. (Docket Entry # 76-30). Thereafter, Sergeant Warren filed an application for a criminal complaint for a chapter 209A violation in Lowell District Court. (Docket Entry # 81-7, Ex. 64). On November 5, 2013, the court found probable cause and issued a criminal complaint based on a violation of chapter 209A. (Docket Entry # 81-7, Ex. 64). The court later dismissed

the complaint on a recommendation of the court's Probation Department on September 19, 2014.  (Docket Entry # 81-7, Ex. 64).

20.  October 15, 2012

On October 15, 2012, Lieutenant Gaynor spoke with Lisa Mackey at the TPD station.  (Docket Entry # 76-31).  She stated that Verizon had shut off her phone service and that National Grid intended to shut off her gas or electric service.  (Docket Entry # 76-31).  She claimed she had no way of obtaining information about the accounts because they were all in plaintiff's name.  (Docket Entry # 76-31).  In a narrative report, Lieutenant Gaynor wrote that this violated section (A)(3)(c) of the RO, which requires plaintiff not to shut off or cause to be shut off any utilities.  (Docket Entry # 76-31). Lisa Mackey also told Lieutenant Gaynor that the bank notified her that her husband stopped paying the mortgage.  (Docket Entry # 76-31).  Lieutenant Gaynor also wrote that this violated section (A)(3)(d), which required plaintiff not to interfere with Lisa Mackey's possession of her home.  (Docket Entry # 76-31).  He reported that there was probable cause to believe that plaintiff had violated the RO.  (Docket Entry # 76-31).  He also noted that plaintiff has eight open cases relating to RO violations and that he was due in Lowell District Court on October 17, 2012.  (Docket Entry # 76-31).  Sergeant Warren then

filed an application for a criminal complaint for a chapter 209A violation in Lowell District Court. (Docket Entry # 81-7, Ex. 65). The court dismissed the complaint at plaintiff's request on January 31, 2014. (Docket Entry # 81-7, Ex. 65).

At his deposition, Sergeant Warren testified that Lieutenant Gaynor's narrative report contained insufficient evidence for a finding of probable cause. (Docket Entry # 81-4, Ex. 39, pp. 624-25). He also agreed that Lisa Mackey had lied to Lieutenant Gaynor when she claimed that the house phone was under plaintiff's name, when it was in fact under her own name. (Docket Entry # 81-4, Ex. 39, pp. 624-25). Finally, he testified that if he had been in Lieutenant Gaynor's position, he would have initiated a criminal complaint against Lisa Mackey for making a false statement. (Docket Entry # 81-4, Ex. 39, p. 625).

21. October 17, 2012

On October 17, 2012, Officer Hanley met with Lisa Mackey at the TPD station. (Docket Entry # 76-32). She explained that the RO against plaintiff required him not to shut off or cause to be shut off any utilities at 68 Mitchell Drive. (Docket Entry # 76-32). She stated that her Verizon landline telephone had been disconnected on October 14, 2012 for nonpayment of a past due bill. (Docket Entry # 76-32). Officer Hanley called the telephone landline number to confirm it had been

disconnected.  (Docket Entry # 76-32).  Sergeant Warren

contacted a Magistrate at Lowell District Court, who stated that

the landline telephone qualified as a utility under the RO.

(Docket Entry # 76-32).  Lisa Mackey also stated that National

Grid intended to disconnect her gas line for failure to pay a

bill.  (Docket Entry # 76-32).

Officer Hanley stated in his narrative report that "there

is probable cause to believe that [plaintiff] failed to pay the

telephone bill in a timely manner which resulted in the landline

phone to be disconnected."  (Docket Entry # 76-32).  He also

stated that he and other officers searched for plaintiff at

"numerous pieces of property" owned by him in Tewksbury but

failed to find him.  (Docket Entry # 76-32).  As indicated in

the narrative report, Officer Hanley was requesting a warrant

charging plaintiff with a chapter 209A violation.  (Docket Entry

# 76-32).  The "Officer's Notes" in the narrative report explain

that Officer Hanley was requesting the warrant because

plaintiff's primary residence was unknown and because plaintiff

"has several open cases with Lowell District Court and he can

never be located to be served process."  (Docket Entry # 76-32)

(emphasis added).  As also stated in the narrative report, this

led Officer Hanley to believe "there is a possibility that

[plaintiff] will not receive a summons in the mail."  (Docket

Entry # 76-32).[23]

22. November 2, 2012

On November 2, 2012, Lieutenant Gaynor received a phone
call from Lisa Mackey, who claimed that plaintiff had not paid
her support as required by the RO. (Docket Entry # 76-33)
(Docket Entry # 81-7, Ex. 67). In a narrative report,
Lieutenant Gaynor noted that the RO required plaintiff to pay
Lisa Mackey $150 "per week . . . via U.S. Mail." (Docket Entry
# 76-33). As also stated in the narrative report, Lieutenant
Gaynor "sent officers to several locations" in an unsuccessful
attempt to locate plaintiff and was requesting issuance of a
summons for a chapter 209 violation "[b]ased on the verbal
account of Lisa Mackey." (Docket Entry # 76-33) (Docket Entry #
81-7, Ex. 67). On November 5, 2012, Sergeant Warren applied for
a warrant based on a chapter 209A violation. (Docket Entry #
81-7, Ex. 67). One year later, the Lowell District Court issued
a criminal complaint for a chapter 209A violation based on
Lieutenant Gaynor's narrative report of plaintiff's nonpayment.
(Docket Entry # 81-7, Ex. 67). The court also issued a summons
on November 5, 2013 and on December 13, 2013 conducted an
arraignment and released plaintiff on personal recognizance.

---

[23] The record fails to indicate that Officer Hanley filed an
application for a criminal complaint regarding this incident or
that an arrest warrant issued. (Docket Entry # 76-32) (Docket
Entry # 81-7, Ex. 67) (Docket Entry # 81-4, Ex. 33, p. 247).

(Docket Entry # 81-7, Ex. 67).  The court eventually dismissed the complaint on September 19, 2014 on a recommendation of the court's Probation Department.  (Docket Entry # 81-7, Ex. 67).

At his deposition, Sergeant Warren agreed that Lisa Mackey had lied when she claimed that plaintiff must pay her by Friday because the RO does not specify a day on which payment is due. (Docket Entry # 81-4, Ex. 39).  Therefore, he agreed there was no probable cause to believe that plaintiff had violated the RO. (Docket Entry # 81-4, Ex. 39).  Lieutenant Gaynor likewise agreed that the RO did not specify a day on which payment is due and could not "recall the basis of [his] determination" that it established a Friday deadline.  (Docket Entry # 81-4, Ex. 36). A receipt from the United States Postal Service ("USPS") shows that plaintiff paid Lisa Mackey $150 on November 2, 2012 by certified mail to the 68 Mitchell Drive address that same day. (Docket Entry # 81-7, Ex. 67).

23.  November 8 to 16, 2012

On November 8, 2012, plaintiff visited the TPD station to report a fraudulent transaction on his closed Enterprise Bank account.  (Docket Entry # 76-34).  He told Lieutenant Stephens that a representative of Enterprise Bank had called him in February 2012 to inform him that someone had cashed a $3,000 check made out to John Gambale on an account that plaintiff closed in March 2010.  (Docket Entry # 76-34).  Plaintiff denied

writing or signing the check to the bank representative and
"pointed out to [Lieutenant Stephens] that it was not
[plaintiff's] signature" on the check.  (Docket Entry # 76-34).
He also stated that only he and Lisa Mackey knew of the account
and that John Gambale is her father.  (Docket Entry # 76-34).

Detective Donovan investigated and learned that the
identification number used in the transaction was Lisa Mackey's
driver's license number, as set forth in his narrative report.
(Docket Entry # 76-34).  The report also notes that on November
16, 2012, Detective Donovan contacted Lisa Mackey and spoke with
her that day.  (Docket Entry # 76-34).  She stated that
plaintiff had provided the check so that her elderly father
could fix his roof, that her mother and sister had seen him
write it, and that plaintiff had provided the check to John
Gambale knowing that the account had been closed.  (Docket Entry
# 76-34).  She explained that plaintiff "filed for a criminal
hearing" against her in Lynn District Court for uttering and
forging a check after it bounced, and that the court dismissed
the charges when she told her version of the events.  (Docket
Entry # 76-34).  As further reflected in Detective Donovan's
narrative report, Lisa Mackey provided paperwork "proving that
she appeared in Lynn District Court" for the matter on August
15, 2012.  (Docket Entry # 76-34).  She also stated that when
plaintiff provided the check on February 17, 2012, he had not

yet "file[d] for or mention[ed] a divorce until February 26th, 2012." (Docket Entry # 76-34).

The narrative report also notes that, shortly after Detective Donovan spoke with Lisa Mackey on November 16, 2012, plaintiff telephoned the TPD and told Detective Donovan that Lisa Mackey had "stole[n] the check from him [plaintiff] and cashed it at Eastern Bank in Lynn [Massachusetts]," and that he would like to proceed "with any possible criminal charges." (Docket Entry # 76-34). When Detective Donovan informed plaintiff that either the "Lynn Police" or the Lynn District Court would need to handle the matter, plaintiff stated that "he had not contacted either." (Docket Entry # 76-34). "Given the above information," Detective Donovan recites in his narrative report that probable cause existed to charge plaintiff with "[m]isleading a [p]olice [o]fficer" and filing a "[f]alse [c]rime [r]eport." (Docket Entry # 76-34) (Docket Entry # 81-7, Ex. 68). Detective Donovan also requested a warrant. (Docket Entry # 81-7, Ex. 68).

On or about December 12, 2012, Sergeant Warren filed an application for a criminal complaint in Lowell District Court for misleading a police officer in violation of Massachusetts General Laws chapter 268 ("chapter 268"), section 13B, and filing a false crime report. (Docket Entry # 81-7, Ex. 68). On December 13, 2012, a court official at Lowell District Court

issued an arrest warrant and a criminal complaint charging plaintiff with witness intimidation under chapter 268, section 13B,[24] and filing a false crime report under Massachusetts General Laws chapter 269, section 13A.  (Docket Entry # 81-7, Ex. 68).  At the time, a violation of chapter 268, section 13B, was a felony and carried with it a penalty of "state prison for not more than 10 years;" or "imprisonment in the house of correction for not more than 2 1/2 years;" or a fine ranging from $1,000 to $5,000.  (Docket Entry # 81-7, Ex. 68); Mass. Gen. Laws ch. 268, § 13B.  The court released plaintiff on personal recognizance on December 13, 2012.  (Docket Entry # 81-7, Ex. 68).

On March 28, 2013, plaintiff visited the TPD station and spoke with Officer Russo.  (Docket Entry # 81-7, Ex. 68).  He provided a signed, notarized statement written by Tina Mello, Lisa Mackey's sister, stating that Lisa Mackey had taken the check "without [plaintiff] knowing" so that she could give the money to her attorney.  (Docket Entry # 81-7, Ex. 68).  He also provided a similar letter written by Mary Feeley, another of Lisa Mackey's sisters, stating that her parents had not heard about the check until after Lisa Mackey cashed it and that she

---

[24]  Chapter 268, section 13B, proscribes not only intimidating a witness but also "mislead[ing]" a "police officer."  Mass. Gen. Laws ch. 268, § 13(b).

told them that she cashed it to pay her attorney. (Docket Entry
# 81-7, Ex. 68). He submitted that these and other documents
that he provided prove that Lisa Mackey had stolen the check and
that she lied to the TPD to shift the blame to him. (Docket
Entry # 81-7, Ex. 68). Officer Russo nevertheless informed
plaintiff that his documents did not prove that Lisa Mackey had
lied or stolen the check, but that she (Officer Russo) would
forward them "to the detective bureau." (Docket Entry # 81-7,
Ex. 68). The court dismissed the charges against plaintiff upon
failure to prosecute on November 6, 2014. (Docket Entry # 81-7,
Ex. 68).

24. November 13, 2012

On November 13, 2012, Officer Jackman met with Lisa Mackey
at the TPD station concerning plaintiff's possible contact with
a plumber, Rick Caan, to winterize her residence. (Docket Entry
# 81-7, Ex. 69). Officer Jackman called Rick Caan, who stated
that Lisa Mackey had contacted him and that he had never spoken
with plaintiff. (Docket Entry # 81-7, Ex. 69). Officer Jackman
advised Lisa Mackey that "no crime had been committed." (Docket
Entry # 81-7, Ex. 69).

25. November 16, 2012

On Friday, November 16, 2012, Officer O'Keefe was
dispatched to 68 Mitchell Drive. (Docket Entry # 76-35). After
she arrived at the property, Lisa Mackey stated that plaintiff

had failed to pay her that week as required by the RO. (Docket Entry # 76-35). In a narrative report, Officer O'Keefe noted that the RO required plaintiff to pay Lisa Mackey $150 "per week" and that she was "requesting a summons." (Docket Entry # 76-35) (Docket Entry # 81-7, Ex. 70). On November 19, 2012, Sergeant Warren filed an application for a criminal complaint in Lowell District Court based upon a chapter 209A violation. (Docket Entry # 81-7, Ex. 70). After a number of continuances, the court determined there was probable cause and issued a criminal complaint on November 5, 2013 charging plaintiff with a chapter 209A violation of the RO. (Docket Entry # 81-7, Ex. 70). On December 13, 2013, plaintiff was arraigned and released on personal recognizance. (Docket Entry # 81-7, Ex. 70). The court ultimately dismissed the complaint on a recommendation of the court's Probation Department on September 19, 2014. (Docket Entry # 81-7, Ex. 70).

At Sergeant Warren's deposition, he agreed that the RO did not specify that plaintiff must pay Lisa Mackey by Friday, that it required him to pay only $75, and that Officer O'Keefe failed to confirm the content of the RO and to contact plaintiff before proceeding. (Docket Entry # 81-4, Ex. 39, pp. 627-28). Sergeant Warren therefore also agreed there had been no probable cause to believe that plaintiff had violated the RO. (Docket Entry # 81-4, Ex. 39, pp. 627-28).

26. <u>November 25, 2012</u>

On November 25, 2012, Officer Hollis spoke with Lisa Mackey at the TPD station. (Docket Entry # 76-36). As set out in Officer Hollis' narrative report, she claimed that plaintiff had not paid her $150 that week as required by the RO. (Docket Entry # 76-36). She stated that he typically pays her "on Friday of each week." (Docket Entry # 76-36). The narrative report further reflects that Officers Griffin and Hollis visited plaintiff's residence, where plaintiff met them at the door[25] and "provided a U.S. Postal service receipt that was time and date stamped." (Docket Entry # 76-36). It showed a money order for $151.15 issued on November 24, 2012 at 11:34 a.m. (Docket Entry # 76-36). The narrative report notes that the officers did not arrest plaintiff at that time because he made the payment during the calendar week. (Docket Entry # 76-36). However, Officer Hollis requested that "a summons be issued for" violation of the RO because Lisa Mackey had not received the payment during the calendar week. (Docket Entry # 76-36).[26]

27. <u>December 18, 2012</u>

_____

[25] In an affidavit, plaintiff states that Officer Griffin pushed the door as plaintiff opened it. (Docket Entry # 81-1, Ex. 1, ¶ 6). Plaintiff also states that, "Officer Hollis stopped Officer Griffin from pushing on the door." (Docket Entry # 81-1, Ex. 1, ¶ 8). This court struck _other_ portions of paragraphs six and eight of the affidavit.
[26] The record does not indicate whether the officers ultimately filed an application for a criminal complaint.

In an affidavit, plaintiff states that he missed a court hearing on December 17, 2012 because he had not received notice of it. (Docket Entry # 81-1, Ex. 1, ¶ 10). The Lowell District Court issued default warrants. (Docket Entry # 81-1, Ex. 1, ¶ 11). The clerk of the Lowell District Court informed plaintiff about the default warrants when he visited the court for an unrelated reason on December 18, 2012. (Docket Entry # 81-1, Ex. 1, ¶ 11). The clerk recalled the default warrants and gave plaintiff warrant recall slips. (Docket Entry # 81-1, Ex. 1, ¶ 11) (Docket Entry # 81-8, Ex. 72). Later that day, "at least six TPD officers, with four cruisers and a K-9, surrounded [plaintiff's] house." (Docket Entry # 81-1, Ex. 1, ¶ 12). Plaintiff allowed the officers to enter his house and showed them the warrant recall slips. (Docket Entry # 81-1, Ex. 1, ¶ 13). The officers left after "at least another twenty minutes." (Docket Entry # 81-1, Ex. 1, ¶ 13).

At his deposition, Sergeant Warren agreed that it was "not routine practice," in his opinion, for the TPD to send six officers to serve a default warrant within 24 hours of its issuance. (Docket Entry # 81-4, Ex. 39, p. 629). He testified that he did not "have any idea why it would have went that way" and that the TPD's response was, in his opinion, "a little strange." (Docket Entry # 81-4, Ex. 39, p. 629).

28. February 6, 2013

On Wednesday, February 6, 2013, Officer Griffin spoke with Lisa Mackey at the TPD station. (Docket Entry # 81-8, Ex. 73). She claimed that plaintiff had violated the RO by failing to pay her $75 as required by the RO. (Docket Entry # 81-8, Ex. 73). Officer Griffin further noted in his narrative report that the RO required payment to be post marked no later than Wednesday. (Docket Entry # 81-8, Ex. 73). Officer Griffin advised her that plaintiff had not yet violated the RO because he had until midnight to complete the payment. (Docket Entry # 81-8, Ex. 73). A USPS receipt postmarked that day shows that plaintiff paid Lisa Mackey $150. (Docket Entry # 81-8, Ex. 73).

29. February 21, 2013

On Thursday, February 21, 2013, Officers Griffin and Michael Newcomb spoke with Lisa Mackey at the TPD station. (Docket Entry # 76-37). She stated that plaintiff had violated the RO by failing to provide a payment of $150 that was postmarked by Wednesday of each week, as required by the RO. (Docket Entry # 76-37). Instead, the payment she received was postmarked Thursday, February 21, 2013. (Docket Entry # 76-37). In his narrative report, Officer Griffin stated that, "after reviewing the documents," probable cause existed to charge plaintiff with violating the RO. (Docket Entry # 76-37).

Sergeant Coviello further testified that when he arrived at the location Officer Nicosia told him that he (Officer Nicosia)

saw plaintiff enter a building on 64 Lorum Street.[27] (Docket

Entry # 81-4, Ex. 38, pp. 540-41, 562). He testified Sergeant

Coviello and Officer Nicosia demanded individuals inside the

building bring plaintiff outside for arrest. (Docket Entry #

81-4, Ex. 38, p. 562) (Docket Entry # 81-5, Ex. 46). Plaintiff

stated by affidavit that the building is private property and he

was there to watch a Bruins game with friends. (Docket Entry #

81-1, Ex. 1, ¶ 14). One of his friends indicated that several

police cruisers were outside. (Docket Entry # 81-1, Ex. 1, ¶

15). Ed Clement, a friend of plaintiff, stated in an affidavit

that when he opened the door, "Officer Nicosia forced his way

into the building." (Docket Entry # 81-5, Ex. 46). Plaintiff

told the officers that they could not enter without a search

warrant. (Docket Entry # 81-1, Ex. 1, ¶ 17). The officers

remained outside the building for approximately an hour.

(Docket Entry # 81-1, Ex. 1, ¶ 18) (Docket Entry # 81-5, Ex.

46). Ed Clement stated that when he later attempted to drive

---

[27] Sergeant Coviello testified that he did not file a narrative
report detailing the events of February 21, 2013 because
"nothing really came of the incident." (Docket Entry # 81-4,
Ex. 38, p. 559-60). Sergeant Coviello also testified that none
of these officers filed narrative reports because "we're not
going to write a report on every single thing that we do."
(Docket Entry # 81-4, Ex. 38, p. 564). However, he did state
that it "[w]ould have been better off" if one of them had
written one. (Docket Entry # 81-4, Ex. 38, p. 564). Sergeant
Coviello described the area as a dead-end street with no traffic
and three buildings. (Docket Entry # 81-4, Ex. 38, p. 561).

away in his pickup truck, Sergeant Coviello pulled him over.
(Docket Entry # 81-5, Ex. 46).  Sergeant Coviello testified that
he pulled over Ed Clement to check whether plaintiff was hiding
in the truck.  (Docket Entry # 81-4, Ex. 38, p. 562-63).
Sergeant Coviello issued several citations after the search
revealed that plaintiff was not in the truck.  (Docket Entry #
81-5, Ex. 46).

Based upon a February 21, 2013 TPD incident report that
includes Officer Griffin's narrative report as well as the
information that Officer Nicosia observed plaintiff's truck on
Lorum Street, five TPD officers (including Sergeant Coviello and
Officers Griffin, Miano, and Nicosia) were dispatched to Lorum
Street to arrest plaintiff, according to Sergeant Coviello's
deposition testimony.  (Docket Entry # 81-4, Ex. 38, pp. 540-41,
559-60) (Docket Entry # 81-8, Ex. 76)[28] (Docket Entry # 76-37).
Several days later, Officer Griffin added to his narrative
report that, "As of February 25, 2013 at approximately 4:00 PM,"
the officers who had searched for plaintiff were unsuccessful in
finding him.[29]  Officer Griffin also reported that he would

---

[28]  The above-cited dispatch report references the February 21,
2013 incident report.  (Docket Entry # 81-8, Ex. 76) (Docket
Entry # 76-37).
[29]  At his deposition, Sergeant Coviello agreed that this was
"not a true statement" given the events that followed on
February 21, 2013.  (Docket Entry # 81-4, Ex. 38, p. 565).  He
also agreed that Officer Griffin, who personally witnessed the

request an arrest warrant for plaintiff because he had "numerous open cases for chapter 209A violations" and because "numerous issues" had arisen in serving process to his address at 51 Riverdale Avenue. (Docket Entry # 76-37). Sergeant Warren filed an application for a criminal complaint based upon a chapter 209A violation in Lowell District Court. (Docket Entry # 81-8, Ex. 74). The court dismissed the charge on a recommendation of the Probation Department on September 19, 2014. (Docket Entry # 81-8, Ex. 74).

30. <u>May 13, 2013</u>

On May 13, 2013, Officer Miano spoke with Lisa Mackey at the TPD station. (Docket Entry # 76-38). She explained that National Grid had shut off her gas service that day for nonpayment of a bill. (Docket Entry # 76-38). She claimed that plaintiff was responsible for paying the bill and presented a copy of the RO, which stated that plaintiff was not to shut off or cause to be shut off any of her utilities. (Docket Entry # 76-38). Officer Miano was unable to contact National Grid for confirmation because its daily customer-service business hours had concluded. (Docket Entry # 76-38).

Officer Miano stated in his narrative report that he had probable cause to believe that plaintiff violated the RO "by

---

events that followed, should have raised them in the report. (Docket Entry # 81-4, Ex. 38, p. 565).

failing to pay the gas utility bill." (Docket Entry # 76-38).
He also stated he was requesting a hearing on the "matter from
Lowell District Court" and "will be attempting to locate
[plaintiff] . . . to speak with him regarding this issue."
(Docket Entry # 76-38). Sergeant Warren requested a warrant on
May 13, 2013, and a criminal complaint issued on October 7, 2013
based upon a chapter 209A violation in Lowell District Court.
(Docket Entry # 81-8, Ex. 78). On October 8, 2013, the court
conducted an arraignment and released plaintiff on personal
recognizance. (Docket Entry # 81-8, Ex. 78). The court
dismissed the complaint at plaintiff's request on December 13,
2013. (Docket Entry # 81-8, Ex. 78).

At his deposition, Sergeant Warren agreed that if he were
in Officer Miano's position, he would not have found probable
cause without learning from a judge "what constituted a utility
and whether nonpayment of that utility bill was a violation" of
the RO. (Docket Entry # 81-4, Ex. 39, p. 631). Thus, he
testified that he did "not see any probable cause in Officer
Miano's report." (Docket Entry # 81-4, Ex. 39, p. 631).

31. May 30, 2013

On May 30, 2013, Lieutenant Gaynor spoke with Lisa Mackey
at the TPD station. (Docket Entry # 76-39). She stated that
National Grid had terminated electricity to her residence
because her account had an outstanding balance of $3,467.86.

(Docket Entry # 76-39).  Lieutenant Gaynor called National Grid and learned that she could settle the matter by opening an account in her own name.  (Docket Entry # 76-39).  Lisa Mackey also stated that she "suffers from various medical conditions, some of which are a result of the constant stress and mental anguish caused by the ongoing situation with [plaintiff] specifically surrounding the termination of other utilities (phone & gas) at the residence."  (Docket Entry # 76-39).  Lieutenant Gaynor called National Grid again and learned that it might restore her electricity if her doctor sent a letter explaining her condition.  (Docket Entry # 76-39).

In his narrative report, Lieutenant Gaynor stated that he had probable cause to believe that plaintiff violated the RO by failing to pay for the utilities.  (Docket Entry # 76-39).  Lieutenant Gaynor also noted that plaintiff had nine pending chapter 209A violations and was scheduled to appear in Lowell District Court on June 26, 2013.  (Docket Entry # 76-39).  Sergeant Warren filed an application for a criminal complaint based on a chapter 209A violation in Lowell District Court and requested an arrest warrant on May 31, 2013.  (Docket Entry # 81-8, Ex. 79).  On November 4, 2013, a criminal complaint issued.  The Lowell District Court found probable cause and issued a summons rather than a warrant.  (Docket Entry # 81-8, Ex. 79).  On December 13, 2013, the court conducted an

arraignment and released plaintiff on his personal recognizance.
(Docket Entry # 81-8, Ex. 79).  (Docket Entry # 81-8, Ex. 79).
The court dismissed the complaint at plaintiff's request on
January 31, 2014.  (Docket Entry # 81-8, Ex. 79).

32.  June 1, 2013

On June 1, 2013, Sergeant Jop spoke with Lisa Mackey at the
TPD station.  (Docket Entry # 76-40).  She explained that while
she was stopped at the intersection of Maple Street and East
Street on Wednesday, May 29, 2013, she saw plaintiff approaching
her from the opposite direction on a motorcycle.  (Docket Entry
# 76-40).  She also stated that she and plaintiff made eye
contact as he passed her, and then he raised his arm and made a
gun gesture toward her with his hand "as if he were shooting her
with a real gun."  (Docket Entry # 76-40).  She claimed that she
tried to photograph him, but that he began operating his
motorcycle erratically to avoid being photographed.  (Docket
Entry # 76-40) (Docket Entry # 80, ¶ 213).  She stated that she
"didn't believe" that plaintiff had violated the RO until she
spoke to a "victim witness advocate" in Lowell District Court on
May 31, 2013.  (Docket Entry # 76-40).  Sergeant Jop's narrative
report also notes that Lisa Mackey and plaintiff were "going
through a bitter divorce" and she claimed to "fear for her
life."  (Docket Entry # 76-40).  Sergeant Jop notes that Lisa
Mackey had visited the station on Thursday, May 30, 2012, and on

Friday May 31, 2012 to report several RO violations but failed to mention this incident during those visits. (Docket Entry # 76-40). He stated in his report that he believed plaintiff committed an RO violation and intimidation of a witness pursuant to chapter 268, section 13B. (Docket Entry # 76-40). He requested a warrant, and Sergeant Warren filed an application for a criminal complaint in Lowell District Court. (Docket Entry # 76-40) (Docket Entry # 81-8, Ex. 80).

On Sunday, June 2, 2012, plaintiff's son, James Mackey III, visited the TPD station to speak with Sergeant Jop. (Docket Entry # 76-40). James Mackey III stated that the alleged incident could not have occurred because he and plaintiff were car shopping together during the time of the alleged incident. (Docket Entry # 76-40). Sergeant Jop told him that the complaint would still go to court and that he should notify plaintiff's lawyer so that he could appear as a witness. (Docket Entry # 76-40).

33. July 26, 2013

On July 26, 2013, Officer Nicosia "was dispatched to the front lobby" of the police station to speak with Lisa Mackey, as reflected in his narrative report. (Docket Entry # 76-41). She stated that plaintiff had not paid her a $150 support payment as required by the RO. (Docket Entry # 76-41). Officer Nicosia wrote that the RO "clearly states" that plaintiff is ordered to

pay $150 per week and these payments must be postmarked by
Wednesday of each week. (Docket Entry # 76-41). On July 26,
2013, Officer Nicosia requested an arrest warrant for plaintiff
charging him with a chapter 209A violation. (Docket Entry # 76-
41). Sergeant Warren filed an application for a criminal
complaint charging plaintiff with a chapter 209A violation in
Lowell District Court. On July 26, 2013, Officer Nicosia
requested a warrant. (Docket Entry # 81-9, Ex. 82). A criminal
complaint eventually issued on February 12, 2014 along with a
summons for plaintiff to appear in court on June 19, 2014.
(Docket Entry # 81-9, Ex. 82). On June 19, 2014, the Lowell
District Court conducted an arraignment and released plaintiff
on personal recognizance. (Docket Entry # 81-9, Ex. 82). On
November 6, 2014, the court dismissed the complaint based on a
failure to prosecute. (Docket Entry # 81-9, Ex. 82).

DISCUSSION

I. <u>Qualified Immunity</u>

Defendants seek qualified immunity on the Fourth Amendment
section 1983 claim(s) for the June 7, 2012 arrest as well as the
subsequent charges on the basis that no reasonable police
officer would have known he did not have probable cause to
arrest or charge plaintiff. (Docket Entry # 75, p. 6). In
seeking immunity, they do not distinguish between the false
arrest or malicious prosecution Fourth Amendment claims.

(Docket Entry # 75).  Rather, they simply allege that all of "[p]laintiff's claims arise out of allegations that the Defendants lacked probable cause."  (Docket Entry # 75, p. 1).  They submit that the "state of the law on restraining orders is confusing and would lead a reasonable officer to believe that arrest is mandatory for any alleged violation."  (Docket Entry # 75, p. 4).

Plaintiff responds that qualified immunity should not apply because he "has a clearly established federal right to be free from arrest in the absence of probable cause."  (Docket Entry # 79, p. 14) (emphasis and capitalization omitted).  "[N]o objectively reasonable police officer would have understood that he had probable cause to arrest [plaintiff] for violating chapter 209A or, at a minimum, there exists a triable issue of fact," according to plaintiff.  (Docket Entry # 79, p. 17) (emphasis and capitalization omitted).

Plaintiff sets out a Fourth Amendment qualified immunity analysis limited to his arrest on June 7, 2012.  (Docket Entry # 79, pp. 12-14).  Because the law was clearly established and because no objectively reasonable police officer would understand he had probable cause to arrest plaintiff on June 7, 2012, plaintiff separately seeks partial summary judgment on liability on the false arrest section 1983 claim ostensibly under Fed. R. Civ. P. 56(f)(1) ("Rule 56(f)(1)").  (Docket Entry

# 79, p. 6, fn. 1, pp. 14-21).  Plaintiff filed this "motion" or request more than a month after the January 19, 2018 deadline to file summary judgment motions.  As such, it is denied as untimely.  See Lewis v. Bank of N.Y. Mellon Tr. Co., N.A., Civil Action No. 16-11122-FDS, 2017 WL 129994, at *1 n.1 (D. Mass. Jan. 12, 2017).  In fact, plaintiff does not request an extension of the January 19, 2018 deadline.

In the alternative, the "motion" is moot.  Rule 56(f)(1) gives this court discretion to "grant summary judgment for a nonmovant" after providing notice and a reasonable opportunity for the movant to respond.  Fed. R. Civ. P. 56(f).  Because defendants are entitled to qualified immunity, which shields them from liability, and the complaint does not seek injunctive relief, an adjudication of liability on the section 1983 false arrest claim is moot.  See generally Cty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1549 (2017) (recognizing that lower Court of Appeals' "focus solely on the risks foreseeably associated with the failure to knock and announce . . . could not serve as the basis for liability since the Court of Appeals concluded that the officers had qualified immunity on that claim").

As to the incidents other than the June 2012 false arrest, plaintiff argues a violation of his First Amendment rights by asserting that "a reasonable factfinder could also conclude that

74

defendants' campaign of harassment violated [plaintiff's] First Amendment rights." (Docket Entry # 79, p. 21) (emphasis and capitalization omitted). With respect to the First Amendment claim, plaintiff also maintains that defendants lack qualified immunity because "[a]n objectively reasonable police officer would have known that bringing baseless charges against [plaintiff] as a result of him having complained to the AGO violated the First Amendment." (Docket Entry # 79, p. 22).

The doctrine of "qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." MacDonald v. Town of Eastham, 745 F.3d 8, 11 (1st Cir. 2014) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)) (internal quotation marks and brackets omitted). It "is 'an immunity from suit rather than a mere defense to liability.'" Pearson, 555 U.S. at 237 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Its purpose is to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions," and, "[w]hen properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). It does not protect public officials "who, 'from an

objective standpoint, should have known that their conduct was unlawful.'" Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir. 2013) (internal citations omitted).

The analysis has two prongs. "First, the court must determine 'whether the plaintiff's version of the facts makes out a violation of a protected right.'" McKenney v. Mangino, 873 F.3d 75, 81 (1st Cir. 2017) (quoting Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017)), cert. denied, 138 S. Ct. 1311 (2018). "Second, the court must determine 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" McKenney v. Mangino, 873 F.3d at 81 (internal citations omitted); accord D.C. v. Wesby, 138 S. Ct. 577, 589 (2018) (officers are entitled to qualified immunity unless "they violated a federal statutory or constitutional right, and . . . unlawfulness of their conduct was 'clearly established at the time'") (internal citation omitted). Once a defendant invokes the qualified immunity defense, it is the plaintiff's burden to make this "two-step showing—that (a) defendants violated a statutory or constitutional right and that (b) the right was clearly established at the time." Rivera-Corraliza v. Morales, 794 F.3d 208, 214 (1st Cir. 2015). These prongs "need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified

immunity defense."  Raiche v. Pietroski, 623 F.3d 30, 35 (1st
Cir. 2010).

The second prong entails "two subsidiary issues: (a) the
clarity of the law in general at the time of the alleged
violation; and (b) the clarity of the law as applied to the
case-in other words, whether a reasonable person in the
defendant's shoes 'would have understood that his conduct
violated the Plaintiff's constitutional rights.'"  Id. at 35-36
(internal citation and brackets omitted); accord Alfano v.
Lynch, 847 F.3d at 75.

> Clearly established means that, at the time of the
> officer's conduct, the law was sufficiently clear that
> every reasonable official would understand that what he is
> doing is unlawful.  In other words, existing law must have
> placed the constitutionality of the officer's conduct
> beyond debate . . .

D.C. v. Wesby, 138 S.Ct. at 589-90 (internal citations and
quotation marks omitted).  As framed by the First Circuit, under
the second prong:

> the plaintiff must point to controlling authority or a
> consensus of cases of persuasive authority that broadcasts
> a clear signal to a reasonable official that certain
> conduct falls short of the constitutional norm.  Then, the
> court must evaluate whether an objectively reasonable
> official in the defendant's position would have known that
> his conduct violated that rule of law.  These inquiries are
> carried out with the understanding that qualified immunity
> is meant to shield all but the plainly incompetent or those
> who knowingly violate the law.

McKenney v. Mangino, 873 F.3d at 81 (internal citations and
quotation marks omitted).  It is also worth noting, particularly

in the case at bar, that qualified immunity applies even if the officers' mistake was a belief that the law reached or applied to the conduct at issue. The "protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson v. Callahan, 555 U.S. at 231 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)); see Groh v. Ramirez, 540 U.S. at 566 (Kennedy, J., dissenting) (explaining that police officer "may be unaware of existing law and how it should be applied").

Here, in seeking qualified immunity defendants rely on the well-honed principle that the Fourth Amendment requires probable cause to arrest an individual. (Docket Entry # 75, pp. 2-4); see Alfano v. Lynch, 847 F.3d at 76 ("the Fourth Amendment requires probable cause to place an individual under arrest"). In addition to seeking qualified immunity regarding the June 7, 2012 arrest, however, they apply this same Fourth Amendment principle to the incidents involving applications for criminal complaints and/or requests for warrants and summonses when, in fact, no arrest took place. Specifically, they assert qualified immunity on the basis that defendants had "probable cause to charge" plaintiff for the chapter 209A and other violations. (Docket Entry # 75, pp. 11-23) (italics added with bolding and capitalization omitted).

As to the post-arrest incidents of filing applications for criminal complaints, it is debatable whether the law was *clearly* established that plaintiff had a Fourth Amendment right in 2012 and 2013 not to be criminally *charged* for an offense without probable cause when the defendant, i.e., plaintiff, is never arrested or detained.[30]  See Britton v. Maloney, 196 F.3d 24, 28-29 (1st Cir. 1999) ("we do not believe that [police officer's] pursuit of baseless criminal charges violated [plaintiff's] Fourth Amendment rights in this case" and further noting "[plaintiff] was never arrested or detained"); see also Parks v. Town of Leicester, Civil Action No. 10-30120-FDS, 2012 WL 2088926, at *5 (D. Mass. June 7, 2012) (court in Britton "held that an officer did not violate the Fourth Amendment by filing criminal charges in that case because 'those charges never cause[d] the [person charged] to be arrested or detained'"); U.S. Const. amend. IV ("no *Warrants* shall issue, but upon probable cause, . . .") (emphasis added).

Here, it is not necessary to resolve the matter because plaintiff's opposition memorandum limits the qualified immunity

_____

[30]  Separate and apart from federal constitutional rights under the Fourth Amendment, a state rule of criminal procedure provides that a "judicial officer shall not authorize a [criminal] complaint unless the information presented by the complainant," usually in an application for the criminal complaint, "establishes probable cause."  Mass. R. Crim. P. 3.1(g)(2).

analysis under the Fourth Amendment entirely to the June 7, 2012 arrest. (Docket Entry # 79, pp. 14-21). As to the incidents that followed the one-time arrest, plaintiff does not identify controlling Fourth Amendment authority or a consensus of persuasive Fourth Amendment authority that gave fair warning to defendants that their conduct of repeatedly charging (but not arresting) plaintiff violated clearly established Fourth Amendment law. See Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 24-27 (1st Cir. 2016). Plaintiff therefore logically and reasonably appears to abandon a Fourth Amendment section 1983 claim based on the applications for criminal complaints that occurred after the single arrest. Rather, plaintiff grounds section 1983 liability on these incidents under the First Amendment due to defendants' retaliation for filing the complaint with the AGO.[31] (Docket Entry # 79, pp. 21-22).

Accordingly, this court limits the Fourth Amendment qualified immunity analysis to the June 7, 2012 arrest without probable cause. Turning to the task, defendants focus their

---

[31] In the event plaintiff does wish to press a Fourth Amendment section 1983 claim based on the incidents occurring after the June 7, 2012 arrest, defendants may renew the summary judgment motion on or before January 14, 2020. Any such renewal may *not* include additional argument or legal citations by either party, and it is limited to seeking *Fourth* Amendment qualified immunity for the post-arrest incidents. The expiration of the deadline to file summary judgment motions will not bar a motion to renew the existing summary judgment when limited in this respect.

qualified immunity argument solely on the second prong. They

argue that there was probable cause that plaintiff violated the

RO by causing the shut off of utilities at 68 Mitchell Drive.

(Docket Entry # 75, p. 10). Defendants note the observations

that the television and the landline telephone were not

functional and that Comcast confirmed the account was in

plaintiff's name. (Docket Entry # 75, p. 10) (Docket Entry #

76-14). They additionally submit that the "law governing abuse

prevention orders is confusing and difficult for the police to

enforce" and because the RO "itself is misleading and

confusing," such that a "reasonable officer reading the 209A

document would believe that any violation of the 209A order is

an arrestable offense." (Docket Entry # 75, pp. 5-6). As

support, defendants argue that although the chapter 209A slide

does not define the nonpayment of utilities as an arrestable

offense, the slide leaves this issue "open to interpretation"

(Docket Entry # 75, p. 5) by stating that "we are looking for a

case to decide this."[32] (Docket Entry # 76-5). Furthermore,

defendants assert that the RO is misleading because the words

"'VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE'" are printed on

it. (Docket Entry # 75, p. 6). Defendants cite the testimony

of various officers who believed that any chapter 209A violation

---

[32] As previously explained, this court does not consider the
chapter 209A slide as a *training* slide.

is arrestable.  (Docket Entry # 75, p. 7).  Defendants contend that, applying an objective standard, probable cause to arrest plaintiff for violating the RO by causing the shut off of a utility was at least arguable thus entitling them to qualified immunity.  (Docket Entry # 75, pp. 3, 10).

Plaintiff argues that the law clearly established his Fourth Amendment right requiring that police have probable cause to place him under arrest.  (Docket Entry # 79, p. 16) (quoting Alfano, 847 F.3d at 76).  He maintains that "an objectively reasonable police officer would have known that arresting [him] on June 7, 2012 violated" his Fourth Amendment right because nonpayment of utilities in violation of the RO was not a crime.[33] (Docket Entry # 79, pp. 16-26).  First, there was no probable cause that he violated an actual provision in the RO because the RO did not obligate him to pay for utilities, according to plaintiff.  Second, even assuming the RO required him to pay utilities, plaintiff contends that no reasonable police officer would conclude that such conduct is a crime under chapter 209A.

---

[33]  To the extent plaintiff implicitly argues that defendants made a mistake of law that chapter 209A proscribed as a crime a violation of the RO's nonpayment of utilities provision, there was no mistake of law.  In the case at bar, the officers' understanding of the law was correct.  Hence, the line of cases, albeit not cited by plaintiff, that conclude that an officer's mistake regarding the law does not provide probable cause "because an officer's mistake of law can never be objectively reasonable," United States v. Gross, 550 F.3d 578, 584 n.2 (6th Cir. 2008) (collecting cases), does not apply.

(Docket Entry # 79, pp. 18-19). Thus, even if the RO required him to pay for utilities, the arresting officers acted unreasonably because monetary violations under chapter 209A are not a crime and therefore not arrestable offenses, according to plaintiff. (Docket Entry # 79, pp. 18-21).

The second prong ascertains "'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" McKenney v. Mangino, 873 F.3d at 81 (internal citations omitted). At the outset, plaintiff must identify "controlling authority or a consensus of cases of persuasive authority that broadcasts a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Id. (setting out the first subsidiary issue of the clearly established second prong) (internal citations and quotation marks omitted). In this respect, plaintiff maintains that the Fourth Amendment prohibits "an arrest without probable cause." (Docket Entry # 79, p. 16). Undeniably, plaintiff had the Fourth Amendment right not to be arrested without probable cause in 2012. See Alfano v. Lynch, 847 F.3d at 76 ("[i]t is hornbook law that the Fourth Amendment requires probable cause to place an individual under arrest"). More specifically, an arrest without a warrant "is permissible under the Fourth Amendment where there is probable cause, i.e., where reasonably trustworthy facts and circumstances would enable a reasonably

prudent person to believe that the arrestee has committed a
crime (even if it differs from the one named by police during
the arrest or booking)."  Robinson v. Cook, 706 F.3d 25, 33 (1st
Cir. 2013) (emphasis omitted) (citing, inter alia, Devenpeck v.
Alford, 543 U.S. at 152.  Plaintiff suggests (Docket Entry # 79,
p. 17) (emphasis omitted) ("police officer only has the legal
authority to arrest an individual if the officer has probable
cause to believe that person has committed a crime") and the law
clearly establishes that "a warrantless arrest by a law officer
is reasonable under the Fourth Amendment where there is probable
cause to believe that a *criminal offense* has been or is being
committed."  Devenpeck v. Alford, 543 U.S. at 152 (emphasis
added).  Simply put, every reasonable police officer would
understand that the Fourth Amendment requires probable cause,
founded upon reasonably trustworthy facts and circumstances, to
believe the suspect had or was committing a crime in order for
him to effectuate the warrantless arrest on June 7, 2012.

Beyond these rules of clearly established law, neither
party provides additional clearly established law defining these
Fourth Amendment rules with greater specificity.  Rather,
plaintiff posits that "'what remains to be done' . . . is to
determine whether an objectively reasonable police officer would
have known that arresting [plaintiff] on June 7, 2012 violated
[his] Constitutional rights."  (Docket Entry # 79, p. 16)

(citing Alfano, 847 F.3d at 80, addressing second subsidiary issue of second prong); see generally Cortés-Reyes v. Salas-Quintana, 608 F.3d at 52 (noting it is plaintiffs' burden to show "law was clearly established"); accord Rivera-Corraliza v. Morales, 794 F.3d at 219. Plaintiff's argument places the remaining issue and the probable cause determination in the context of Alfano's "'test of objective legal reasonableness.'"[34] Alfano v. Lynch, 847 F.3d at 79.

The inquiry therefore reduces to "'whether in the particular factual context of th[is] case,'" Fernández-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 326 (1st Cir. 2015) (internal citation omitted), "an objectively reasonable officer would have believed he had probable cause," Alfano v. Lynch, 847 F.3d at 79, to arrest plaintiff on June 7, 2012. "'[I]f the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach.'" Wilber v. Curtis, 872 F.3d 15, 21 (1st Cir. 2017) (quoting Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004). Both Alanfo and the recent First Circuit decision in Wilber analyze the elements and/or contours of the state offense in assessing probable cause at this juncture of

---

[34] To the extent that greater specificity of the clearly established Fourth Amendment law is required, see Wesby, 138 S. Ct. at 590, plaintiff thus fails in his burden to provide it which, in turn, provides an alternative basis to allow qualified immunity.

the immunity analysis.  Wilber v. Curtis, 972 F.3d at 20-22;

Alfano v. Lynch, 847 F.3d at 78-80.  Adhering to this framework,

this court turns to the offense both plaintiff and defendants

identify, i.e., a statutory violation of the RO under chapter

209A.[35]  To be clear, the state law is *not* clearly established

federal law, which requires probable cause to support a

warrantless arrest, except insofar as state precedents outline

the relevant federal constitutional right.  See Alfano v. Lynch,

847 F.3d at 76.  Finally, if the underlying state offense itself

is uncertain such that it is unclear that it encompasses the

particular circumstances the arresting officers confronted and

it was not unreasonable for them to conclude that it did, then

qualified immunity exists.  Wilber v. Curtis, 872 F.3d at 21-22.

Chapter 209A limits the offenses "which will constitute a

criminal violation" of the statute.  Commonwealth v. Delaney,

682 N.E.2d 611, 617 (Mass. 1997).  Section seven of chapter 209A

sets out the enumerated criminal offenses.  Id. ("read[ing] § 7

as limiting to the enumerated offenses those actions which will

constitute a criminal violation of G.L. c. 209A") (citing

Commonwealth v. Gordon, 553 N.E.2d 915, 918 (Mass. 1990));

---

[35]  Because chapter 209A provides the presence of arguable
probable cause, as discussed below, it is not necessary to
examine any other offense as the underlying crime.  See, e.g.,
Wilber v. Curtis, 872 F.3d at 21 (ascertaining probable cause to
determine qualified immunity and "focus[ing] on only one of"
three identified state law offenses).

accord <u>Commonwealth v. Finase</u>, 757 N.E.2d 721, 724 (Mass. 2001)

("§ 7 limits to the offenses enumerated therein those actions

that will constitute a criminal violation of G.L. c. 209A").

The Massachusetts Supreme Judicial Court ("SJC") in <u>Finase</u>

unequivocally identifies those offenses as "orders to have no

contact with the plaintiff or the plaintiff's minor children

('no contact' orders) as well as orders to vacate and to refrain

from abuse."[36]   <u>Commonwealth v. Finase</u>, 757 N.E.2d at 723.   The

SJC further states that, "By its terms, § 7 criminalizes

violations of these three types of orders" and that "the *only*

criminal violations that may be prosecuted under § 7 are those

relating to orders to vacate, to refrain from abuse, or to have

no contact . . .."   <u>Id.</u> at 724 (emphasis added).   Accordingly,

it was clear that a violation of an order to vacate within a

restraining order was a criminal offense under state law.

The SJC in <u>Gordon</u> sets out the principle that the statutory

language of chapter 209A determines "the range of activity the

Legislature intended to prohibit by authorizing courts to issue

orders requiring defendants to 'vacate' the marital home."

<u>Commonwealth v. Gordon</u>, 553 N.E.2d at 918 (internal citations

omitted).   At the time of the <u>Gordon</u> decision, chapter 209A did

---

[36]   The statute also includes a violation of an order to
surrender firearms as an enumerated criminal offense in section
seven.   Mass. Gen. Laws ch. 209A, §§ 3B, 7.

not define the term "vacate."[37]  <u>Id.</u> at 918.  By the time of

plaintiff's arrest, an amendment to the statute defined a

"vacate order" as an "order to leave and remain away from a

premises."  Mass. Gen. Laws ch. 209A, § 1.  In the case of a

residence inhabited by the victim, the statute includes a

directive in the *definition* of a "vacate order" that "[t]he

defendant . . . shall not shut off or cause to be shut off any

utilities . . .."  Mass. Gen. Laws ch. 209A, § 1.  In fact, the

definition of a "vacate order" as a "court order to leave and

remain away from a premises" is immediately followed by the next

sentence that "[t]he defendant . . . shall not shut off or cause

to be shut off any utilities . . .."  Mass. Gen. Laws ch. 209A,

§ 1.  Tracking this language, the RO orders plaintiff "not to

shut off or cause to be shut off any utilities" in the same

paragraph as the order to leave the premises.[38]  (Docket Entry #

76-1).  Hence, the case law and the language of chapter 209A

---

[37]  Officer McLaughlin does not recall reading the <u>Gordon</u>
decision.  (Docket Entry # 81-5, Ex. 41, p. 19).
[38]  At the time of the arrest, the officers did not have a copy
of the RO and did not know that the provision requiring
plaintiff not to shut off utilities was in the same paragraph as
the requirement to leave the premises.  Rather, the vantage
point to view immunity is what the officers knew at the time of
the arrest, namely, Lisa Mackey's recitation of the RO's
provision that plaintiff "cannot shut off any utilities of
Lisa[] [Mackey's]."  (Docket Entry # 76-14).

support a construction that a "vacate order" may encompass an order not to shut off any utilities.[39]

In contrast to the foregoing criminal offenses imbedded in chapter 209A, the statute sets out provisions enforceable as "civil or criminal remedies."[40]  See Mass. Gen. Laws ch. 209A, §§ 3, 7.  Section three of chapter 209A lists a series of requests a victim may make to the court and that the court may order. Mass. Gen. Laws ch. 209A, § 3; Commonwealth v. Gordon, 553 N.E.2d at 917-18.  The first three requests lay the groundwork for the criminally enforceable orders "to refrain from abusing the plaintiff," "to refrain from contacting the plaintiff," and "to vacate forthwith and remain away" from the dwelling.  Mass. Gen. Laws ch. 209A, § 3(a)-(c); Commonwealth v. Finase, 757 N.E.2d at 723-24.  Section three contains a lengthy list of *other* requests that the court may order, including ordering the

---

[39]  To add further support, an order to vacate serves the statutory purpose of chapter 209A because it "creates a haven for the abused party in which no further abuse need be feared and provides a temporary, partial separation of the abused and abusive party, thereby leaving fewer opportunities for abusive contact."  Commonwealth v. Gordon, 553 N.E.2d at 918 (statutory language is "'considered in connection with the cause of the statute's enactment, the mischief or imperfection to be remedied and the main object to be accomplished'") (brackets and internal citations omitted).  Likewise, an order not to shut off utilities serves the same purpose of allowing the victim to reside in a habitable haven.
[40]  The presence of arguable probable cause to arrest plaintiff for violating the utilities' provision in the RO forecloses the need to address the criminal contempt offense.  See, e.g., Wilber v. Curtis, 872 F.3d at 21-22.

defendant "to pay temporary support for the plaintiff" and

"monetary compensation" to the plaintiff for losses directly

resulting from the abuse.[41]  Mass. Gen. Laws ch. 209A, § 3;

Commonwealth v. Finase, 757 N.E.2d at 723-24 (quoting section

three's list of requests).  Violations of these other provisions

of a restraining order, such as to pay support, are litigated or

prosecuted as violations of the terms of the restraining order

through civil or criminal contempt proceedings.  See

Commonwealth v. Finase, 757 N.E.2d at 723, 724 n.2 (terms of

section seven criminalize only "orders to vacate, to refrain

from abusing, or to have no contact"; statute "does not appear"

to criminalize all chapter 209A violations, such as the numerous

types of orders section three authorizes, including ordering

defendant to pay support); Commonwealth v. Delaney, 682 N.E.2d

at 617 (section seven enumerates "actions which will constitute

a criminal violation" and "[a]ll other violations of a c. 209A

order cannot be prosecuted as a statutory offense; rather, they

can be prosecuted as criminal contempt"); Mahoney v.

Commonwealth, 612 N.E.2d 1175, 1178-79 (Mass. 1993) (construing

---

[41]  Hence, plaintiff insists that "[a]ny reasonable police
officer would have understood that a failure to affirmatively
pay for utilities . . . is not criminal conduct for which one
may be arrested under Chapter 209A."  (Docket Entry # 79, p.
18).  The argument rephrases the provision in the RO that the
officers objectively knew about from Lisa Mackey, i.e., that
plaintiff "cannot shut off any utilities" (Docket Entry # 76-
14), into an RO provision that plaintiff must pay for utilities.

enforcement of chapter 209A order as civil contempt in light of the remedial nature of the sanction imposed); Mass. Gen. Laws ch. 209A, § 7 ("superior, probate and family, district and Boston municipal court departments may each enforce by civil contempt procedure a violation of its own court order").

Although police training materials do not "establish the constitutional standard," they are nevertheless relevant to the Fourth Amendment analysis in this action. Stamps v. Town of Framingham, 813 F.3d 27, 32 n.4 (1st Cir. 2016). TPD training materials at the time of the arrest correspond to the above-noted case law that restricts criminal offenses of chapter 209A to a restraining order's no contact, refrain from abuse, and vacate violations. (Docket Entry # 81-3, Ex. 29) (Docket Entry # 81-4, Ex. 31, p. 30). The Scheft Manual expressly defines a vacate order as "mean[ing] that defendant must: Surrender the keys immediately; [n]ot damage any household property; [and] *[n]ot disrupt utility service* or mail delivery . . .."[42] (Docket Entry # 81-4, Ex. 31, p. 29) (emphasis added).

Determining "whether an officer had probable cause to arrest an individual" entails "examin[ing] the events leading up

---

[42]  Deputy Chief John Voto ("Deputy Chief Voto") testified that the TPD "buy[s] training books every year," including the Scheft Manual, and that there are "multiple copies of these books around" the TPD station for officers to review. (Docket Entry # 81-4, Ex. 34, p. 308).

to the arrest, and then decid[ing] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." <u>Md. v. Pringle</u>, 540 U.S. 366, 371 (2003) (internal citation omitted). The degree of certainty "falls somewhere between bare suspicion and what would be needed to justify conviction." <u>Burke v. Town of Walpole</u>, 405 F.3d 66, 80 (1st Cir. 2005) (internal citations, quotation marks, ellipses and brackets omitted). "The proof must be such as to give rise to a reasonable likelihood that the putative arrestee committed the suspected crime." <u>Cox v. Hainey</u>, 391 F.3d 25, 31 (1st Cir. 2004). Moreover, the Fourth Amendment demands "reasonably trustworthy facts and circumstances" that would enable an objectively reasonable officer "to believe that the arrestee has committed a crime." <u>Robinson v. Cook</u>, 706 F.3d at 33; <u>see</u> <u>Alfano v. Lynch</u>, 847 F.3d at 79. Information "is trustworthy enough" if a reasonable police officer would rely on it in forming a belief "about the suspect's conduct." <u>Robinson v. Cook</u>, 706 F.3d at 34. Information from a victim is ordinarily "sufficiently reliable to support a finding of probable cause." <u>Holder v. Town of Sandown</u>, 585 F.3d 500, 505 (1st Cir. 2009) ("Ms. Holder had told the officer that Mr. Holder had pushed her, and . . . 'information furnished by a victim is generally considered sufficiently reliable to support a finding of probable cause'") (internal citations omitted).

The qualified immunity issue is not whether probable cause exists but rather whether an objectively reasonable police officer would have known he lacked probable cause. See Alfano v. Lynch, 847 F.3d at 75 ("second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that [clearly established] rule of law" and "not whether the official actually abridged the plaintiff's constitutional rights").

Here, probable cause is at least arguable as to the June 7, 2012 arrest. The information provided to Officers McMahon and McLaughlin by Lisa Mackey was that plaintiff "ha[d] not paid for" the "cable (phone *included*)" and the internet service. (Docket Entry # 76-14) (emphasis added). She also informed them that, under the RO, plaintiff "cannot shut off any utilities" at 68 Mitchell Drive. (Docket Entry # 76-14). The officers observed that the telephone and the cable television were not functioning. (Docket Entry # 76-14). A Comcast representative confirmed that "the account" was in plaintiff's name and that payment was past due. (Docket Entry # 76-14). With the service in plaintiff's name, the account past due, the telephone and television not functioning, and information that the RO prohibited plaintiff from shutting off any utilities and that plaintiff had not paid for the service, the officers had trustworthy information that the RO required plaintiff not to

shut off any utility and that plaintiff violated that provision. Such a conclusion was reasonable as opposed to "'plainly incompetent.'" Alfano v. Lynch, 847 F.3d at 75 (question asks whether "official's conduct was unreasonable" and qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law'") (internal citation omitted).

It is true that the officers did not conduct a further investigation beyond contacting Comcast and perhaps speaking with plaintiff for a minute prior to the arrest. (Docket Entry # 76-14) (Docket Entry # 81-4, Ex. 40, p. 662). As to the latter, Officer McMahon recalls they spoke to plaintiff "for a minute." (Docket Entry # 81-4, Ex. 40, p. 662). Officer McMahon did not remember what plaintiff said.[43] (Docket Entry # 81-4, Ex. 40, p. 662). They also did not personally review the terms of the RO. Relying on Lisa Mackey's recitation of the RO's provision that plaintiff cannot shut off utilities, however, was reasonable under the circumstances. At that point, the officers had little reason to suspect she was not telling the truth given the limited, prior interactions with her. For

---

[43] After walking plaintiff to the police cruiser, they placed handcuffs on him and put him in the rear of the police cruiser. (Docket Entry # 81-4, Ex. 40, p. 662) (Docket Entry # 81-1, ¶ 3, sent. 2). It was only after this arrest that plaintiff informed the officers in the cruiser that he did not think or know that "non payment of a cable bill constituted [a] violation" of the RO. (Docket Entry # 76-14) (Docket Entry # 81-4, Ex. 40, p. 662) (Docket Entry # 81-1, ¶ 3, sent. 3).

example, Officer McLaughlin testified that he had never heard anything about James or Lisa Mackey and Officer McMahon had met Lisa Mackey only "a couple times" prior in connection with "calls for services," and the TPD had only limited, prior interactions with her.[44] (Docket Entry # 81-4, Ex. 32, pp. 77, 87) (Docket Entry # 81-5, Ex. 41, p. 7) (Docket Entry # 81-4, Ex. 40, p. 657). Whereas undertaking more investigation and/or contacting the court or a prosecutor might have been helpful, the failure to do so does not defeat the objective reasonableness of the officers' decision to arrest plaintiff under the totality of the circumstances. See Holder v. Town of Sandown, 585 F.3d at 505. In addition, plaintiff does not identify and this court could not locate a case that defines a utility as excluding a telephone line prior to June 7, 2012 and it is reasonable to interpret utilities as encompassing, at a minimum, telephone service. See Public Utility, Black's Law Dictionary (11th ed. 2019) ("A company that provides necessary services to the public, such as telephone lines and service, electricity, and water"); Utility, Cambridge Dictionary (Cambridge University Press 2019) ("a supply of gas, electricity, water, or telephone service to homes and

---

[44] Chief Sheehan previously did business with plaintiff in connection with plaintiff's construction business until 2008. He also socialized with plaintiff at neighborhood cookouts from 2000 to 2012. (Docket Entry # 81-4, Ex. 32, p. 77).

businesses, or a business that supplies such services"); see generally Commonwealth v. Gordon, 553 N.E.2d at 918 (examining dictionary to determine if it defines chapter 209A's then-undefined term "vacate" although concluding that dictionary definition provided no guidance).

Notably, police officers are "entitled to qualified immunity for their reasonable but mistaken assessments of the bounds of state law" in their determination of probable cause to effectuate a state law arrest. Wilber v. Curtis, 872 F.3d at 21 ("police officers are, in determining whether probable cause exists to make a state law arrest, entitled to qualified immunity for their reasonable but mistaken assessments of the bounds of state law"). As explained above, a reasonable assessment of the boundaries of chapter 209A is that the statute creates a criminal offense for violating a vacate order in a restraining order. A reasonable but perhaps mistaken (or not mistaken) assessment of chapter 209A is that a vacate order encompasses a directive not to shut off any utilities. Mass. Gen. Laws ch. 209A, §§ 1, 3(c), 7. The uncertain nature of the law in the area of shutting off utilities as an RO arrestable criminal offense and the absence of Massachusetts case law that shutting off utilities cannot form part of a vacate order support defendants' entitlement to qualified immunity. See

<u>Wilber v. Curtis</u>, 872 F.3d at 22;[45] <u>see</u> <u>generally</u> <u>Rivera-</u>
<u>Corraliza v. Morales</u>, 794 F.3d at 215 ("[c]ourts penalize
officers for violating 'bright lines,' not for making 'bad
guesses in gray areas'") (internal citations omitted).  Officer
McLaughlin's subjective belief that the circumstances he faced
on June 7, 2012 did not relate to plaintiff's failure to vacate
the premises (Docket Entry # 81-5, Ex. 41, pp. 14, 17-18, 22) is
not the standard because the presence of probable cause is
evaluated objectively as is the qualified immunity determination
of "whether an objectively reasonable officer would have

---

[45] Relevant portions of the <u>Wilber</u> decision are instructive:

> We also have made clear that police officers are, in
> determining whether probable cause exists to make a state
> law arrest, entitled to qualified immunity for their
> reasonable but mistaken assessments of the bounds of state
> law.  <u>Cortés-Reyes v. Salas-Quintana</u>, 608 F.3d 41, 51–52
> (1st Cir. 2010) (holding that defendants were protected by
> qualified immunity because the underlying state law was
> uncertain, and 'any conclusions we might draw about the
> relevant Commonwealth law would be uncertain at best') . .
> .
>
> [F]or purposes of qualified immunity, it is not enough to
> show that the officers may have made a mistaken
> determination about whether Wilber's conduct provided
> probable cause to conclude that he had committed the
> offense for which he was arrested.  Wilber must show that
> it was clear under state law that there was not probable
> cause to arrest him for this crime.  <u>See</u> <u>Cox</u>, 391 F.3d at
> 31 . . .

<u>Wilber v. Curtis</u>, 872 F.3d at 21-22.

believed he had probable cause."[46]  Alfano v. Lynch, 847 F.3d at

79; Robinson v. Cook, 706 F.3d at 37 n.13 ("[e]ven if Detective

Cook genuinely believed that Robert was not driving the car . .

., that fact would not vitiate probable cause, which is

evaluated objectively") (internal citation omitted); Estrada v.

R.I., 594 F.3d 56, 65 (1st Cir. 2010) ("[a]lthough Officer

Chabot's police report and deposition testimony calls into

question whether he himself believed he had probable cause to

escort the Plaintiffs to ICE, . . ., for the purposes of

qualified immunity, we look to the objective perspective of a

reasonable officer and inquire whether given all the facts in

the record, *that* officer would have believed that he was not

violating the Plaintiffs' Constitutional rights in taking the

action at issue") (emphasis added).

Accordingly, defendants are entitled to qualified immunity

on the Fourth Amendment false arrest section 1983 claim in Count

I.  Defendants limit their qualified immunity argument to the

absence of probable cause.  (Docket Entry # 75).  As such, they

do not seek qualified immunity on the First Amendment

retaliation section 1983 claim.  Rather, they move for summary

judgment on the First Amendment claim on the merits because

---

[46]  The same reasoning supports discounting the subjective
beliefs of other TPD officers as to existence of probable cause
on June 7, 2012.

defendants had no knowledge of the AGO complaint, and they did not act under an agreement to bring unlawful criminal actions or harass plaintiff. (Docket Entry # 75, pp. 23-25).

## II.  Section 1983 Claims (Count I)

Defendants next seek summary judgment on all of the section 1983 claims in Count I because plaintiff "was not deprived of a constitutional or federal statutory right." (Docket Entry # 75, pp. 23-25). In the complaint, plaintiff alleges that defendants violated his "First Amendment rights when they engaged in a long campaign of harassment against [him], including the filing of at least 19 meritless criminal charges, in retaliation for him engaging in protected speech" by filing a complaint against the TPD with the AGO in November 2011. (Docket Entry # 1, pp. 9, 49) (Docket Entry # 81-1, Ex. 6). Count I also sets out Fourth Amendment "false arrest and malicious prosecution" claims under section 1983. (Docket Entry # 1, p. 50, ¶ 330).

## A.  Fourth Amendment Claims

With respect to the Fourth Amendment section 1983 claims, defendants argue they had probable cause for the arrest and all of the charges thereby foreclosing any violation of the Fourth Amendment. (Docket Entry # 75, p. 25). It is not necessary to address the merits of the false arrest section 1983 claim because defendants are entitled to qualified immunity on the June 7, 2012 arrest, which is the only actual arrest in the

record.  In addition, the complaint does not seek injunctive

relief.  Rather, it seeks monetary damages.  (Docket Entry # 1,

p. 59).

The remaining Fourth Amendment section 1983 claim is a

malicious prosecution claim.  Defendants' one-paragraph

argument, however, makes no mention of the malicious prosecution

claim.  It simply asserts there is no Fourth Amendment "claim"

for all of the charges given the existence of probable cause.

(Docket Entry # 75, p. 25).  Hence, not only do defendants fail

to mention the malicious prosecution section 1983 claim but they

fail to distinguish between the two Fourth Amendment section

1983 claims (false arrest and malicious prosecution) in the

complaint.  Defendants' failure to adequately develop the

probable cause argument as pertaining to the malicious

prosecution section 1983 claim amounts to a waiver of the

argument for purposes of their summary judgment motion.[47]  See

Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260

(1st Cir. 1999) ("district court is free to disregard arguments

that are not adequately developed"); Paterson-Leitch Co., Inc.

v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 990

(1st Cir. 1988) ("party has a duty to put its best foot forward

---

[47]  In contrast, defendants sufficiently develop the probable
cause argument regarding the common law malicious prosecution
claim, which is addressed later in this opinion.

before the magistrate: to spell out its arguments squarely and distinctly").

B.  First Amendment Claim

Defendants next argue that the section 1983 First Amendment claim "fails because [plaintiff] has not put forth any evidence that anyone at the TPD was aware of the written complaint to the AGO," which he claims inspired a long, retaliatory "'campaign of harassment,'" and because he fails to provide evidence that "Defendants 'were acting pursuant to an agreement to bring unlawful criminal actions against [plaintiff] and otherwise harass and persecute him.'"  (Docket Entry # 75, p. 24) (quoting paragraph 341 of the complaint).  The latter argument essentially submits that defendants were not acting in retaliation against plaintiff.  Citing deposition testimony, defendants emphasize there was never any "order or directive to pursue charges against" plaintiff.  (Docket Entry # 75, p. 24).  Plaintiff argues that "[t]he record, taken as a whole and drawing all reasonable inference [sic] in [his] favor, supports a finding that Defendants' campaign of harassment against [him] was motivated by his complaint to the AGO."  (Docket Entry # 79, p. 22).

"It is well established that claims of retaliation for the exercise of First Amendment rights are cognizable under section 1983."  Gericke v. Begin, 753 F.3d 1, 6 (1st Cir. 2014).  "In a

section 1983 claim of retaliatory prosecution for First
Amendment activity, a plaintiff must prove that [his or] her
conduct was constitutionally protected and was a substantial or
motivating factor for the retaliatory decision, and that there
was no probable cause for the criminal charge." Id. (internal
citations and quotation marks omitted). A "causal connection
between the alleged retaliatory action and the protected
expression" is required. Delaney v. Town of Abington, 890 F.3d
1, 6 (1st Cir. 2018); see Hartman v. Moore, 547 U.S. 250, 259-
260 (2006) (stating that section 1983 "plaintiff must show a
causal connection between a defendant's retaliatory animus and
subsequent injury in any sort of retaliation action" and that
"causation is understood to be but-for causation, without which
the adverse action would not have been taken"); Tatro v. Kervin,
41 F.3d 9, 18 (1st Cir. 1994) (applying but-for causation and
noting plaintiff does not need to show "that the defendant's
sole motive was to chill the plaintiff's protected expression").
The summary judgment record must provide a basis "from which a
jury could reasonably find that . . . the defendants knew that
[the plaintiff] had filed the report with the AG Office."
Delaney v. Town of Abington, 890 F.3d at 6.

In the case at bar, the summary judgment record reveals
several facts that weigh in plaintiff's favor. First, plaintiff
made a written statement about the hunting incident dated

November 7, 2010. (Docket Entry # 81-1, Ex. 3). The report states that plaintiff "called the Massachusetts Environmental Police" and thereafter spoke and set up an appointment with a Massachusetts Environmental Police Officer. (Docket Entry # 81-1, Ex. 3, p. 19). Plaintiff's written statement concludes with the information that he will be asking the "the State Police and Attorney General [to] conduct an investigation regarding" the crime of the assault on him. (Docket Entry # 81-1, Ex. 3, p. 20). In his narrative report, Sergeant Cooke confirms that he received plaintiff's statement because the Massachusetts Environmental Police Officer provided him with a copy. (Docket Entry # 81-1, Ex. 2). Lieutenant Stephens telephoned Chief Sheehan and told him about the hunting incident and that plaintiff was considering reporting the TPD to the AGO because of his belief that the TPD treated him unfairly. (Docket Entry # 81-1, Ex. 5). This evidence allows a jury to reasonably infer and conclude that the TPD was aware of the AGO complaint, despite a number of defendants' deposition statements indicating the contrary.

There are also several facts from which a jury could reasonably infer that defendants' actions were retaliatory. One is the sheer quantity of chapter 209A violations for which plaintiff was charged. The fact that all of them were dismissed

could allow a jury to infer that defendants had agreed and decided to inundate plaintiff with meritless charges.

Furthermore, several incidents present unusual facts concerning defendants' efforts to detain plaintiff. For example, Lisa Mackey alleged that plaintiff violated the RO by having Melissa Mackey deliver a support payment on his behalf on July 17, 2012. (Docket Entry # 81-6, Ex. 55). Detective Regan's narrative report indicates multiple officers remained outside the residence of plaintiff's father while they waited for search and arrest warrants to be issued—though both were denied. (Docket Entry # 81-6, Ex. 55). In the incident on July 24, 2012, Lisa Mackey claimed that plaintiff had shut off her telephone service, but a jury could reasonably find that the TPD's investigation revealed she had done so herself. (Docket Entry # 81-6, Ex. 58). Chief Sheehan's narrative report reflects that a Verizon representative informed him the telephone was in Lisa Mackey's name and was disconnected because Lisa Mackey set "up a disconnect order." (Docket Entry # 81-6, Ex. 58). Sergeant Warren included this information in his narrative report. He nevertheless filed an application for a criminal complaint against plaintiff based on a chapter 209A violation, which his narrative report identifies as a violation of the RO's provision regarding utilities because plaintiff did not pay the telephone bill. (Docket Entry # 81-6, Ex. 58).

Sergeant Warren's only explanation was that his conclusion to find probable cause "[h]ad to be a mistake" and that he "screwed up when [he] was writing the report." (Docket Entry 81-4, Ex. 39, pp. 622-623).

In addition, on December 18, 2012, "at least" six officers and a K-9 attempted to arrest plaintiff within 24 hours of plaintiff missing a hearing. (Docket Entry # 81-1, Ex. 1, ¶¶ 10 (sent. 2), 12-13). Sergeant Warren testified that this was "not routine practice," that he did not "have any idea why it would have went that way," and that this response was "a little strange." (Docket Entry # 81-4, Ex. 39, p. 629). On February 21, 2013, multiple TPD officers went to the Lorum Street location where plaintiff was "watching a Bruins game" with friends based on Lisa Mackey's allegation that plaintiff's payment to her was postmarked Thursday of that week, rather than Wednesday. (Docket Entry # 76-37) (Docket Entry # 81-1, Ex. 1, ¶ 14) (Docket Entry # 81-8, Exs. 74, 76) (Docket Entry # 81-4, Ex. 38, pp. 559, 561).

In short, these incidents reflect substantial efforts to arrest plaintiff for minor or technical RO violations. The disproportionality of these responses allow a reasonable jury to infer that defendants were motivated by a retaliatory animus against plaintiff.

More evidence of animus appears in various defendants'
deposition testimony.  Lieutenant Stephens agreed that
"probably," "on more than one occasion," Chief Sheehan told him
"'[i]f there's a violation of this 209A order, I want you to use
all of your powers to locate [plaintiff].'"[48]  (Docket Entry #
81-4, Ex. 35, p. 374).  Lieutenant Stephens also testified that
he could not recall either Chief Sheehan or Deputy Chief Voto
ever "specifically tell[ing] [him] to make every available
effort to arrest everyone else for violation of a 209A order,
other than [plaintiff]."  (Docket Entry # 81-4, Ex. 35, p. 377).
Furthermore, during the incident on July 24, 2012, Chief Sheehan
was recorded asking, "[s]hould we still be locking this fucking
guy up and dragging his ass in because obviously they don't even
think we have the right to arrest because they're not putting it
on for a warrant."  (Docket Entry # 81-4, Ex. 32, p. 172).
Chief Sheehan agreed that he appeared to be "acknowledging that
the Lowell District Court [did]n't believe [he] ha[d] the
authority to arrest."  (Docket Entry # 81-4, Ex. 32, p. 172).
The disparaging remark with which Chief Sheehan referred to
plaintiff, combined with his apparent targeting of plaintiff for
chapter 209A violations, lend further support for a jury to
reasonably infer that, but-for plaintiff engaging in protected

---

[48]  The above testimony is not considered for the truth of the
matter asserted.

speech, defendants would not have pursued repeatedly and persistently the chapter 209A charges or acted in the above-noted manner against plaintiff.

In sum, the foregoing evidence allows a jury to reasonably infer and conclude that defendants were aware of plaintiff's complaint to the AGO and that this motivated defendants to retaliate against him by filing meritless charges and expending considerable efforts to detain him. Therefore, defendants are not entitled to summary judgment on the section 1983 First Amendment claim.

III. Supervisory Liability and Monell Claims (Counts II and III)

Defendants also move for summary judgment on the supervisory liability claim in Count II and the Monell claim in Count III against the Town, the TPD, and Chief Sheehan. Specifically, defendants argue:

> If there are no wrongful acts by an individual, then there can be no recovery against the Town, Police Department and/or Chief. As *discussed hereinabove*, summary judgment should enter for all the Defendants as they either had probable cause or because they are entitled to qualified immunity, thus precluding recovery from the Defendants.

(Docket Entry # 75, p. 25) (emphasis added).

As framed, defendants' brevis argument extends only to the matters they "discussed hereinabove." (Docket Entry # 75, p. 25). As previously explained, defendants limited their qualified immunity argument to the existence of probable cause

for the arrest and for the charges. Defendants therefore "discussed hereinabove" their qualified immunity on the section 1983 false arrest claim and for all of the charges based on the existence of probable cause for such charges. As also previously noted, for purposes of summary judgment only, defendants waived the argument that the malicious prosecution section 1983 claim in Count I fails on the basis that plaintiff was not deprived of a Fourth Amendment constitutional right.[49]

That said, defendants undeniably "discussed hereinabove" their entitlement to summary judgment on the false arrest section 1983 claim regarding the June 7, 2012 arrest on the basis of the clearly established prong of qualified immunity, which this court allowed. Accordingly, defendants' argument, as framed, reduces to the absence of derivative supervisory and Monell liability for the false arrest section 1983 claim in Count I.

---

[49] As to qualified immunity, this court did not address the Fourth Amendment claim based on the incidents occurring after the June 7, 2012 arrest because it was not clear if plaintiff wished to press such a claim because he addressed these incidents as a First Amendment violation, as explained in footnote 31 and the related text. Adhering to the same premise, in the event plaintiff does wish to press such a Fourth Amendment claim, defendants may renew the supervisory and Monell argument in their summary judgment motion regarding these post-arrest incidents on or before January 14, 2020. Again, any such renewal may not include additional argument or legal citations by either party. The expiration of the deadline to file summary judgment motions will not bar a motion to renew the existing summary judgment when limited in this respect.

In opposition to defendants' argument, plaintiff asserts that "[q]ualified immunity does not shield the Defendants' conduct in this case, and a reasonable factfinder could conclude that there was no probable cause to arrest and charge" him. (Docket Entry # 79, p. 22).  Plaintiff's two-sentence opposition on this point simply refers back to his qualified immunity argument regarding the section 1983 false arrest claim.  (Docket Entry # 79, p. 22).

First, plaintiff does not argue that allowing summary judgment on qualified immunity does not preterminate the supervisory and Monell claims, as defendants submit.  He therefore waives the contention that a defendant-favorable qualified immunity ruling does not foreclose supervisory and Monell liability.  See Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010); see also Curet-Velázquez v. ACEMLA de P.R., Inc., 656 F.3d 47, 54 (1st Cir. 2011) ("[a]rguments alluded to but not properly developed before a magistrate judge are deemed waived").  Second, defendants' argument has merit. See Machado v. Weare Police Dep't, 494 F. App'x 102, 107 (1st Cir. 2012) (explaining that because the arresting defendants' "actions either did not violate the Fourth Amendment or were protected by qualified immunity," this "resolves claims against other defendants of supervisory and municipal liability") (per curiam) (unpublished).  Accordingly, the supervisory and Monell

claims against the Town, the TPD, and Chief Sheehan are subject
to summary judgment albeit only on the section 1983 false arrest
claim based on the June 2012 arrest. The supervisory and <u>Monell</u>
claims based on the section 1983 First Amendment claim remain
intact because this court denied summary judgment on this
underlying claim.

IV. <u>False Arrest and False Imprisonment Claim (Count IV)</u>

Defendants argue that they are entitled to summary judgment
on the false arrest and false imprisonment common law claims in
Count IV. Specifically, they maintain that probable cause is a
defense for both claims and that they "had probable cause to
charge and arrest the Plaintiff based upon their reasonable
belief that a violation of a 209A order had taken place."
(Docket Entry # 75, p. 26). Plaintiff responds that "a
reasonable factfinder could conclude that no such probable cause
existed and, therefore, summary judgment on these claims is
inappropriate." (Docket Entry # 79, p. 29).

Count IV is premised solely on the June 7, 2012 arrest and
resulting purportedly false imprisonment overnight at the TPD.
(Docket Entry # 1, p. 53, ¶¶ 356-362). Plaintiff brings the
false arrest and false imprisonment claims against "Officer
Markus, Officer McMahon, and Lieutenant Stephens." (Docket
Entry # 1, p. 53). "Officer Markus" is not a named defendant.
The parties are therefore directed to determine if they can

stipulate that the count is brought against Officer McLaughlin as opposed to Officer Markus.[50]

The elements of a common law false arrest claim are: "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendant had no privilege to cause the confinement." Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 n.6 (1st Cir. 1995) (further noting that "[n]either actual malice nor lack of probable cause is an element of false arrest"). Unlike a section 1983 claim, the defendant in a false arrest claim based upon a warrantless arrest bears the burden of proving the presence of probable cause to justify the arrest. Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 564 (Mass. 2002). "Although probable cause is not an element of false arrest, the existence of probable cause defeats a false arrest claim." Cabot v. Lewis, 241 F. Supp. 3d 239, 259 (D. Mass. 2017).

In order "[t]o succeed on a claim of false imprisonment, a party must show an 'intentional and unlawful confinement of a person, either directly or indirectly, of which the person confined is conscious or is harmed by such confinement.'"

---

[50] Markus is Officer McMahon's first name.

Campbell v. Casey, 166 F. Supp. 3d 144, 152 (D. Mass. 2016)

(internal citation omitted); accord Walker v. Femino, 311 F.

Supp. 3d 441, 455 (D. Mass. 2018).  In the event "a police

officer has probable cause to arrest an individual, there is

legal justification for the confinement, and no cause of action

for false imprisonment under Massachusetts law."  Walker v.

Femino, 311 F. Supp. 3d at 455 (citations omitted).

As previously explained, "'[p]robable cause to arrest

exists when, at the moment of arrest, the facts and

circumstances within the knowledge of the police are enough to

warrant a prudent person in believing that the individual

arrested has committed or was committing an offense.'"

Commonwealth v. Wardsworth, 124 N.E.3d 662, 689 (Mass. 2019)

(internal citations omitted).  "The inquiry into probable cause

is an objective one," Commonwealth v. Hason, 439 N.E.2d 251, 255

(Mass. 1982), which entails "examin[ing] the events leading up

to the arrest, and then decid[ing] 'whether these historical

facts, viewed from the standpoint of an objectively reasonable

police officer, amount to' probable cause."  Md. v. Pringle, 540

U.S. at 371 (internal citation omitted).  "[R]easonably

trustworthy facts and circumstances" must exist that would

enable an objectively reasonable officer "to believe that the

arrestee has committed a crime."  Robinson v. Cook, 706 F.3d at

33.  Information "is trustworthy enough" if a reasonable police

officer would rely on it in forming a belief "about the suspect's conduct." Id. at 34. Information from a victim is ordinarily "'sufficiently reliable to support a finding of probable cause.'" Holder v. Town of Sandown, 585 F.3d at 505 (internal citations omitted); see also Robinson v. Cook, 706 F.3d at 33 (same standard governs probable cause for warrantless arrests under Fourth Amendment and Massachusetts Constitution).

For reasons previously stated, a violation of an order to vacate within a restraining order is a criminal offense under chapter 209A. Solely for purposes of resolving the false arrests and false imprisonment claims and for previously stated reasons, this court additionally concludes that an order to vacate in a restraining order encompasses an order not to shut off any utilities. Briefly reiterating the prior analysis, the definition of a "vacate order" in chapter 209A includes the directive that "the defendant shall not . . . shut off or cause to be shut off any utilities . . .." Mass. Gen. Laws ch. 209A, § 1. Construing the statute in this manner serves the statute's purpose of "creat[ing] a haven for the abused party in which no further abuse need be feared . . .." Commonwealth v. Gordon, 553 N.E.2d at 919. Enforcing an order not to shut off utilities as a criminal offense encompassed within a "vacate order" serves this purpose by allowing the victim to reside in a habitable home.

Whereas this court previously determined that probable cause was arguable for the June 7, 2012 arrest, the same reasons establish the existence of probable cause as a matter of law. Officers McMahon and McLaughlin observed that the telephone and the television were not functioning. (Docket Entry # 76-14). A Comcast representative confirmed that "the account" was in plaintiff's name and that payment was past due. (Docket Entry # 76-14). At that time, the officers had little reason to question Lisa Mackey's reliability. See Holder v. Town of Sandown, 585 F.3d at 505. She informed them that plaintiff "had not paid for" the "cable (phone *included*)" and that, under the RO, plaintiff "cannot shut off any utilities" at 68 Mitchell Drive. (Docket Entry # 76-14). With the service in plaintiff's name, the account past due, the telephone and television not functioning, and information that the RO prohibited plaintiff from shutting off any utilities and that plaintiff had not paid for the service, the officers had trustworthy information that the RO required plaintiff not to shut off any utility and that plaintiff violated that provision. An objectively reasonable officer would find probable cause based on the facts known to Officer McMahon, Officer McLaughlin, and Lieutenant Stephens at that time. Summary judgment in their favor is therefore warranted on the false arrest and false imprisonment claims in Count IV.

V. <u>Malicious Prosecution Claim (Count V)</u>

Defendants next maintain they are entitled to summary judgment on the common law malicious prosecution claim in Count V because "there is no evidence of malice and there was probable cause for the Plaintiff's arrest and criminal charges." (Docket Entry # 75, p. 26). Plaintiff responds that "[t]he record, as viewed in a light most favorable to [him], permits a reasonable factfinder to conclude that Defendants, with malice, brought nineteen baseless criminal charges against [him], all of which lacked probable cause and all of which were dismissed by the court." (Docket Entry # 79, p. 24).

In order to succeed in a malicious prosecution claim under Massachusetts law, "[a] plaintiff must establish that he was damaged because (1) the defendant commenced an original action without probable cause, (2) with malice, and (3) that the original action terminated in his favor." <u>Yacubian v. United States</u>, 750 F.3d 100, 108-09 (1st Cir. 2014). The SJC has, "in connection with the tort of malicious prosecution, defined 'malice' as denoting something other than what may be encompassed in the literal sense of the term." <u>Chervin v. The Travelers Ins. Co.</u>, 858 N.E.2d 746, 757 (Mass. 2006). Instead, it has "adopt[ed] the 'improper purpose' formulation in § 676 of the Restatement (Second) of Torts in place of the element of 'malice.'" <u>Id.</u> at 758. Thus, this element is satisfied if

"'the proceedings . . . [were] initiated or continued primarily for a purpose other than that of securing the proper adjudication of the claim on which they are based.'" Id. at 756 (quoting Restatement (Second) of Torts § 676 (1979)).  More specifically, "the plaintiff must show that defendants 'acted primarily for a purpose other than that of properly carrying out [their] duties, or w[ere] attempting to achieve an unlawful end or a lawful end through unlawful means, or intended to harass, vex, or annoy the plaintiff.'" D'Ambrosio v. City of Methuen, Civil Action No. 16-10534-MPK, 2019 WL 1438050, at *14 (D. Mass. Mar. 31, 2019) (quoting Williams v. City of Boston, 771 F. Supp. 2d 190, 206 (D. Mass. 2011)) (internal citations omitted), appeal filed, No. 19-1352 (1st Cir. Apr 16, 2019)).  One way this may occur is when "'the proceedings are begun primarily because of hostility or ill will.'" Chervin v. Travelers Ins. Co., 858 N.E.2d at 756. (quoting Restatement (Second) of Torts § 676, cmt. c, (1979)).

As discussed, a jury could reasonably infer that defendants arrested plaintiff and subjected him to meritless charges as retaliation for filing a complaint with the AGO.  Thus, it could find that defendants acted for a purpose other than carrying out their duties or for the purpose of harassing plaintiff. Material issues of fact therefore exist as to whether defendants

acted with an "improper motive" with respect to the malicious prosecution claim.

Turning to probable cause, in a common law malicious prosecution claim, a police officer acts with probable cause if he "acted reasonably in swearing out a complaint against the plaintiff on the basis of the information and knowledge which he possessed at that time." Lincoln v. Shea, 277 N.E.2d 699, 702 (Mass. 1972). It consists of "'facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested is guilty.'" Id. (internal citation omitted). The existence of probable cause also "depends on all of [the] facts of the case." Id.

A number of applications for criminal complaints belie the existence of probable cause particularly given the volume of applications against plaintiff and, as time passed, questions regarding Lisa Mackey's veracity. At a minimum, the applications based on the June 22, September 29, and November 12, 2012 incidents give rise to genuine issues of material fact.

In June 2012, Sergeant Warren applied for a criminal complaint in Lowell District Court for a chapter 209A violation based on the incident occurring on June 22, 2012 and supported by Officer Ryser's narrative report and Lisa Mackey's statement. (Docket Entry # 81-6, Ex. 51). The application for the criminal

complaint was based on a violation of chapter 209A for not complying with "a court order to refrain from abuse, to vacate the household . . ., [and/or] to have no contact with the plaintiff . . .." (Docket Entry # 81-6, Ex. 51). The narrative report recites Officer Ryser's interactions with Lisa Mackey and her statement that plaintiff had not paid her support due on Friday, June 15, 2012. (Docket Entry # 51). The report also outlines the discrepancies in the $150 and $75 amounts in the Probate Court's and the Lowell District Court's Orders. (Docket Entry # 81-6, Ex. 51).

Nonpayment of support, however, is not a criminal statutory offense under chapter 209A, as previously explained. Further, as to criminal contempt, the facts in the narrative report belie intentional conduct on the part of plaintiff because of Lisa Mackey's subsequent communication to Officer Ryser that her daughter informed her (Lisa Mackey) that plaintiff paid what he owed on June 22, 2012.[51] (Docket Entry # 81-6, Ex. 51); see Commonwealth v. Delaney, 682 N.E.2d at 617-18 ("to prove a defendant guilty of criminal contempt, the Commonwealth must prove beyond a reasonable doubt [inter alia], 'that the defendant clearly and intentionally disobeyed that order in

---

[51] Neither party objects to the above hearsay and double hearsay in the narrative report. See fn. 11; Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d at 420 n.2.

circumstances in which he was able to obey it'") (internal citations omitted).  Hence, at a minimum, a genuine issue of fact exists as to whether there was probable cause that plaintiff committed a crime.

Furthermore, Lisa Mackey's acknowledged falsification of a court document on June 21, 2012 at the TPD station raises questions regarding the veracity of her account on June 22, 2012 that plaintiff had not paid any support for the week on a timely basis.  (Docket Entry # 81-5, Ex. 50) (Docket Entry # 81-6, Ex. 51).  Thus, although uncorroborated information from a victim is ordinarily "'sufficiently reliable to support a finding of probable cause,'" Holder v. Town of Sandown, 585 F.3d at 505 (internal citations omitted), Lisa Mackey's known falsification of a court document the day before raises doubts regarding her veracity.  See Acosta v. Ames Dep't Stores, Inc., 386 F.3d at 10 (noting that "[i]n the absence of circumstances that would raise a reasonably prudent officer's antennae . . . uncorroborated testimony of a victim . . ., standing alone, ordinarily can support a finding of probable cause").

The applications Sergeant Warren filed based on the September 29 and November 16, 2012 incidents are similarly deficient.  (Docket Entry # 81-7, Ex. 64) (Docket Entry # 81-7, Ex. 70).  In or around July 2012, Chief Sheehan questioned whether the TPD had the right to arrest plaintiff because the

Lowell District Court was not acting on the applications for a warrant or "moving it on to a summons." (Docket Entry # 81-4, Ex. 32, p. 172). Sergeant Warren filed the September 29 and November 12, 2012 applications after Lisa Mackey admitted to falsifying a court document at the TPD station and her own daughter described her mother as a "pathological liar." (Docket Entry # 81-5, Ex. 50) (Docket Entry # 81-6, Ex. 60). Thus, by the time of the September 29 and November 16, 2012 incidents, Sergeant Warren had even more reason to question Lisa Mackey's credibility.

In light of the foregoing incidents, it is not necessary to make findings regarding all of the applications and charges brought by defendants regarding the probable-cause element of the malicious prosecution claim. The above-noted incidents adequately establish that the common law malicious prosecution claim survives summary judgment. Accordingly, defendants are not entitled to summary judgment on Count V.

VI.   Abuse of Process Claim (Count VI)

Defendants next seek summary judgment on the abuse of process claim because "the officers instituted all criminal complaints and requests for warrants based on probable cause" and "[t]he officers reasonably believed that the Plaintiff had violated a provision of the 209A order." (Docket Entry # 75, p. 27). Plaintiff responds that that "a reasonable factfinder

could conclude that no such probable cause existed and, therefore, summary judgment" is inappropriate. (Docket Entry # 79, p. 29).

"Under Massachusetts law, an abuse of process claim requires a plaintiff to show that 'process' was used for an ulterior or illegitimate purpose and resulted in damages." Yacubian, 750 F.3d at 110 (internal citation omitted); see also 477 Harrison Ave., LLC v. Jace Bos., LLC, 74 N.E.3d 1237, 1244 (Mass. 2017) ("abuse of process claim involves three elements: '[1] that process was used, [2] for an ulterior or illegitimate purpose, [3] resulting in damage'") (internal citation omitted). The premise upon which defendants base their two-sentence argument, i.e., the absence of probable cause and the officers' reasonable belief that plaintiff violated chapter 209A, does not necessarily absolve them of liability. An abuse of process claim is "distinct" from false arrest and malicious prosecution claims "to the extent that it can be held to lie regardless of whether there was probable cause." Santiago v. Fenton, 891 F.2d 373, 388 (1st Cir. 1989). In fact, "probable cause is irrelevant to an abuse of process claim." Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d at 563; see Quaranto v. Silverman, 187 N.E.2d 859, 861 (Mass. 1963) (noting "'[i]t is immaterial that the process . . . was obtained in the course of proceedings which were brought with probable cause'") (internal citation

omitted). While there may be other arguments that dispel

defendants' liability for abuse of process, the absence of

probable cause is not one of them. Absent a viable argument,

summary judgment is not appropriate on Count VI.

VII. Civil Conspiracy Claim (Count VII)

Defendants next submit they are entitled to summary

judgment on the civil conspiracy claim because "[t]he Plaintiff

has not put forth any evidence that the Defendants conspired to

violate his federal and state Constitutional rights." (Docket

Entry # 75, p. 28). Plaintiff responds that:

> [A] reasonable factfinder could conclude that Defendants
> conspired to violate Mr. Mackey's rights and conspired to
> engage in malicious prosecution based on the totality of
> Defendants' conduct, including, but not limited to, Chief
> Sheehan's directive to arrest Mr. Mackey for all perceived
> violations of the RO. As Chief of the TPD, Chief Sheehan
> undoubtedly knew that all violations of the terms of a 209A
> order are not arrestable. A jury could disbelieve his
> testimony to the contrary and draw the inference that
> Defendants' conduct was deliberate.

(Docket Entry # 79, p. 29).

"Under Massachusetts law, either of two possible causes of

action may be called 'civil conspiracy.'" Aetna Cas. Sur. Co.

v. P & B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994). The more

common one, and the one alleged in the case at bar, is the

"'concerted action'" type. Id. at 1564. This requires

plaintiff to "show an underlying tortious act in which two or

more persons acted in concert and in furtherance of a common

122

design or agreement." Bartle v. Berry, 953 N.E.2d 243, 253 (Mass. App. Ct. 2011). "'[T]his type of civil conspiracy requires an underlying tort and the conspiracy consists in agreeing to, or assisting in, this underlying tort.'" Thomas v. Harrington, 909 F.3d 483, 490 (1st Cir. 2018) (internal brackets and citation omitted); Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 244 (D. Mass. 1999) (concerted form of civil conspiracy "is 'more akin to a theory of common law joint liability in tort'") (internal citation omitted). A concerted action form of civil conspiracy requires a plaintiff to "show that defendants either (1) acted 'in concert with or pursuant to a common design with' the tortfeasor or (2) 'gave substantial assistance to' the tortfeasor's conduct." Thomas v. Harrington, 909 F.3d at 490 (quoting Kyte v. Philip Morris Inc., 556 N.E.2d 1025, 1027 (Mass. 1990)). The facts here give rise to the "'common design'" theory under which "a plaintiff must show 'first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement.'" Id. (quoting Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d at 1564. Generally, the "'agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances.'"

Williams v. City of Bos., 771 F. Supp. 2d 190, 205 (D. Mass.
2011) (quoting Earle v. Benoit, 850 F.2d 836, 843 (1st Cir.
1988)).

As discussed, a jury could reasonably infer that defendants
were aware of plaintiff's complaint to the AGO and that this
complaint prompted defendants to inundate him with charges that
were not criminal offenses under chapter 209A.  It is noteworthy
that, "on more than one occasion," Chief Sheehan told Lieutenant
Stephens that, "'[i]f there's a violation of this 209A order, I
want you to use all of your powers to locate [plaintiff].'"
(Docket Entry # 81-4, Ex. 35, p. 374).  Moreover, Lieutenant
Stephens testified that neither Chief Sheehan nor Deputy Chief
Voto ever "specifically t[old] [him] to make every available
effort to arrest everyone else for violation of a 209A order,
other than [plaintiff]."  (Docket Entry # 81-4, Ex. 35, p. 377).
These facts, and others discussed previously, allow a reasonable
jury to find that various criminal charges were the product of a
"'common design or an agreement'" among defendants "'to do a
wrongful act.'"  Thomas v. Harrington, 909 F.3d at 490 (internal
citation omitted); see Bartle v. Berry, 953 N.E.2d at 253.
Hence, summary judgment on Count VII is not warranted.

VIII.  IIED Claim (Count VIII)

Defendants argue that they are entitled to summary judgment
on the IIED claim because their "actions were not 'extreme and

124

outrageous'" and because "the Plaintiff's emotional distress is not so 'severe.'" (Docket Entry # 75, pp. 28-29). Plaintiff responds that "[a] reasonable factfinder could conclude that Defendants' initiation of nineteen baseless criminal charges against [him] . . . was extreme and outrageous" and that, "[a]s a result of Defendants' conduct, [he] was forced to live in panic and fear of being arrested, to the extent that he had to stay inside his home whenever possible, stay in out-of-town hotels, and ride around town in the trunk of a car." (Docket Entry # 79, p. 30). He alleges that "[t]his fear and panic resulted in depression, anxiety, headaches, stomach pain, sleeplessness, and grinding of teeth." (Docket Entry # 79, p. 30).

"To make out a claim of intentional infliction of emotional distress," plaintiffs must "show (1) that [defendant] intended, knew, or should have known that [his] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014). "'The standard for making a claim of intentional infliction of emotional distress is very high.'" Id. (internal citations omitted). As explained by the court in Polay:

> Liability cannot be predicated on mere insults,
> indignities, threats, annoyances, petty oppressions, or
> other trivialities, nor even is it enough that the
> defendant has acted with an intent which is tortious or
> even criminal, or that he has intended to inflict emotional
> distress, or even that his conduct has been characterized
> by malice, or a degree of aggravation which would entitle
> the plaintiff to punitive damages for another tort.
> Conduct qualifies as extreme and outrageous only if it
> go[es] beyond all possible bounds of decency, and [is]
> regarded as atrocious, and utterly intolerable in a
> civilized community.

Id. at 385-386 (internal citations and quotation marks omitted).

Based on the totality of the circumstances, "'[r]epeated

harassment . . . may compound the outrageousness of incidents

which, taken individually, might not be sufficiently extreme to

warrant liability for infliction of emotional distress.'" Sindi

v. El-Moslimany, 896 F.3d 1, 21 (1st Cir. 2018) (quoting Boyle

v. Wenk, 392 N.E.2d 1053, 1056 (Mass. 1979)).  When assessing

the severity of plaintiff's distress, factors to consider

"include (1) the nature and character of the alleged harm; (2)

the severity of the harm; (3) the length of time the complainant

has suffered and reasonably expects to suffer; and (4) whether

the complainant has attempted to mitigate the harm."  Stonehill

Coll. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 205,

225 (Mass. 2004).

It is true that "applying for an arrest warrant . . . can

[not] be considered 'utterly intolerable in a civilized

community.'"  Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass.

1994) (quoting Agis v. Howard Johnson Co., 355 N.E.2d 315, 319

(Mass. 1976)).  As noted, however, "[r]epeated harassment . . .

may compound the outrageousness of incidents which, taken

individually, might not be sufficiently extreme to warrant

liability for infliction of emotional distress." Boyle, 392

N.E.2d at 1056.  Here, a jury could conclude that the sheer

scale and duration of defendants' "campaign" of harassment

rendered it extreme and outrageous.  Examples include multiple

officers staking out the home of plaintiff's father on July 17,

2012 in response to Lisa Mackey's assertion that Melissa Mackey

delivered the support payment from plaintiff to Lisa Mackey on

Friday, July 13, 2017.  (Docket Entry # 81-6, Ex. 55).  The

court denied Detective Regan's applications for search and

arrest warrants.  (Docket Entry # 81-6, Ex. 55).  On December

18, 2012, "at least six TPD officers" "and a K-9" surrounded

plaintiff's home after plaintiff missed a court date the

previous day.  (Docket Entry # 81-1, Ex. 1, ¶¶ 11-12).  As

previously recounted, on February 21, 2013, multiple police

officers went to the Lorum Street property to locate plaintiff

in light of Lisa Mackey's allegation that he mailed a support

payment on a Thursday as opposed to a Wednesday.  (Docket Entry

# 81-8, Exs. 74, 76) (Docket Entry # 81-1, Ex. 1) (Docket Entry

# 81-4, Ex. 38, p. 559).

Furthermore, plaintiff's emotional distress is similar to that of the plaintiff in Sindi: "depression, anxiety, headaches, stomach pain, grinding of teeth" and sleeplessness. (Docket Entry # 81-5, Ex. 47, p. 568); see Sindi v. El-Moslimany, 896 F.3d at 22 (recounting plaintiff's testimony of experiencing anguish that "manifested itself in diverse ways including lost sleep, blinding headaches, heart palpitations, and fears for her safety" over extended time period). Plaintiff also lived in fear from the time of the June 7, 2012 arrest to at least January 2016 causing him to confine himself to his home, hide in trunks of cars, and stay in hotel rooms outside Tewksbury. (Docket Entry # 81-5, Ex. 47, p. 568).

Accordingly, a jury could find the necessary extreme and outrageous conduct as well as conclude that plaintiff suffered severe emotional distress. Summary judgment on Count VIII is therefore not appropriate.

IX. MCRA Claim (Count IX)

With respect to Count IX, plaintiff is correct that defendants' memorandum "does not articulate why summary judgment is appropriate on [his] claim under the Massachusetts Civil Rights Act." (Docket Entry # 79, p. 23). Rather, defendants merely describe the law governing an MCRA claim without making any argument for summary judgment in their favor. (Docket Entry # 75, pp. 29-30). Defendants therefore waived any argument for

summary judgment on the MCRA claim in Count IX.  See <u>Guillemard-</u>
<u>Ginorio v. Contreras-Gomez</u>, 490 F.3d 31, 37 (1st Cir. 2007)
("'issues adverted to in a perfunctory manner, unaccompanied by
some effort at developed argumentation, are deemed waived'")
(internal citations omitted).

CONCLUSION

In accordance with the foregoing discussion, the motion for
summary judgment (Docket Entry # 74) is **ALLOWED** as to the false
arrest claim based on the June 2012 arrest in Count I; the
supervisory and <u>Monell</u> claims in counts II and III only on the
section 1983 false arrest claim based on the June 2012 arrest;
and Count IV.  The motion (Docket Entry # 74) is otherwise
**DENIED**.  Plaintiff's Rule 56(f)(1) request for partial summary
judgment in plaintiff's opposition to summary judgment (Docket
Entry # 79, fn. 1) is **DENIED**.  The parties shall appear for a
status conference on January 16, 2020, at 2:45 p.m. to set a
trial date.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge